# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION - DETROIT

**IN THE MATTER OF:**

| | |
|---|---|
| Sheldon M. Korn,<br><br>                    Debtor. | Bankruptcy Case No. 14-41173<br>Chapter 7<br>Hon. Thomas J. Tucker |

Lawrence Lenchner; Harbor Building
Company, LLC; Northern Grading, Excavating
& Septic, LLC; Abington Development, Inc.;
Bridgestone Development, LLC; and Clarita
Commons Development, LLC

                    Plaintiffs,

v.

Sheldon M. Korn

                    Defendant.

Adversary Proceeding No. 14-04408
Hon. Thomas J. Tucker

## MOTION FOR PARTIAL SUMMARY JUDGMENT

NOW COME Harbor Building Company, LLC, Discount Homes, LLC, Northern Grading, Excavating & Septic, LLC, Abington Development Company, Inc., Bridgestone Development, LLC, Clarita Commons Development, LLC, and Lawrence Lenchner (collectively, "Plaintiffs"), by and through their counsel, Stevenson & Bullock, P.L.C., who hereby move this Court for an Order granting partial summary judgment in favor of the Plaintiffs in substantially the same form as attached hereto as Exhibit 1. Plaintiffs, through their Counsel, for their Motion states:

1. The Plaintiffs rely on the law and arguments as set forth in the attached Brief in Support.

2. Pursuant to E.D. Mich. LBR 9014-1(g), counsel for the Plaintiffs has previously requested that Defendant concur with the relief sought herein; however, as of the time of filing this Motion, no such concurrence was granted.

WHEREFORE, Plaintiffs, Harbor Building Company, LLC, Discount Homes, LLC, Northern Grading, Excavating & Septic, LLC, Abington Development Company, Inc., Bridgestone Development, LLC, Clarita Commons Development, LLC, and Lawrence Lenchner, respectfully request that this Honorable Court enter the proposed Order Granting Partial Summary Judgment attached hereto as Exhibit 1, and order any additional relief that the Court deems appropriate.

Respectfully submitted,
**STEVENSON & BULLOCK, P.L.C.**

By: /s/ Elliot G. Crowder
Elliot G. Crowder (P76137)
Counsel for Plaintiffs
26100 American Drive, Suite 500
Southfield, MI 48034
Phone: (248) 354-7906
Facsimile: (248) 354-7907
Email: ecrowder@sbplclaw.com

Dated: October 1, 2014

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION - DETROIT**

**IN THE MATTER OF:**

| | |
|---|---|
| Sheldon M. Korn, | Bankruptcy Case No. 14-41173 |
| | Chapter 7 |
| Debtor. | Hon. Thomas J. Tucker |
| | |
| | Adversary Proceeding No. 14-04408 |
| Lawrence Lenchner; Harbor Building | Hon. Thomas J. Tucker |
| Company, LLC; Northern Grading, Excavating | |
| & Septic, LLC; Abington Development, Inc.; | |
| Bridgestone Development, LLC; and Clarita | |
| Commons Development, LLC | |
| | |
| Plaintiffs, | |
| v. | |
| | |
| Sheldon M. Korn | |
| | |
| Defendant. | |

**ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT**

THIS MATTER having come before this Honorable Court upon the Plaintiffs' Motion for Partial Summary Judgment (the "Motion"); notice having been proper; no objections having been timely filed, or any such timely filed objections having been overruled; and the Court being otherwise duly advised in the premises;

NOW THEREFORE;

IT IS HEREBY ORDERED that Plaintiffs' Motion is GRANTED.

IT IS FURTHER ORDERED that Count IV of Plaintiffs' Complaint Objecting to Debtor's Discharge Pursuant to 11 U.S.C. § 727 and Dischargeability of Debt Pursuant to 11 U.S.C. § 523 (the "Complaint") is granted pursuant to Rule 56 of the Federal Rules of Civil

Procedure, made applicable to this Proceeding pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. § 523(a)(2)(A).

IT IS FURTHER ORDERED that Count V of Plaintiff's Complaint is granted pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to this Proceeding pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. § 523(a)(2)(A).

IT IS FURTHER ORDERED that Count VI of Plaintiff's Complaint is granted pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to this Proceeding pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. § 523(a)(2)(A).

IT IS FURTHER ORDERED that Count VII of Plaintiff's Complaint is granted pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to this Proceeding pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. § 523(a)(4).

IT IS FURTHER ORDERED that Count VIII of Plaintiff's Complaint is granted pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to this Proceeding pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. § 523(a)(6).

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION - DETROIT**

**IN THE MATTER OF:**

| | |
|---|---|
| Sheldon M. Korn, | Bankruptcy Case No. 14-41173 |
| | Chapter 7 |
| Debtor. | Hon. Thomas J. Tucker |
| | |
| | Adversary Proceeding No. 14-04408 |
| Lawrence Lenchner; Harbor Building | Hon. Thomas J. Tucker |
| Company, LLC; Northern Grading, Excavating | |
| & Septic, LLC; Abington Development, Inc.; | |
| Bridgestone Development, LLC; and Clarita | |
| Commons Development, LLC | |
| | |
| Plaintiffs, | |
| v. | |
| Sheldon M. Korn | |
| Defendant. | |

**NOTICE AND OPPORTUNITY TO OBJECT TO**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that Harbor Building Company, LLC, Discount Homes, LLC, Northern Grading, Excavating & Septic, LLC, Abington Development Company, Inc., Bridgestone Development, LLC, Clarita Commons Development, LLC, and Lawrence Lenchner (collectively, "Plaintiffs"), by and through their counsel, Stevenson & Bullock, P.L.C., has filed a Motion for Partial Summary Judgment ("Motion").

Your rights may be affected.  You may wish to review the Motion and discuss it with your attorney, if you have one in this bankruptcy case.  If you do not have an attorney, you may wish to consult one.

If you wish to object to the Court granting the relief sought in the Motion, or if you want the Court to otherwise consider your views on the Motion, within fourteen (14) days of service of the Motion, or such shorter time as the Court may hereafter order, you or your attorney must:

1. File with the Court a written response or an answer[1], explaining your position at:

United States Bankruptcy Court
211 West Fort Street
Detroit, Michigan 48226

If you mail your response to the Court for filing, you must mail it early enough so the Court will receive it on or before the date stated above.

You must also mail a copy to:

Stevenson & Bullock, P.L.C.
Attn.: Elliot G. Crowder
26100 American Drive, Suite 500
Southfield, Michigan 48034

-and-

Office of the United States Trustee
211 West Fort Street, Suite 700
Detroit, Michigan 48226

If a response or answer is timely filed and served, the clerk may schedule a hearing on the Motion and you will be served with a notice of the date, time, and location of the hearing.

If you or your attorney do not take these steps, the Court may decide that you do not oppose the relief sought in the Motion and may enter an Order granting the relief sought therein.

---

[1] Response or answer must comply with FED.R.CIV.P. 8(b), (c), and (e).

Respectfully submitted,
**STEVENSON & BULLOCK, P.L.C.**

By: /s/ Elliot G. Crowder
Elliot G. Crowder (P76137)
Counsel for Plaintiffs
26100 American Drive, Suite 500
Southfield, MI 48034
Phone: (248) 354-7906
Facsimile: (248) 354-7907
Email: ecrowder@sbplclaw.com

Dated: October 1, 2014

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION - DETROIT

**IN THE MATTER OF:**

Sheldon M. Korn,

                    Debtor.

Bankruptcy Case No. 14-41173
Chapter 7
Hon. Thomas J. Tucker

Adversary Proceeding No. 14-04408
Hon. Thomas J. Tucker

Lawrence Lenchner; Harbor Building
Company, LLC; Northern Grading, Excavating
& Septic, LLC; Abington Development, Inc.;
Bridgestone Development, LLC; and Clarita
Commons Development, LLC

                    Plaintiffs,

v.

Sheldon M. Korn

                    Defendant.

## BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

NOW COME Plaintiffs, by and through their counsel, Stevenson & Bullock, P.L.C., who hereby state as follows in support of their Motion for Partial Summary Judgment:

### INTRODUCTION

Given the principles of collateral estoppel, the Plaintiffs are entitled to summary judgment in this proceeding, because no issues of genuine material fact remain. The same issues regarding the Defendant's fraudulent conduct have been previously adjudicated by a trial court and empaneled jury in the Charlevoix County Circuit Court, affirmed by the Michigan Court of Appeals, and Defendant's appeal to the Michigan Supreme Court was denied. There was a final judgment on the merits, and the Defendant was a party in the prior adjudication. Accordingly, the fraud judgment against the Defendant and in favor of the Plaintiffs should be given

1

preclusive effect by this Court and the debt owed by Defendant should be deemed nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).

**STATEMENT OF FACTS**

Prior to the Defendant, Sheldon M. Korn, (the "Defendant") filing a voluntary petition for relief under Chapter 7 of Title 11 United States Code (the "Bankruptcy Code"), in January of 2003, he, along with his wife, Gale Korn, and the Korn Family Limited Partnership ("KFLP"), a partnership formed in order to avoid collection efforts by the Defendant's creditors, filed a lawsuit against the Plaintiffs in the Charlevoix County Circuit Court (the "State Court Lawsuit").

In general, the Defendant alleged that he was "partners" with Lenchner in various business ventures. A copy of the Complaint from the State Court Lawsuit is attached hereto as Exhibit A. The Plaintiffs in this proceeding denied the allegations lodged by the Defendant and filed an answer and counter claim (the "Counterclaim"). A copy of the Counterclaim is attached hereto as Exhibit B. In the Counterclaim, the Plaintiffs asserted claims for: (1) conversion; (2) civil conspiracy to commit conversion; (3) breach of fiduciary duty; (4) civil conspiracy to commit breach of fiduciary duty; (5) fraud; (6) silent fraud; (7) innocent misrepresentation; (8) conspiracy to commit fraud, silent fraud, and innocent misrepresentation; (9) promissory estoppel; (10) unjust enrichment; and (11) constructive trust.

The claims of breach of fiduciary duty, fraud and misrepresentation, silent fraud, promissory estoppel, and unjust enrichment were presented to the jury nearly three and a half years after the filing of the State Court Lawsuit. The trial began on May 1, 2006 and continued to May 26, 2006 before the Honorable Richard Pajtas. Trial included multiple days of testimony from both the Plaintiff and Defendant. During Defendant's testimony, he admitted to repeatedly lying under oath. Exhibit C Transcript excerpts from May 2, 2006 trial testimony; Pages 164-

169, 171-179; 190-197. Defendant also admitted at trial that he had repeatedly denied, under oath in a sworn deposition in another matter, that he was an owner, or received any compensation for any "work" or consulting services he allegedly provided to the Plaintiffs. (*Id.* pp. 164-169). He also admitted at trial that he denied, repeatedly and under oath, in that same deposition, that he was a partner with Lawrence C. Lenchner or anyone else. *Id.* He also denied, under oath in yet another deposition, to having any interest in real estate other than his two homes, and stated that he was "retired" and didn't need to work. *Id.*

Defendant further admitted to submitting a claim to his insurance company in 1991, again made under oath, stating that he was completely disabled and unable to work. Ex. C at pp. 190-210. The Defendant furthered these false sworn statements on a monthly basis to the insurance company until sometime in 2001, remarkably admitting to nearly ten full years of false sworn statements. *Id.*

After the conclusion of nearly one month of testimony, the jury rejected all of the Defendant's claims and returned a verdict in favor of the Plaintiffs for unjust enrichment, silent fraud, breach of fiduciary duty, and fraud and misrepresentation. The verdict in favor of the Plaintiffs totaled $1,745,000.00 (plus interest and taxable costs). A copy of the Judgment is attached hereto as Exhibit D.

Even after the lengthy State Court Lawsuit and the overwhelming jury verdict, the Defendant requested a judgment notwithstanding the verdict, and after its denial by the trial court, chose to appeal the judgment of fraud and misrepresentation, silent fraud, unjust enrichment, and exemplary damages to the Michigan Court of Appeals.

The Michigan Court of Appeals rejected the Defendant's arguments and entered an Opinion denying the appeal. A copy of the Opinion is attached hereto as Exhibit E. Importantly,

3

during that appellate process, the Defendant's main argument was that his co-counter defendants (his wife, daughters, and KFLP) may not be found liable for the fraud <u>that he alone perpetrated</u>. *Id.* at Page 3 (emphasis added).

In the Opinion, the Michigan Court of Appeals wholly rejected the Defendant's arguments appealing the fraud judgment and noted that the "[Plaintiffs] offered evidence that Sheldon agreed to act like a partner, but did not; this induced Lenchner to fund the companies that the Korns looted." <u>Ex. E</u> at 4. The Court also stated that "the jury could have reasonably found that Sheldon's promise to fully participate in a partnership by contributing capital and agreeing to personally be responsible for company debts, as Lenchner was, induced Lenchner to continue funding the companies from which the Korns siphoned funds for the benefit of all Korns. […] More important, the jury could reasonably have determined from the evidence that Sheldon never intended to fulfill his promise, intended Lenchner to rely and act on it, and that Lenchner and his companies reasonably relied on the false promise and were thereby defrauded." *Id.* at 5. The Court also found that there was evidence that "promises were made, <u>especially by Sheldon</u>, that questionable company expenditures would be documented and accounted for as business expenses." *Id.* at 6 (emphasis added).

Yet again, an appeal was initiated by the Defendant; however, this last gasp to the Michigan Supreme Court was rejected when the Michigan Supreme Court denied the Defendant's request for leave to appeal. <u>Exhibit F</u>. The State Court Lawsuit, and appeals to the Michigan Court of Appeals and Michigan Supreme Court are hereafter collectively referred to as the Prepetition Litigation.

Due to the principles of collateral estoppel, the Defendant must be precluded from re-litigating the issues and facts previously presented in the Prepetition Litigation and summary

4

judgment must be granted in favor of the Plaintiffs and against Defendant. Accordingly, the

Judgment against the Defendant is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A),

(a)(4), and (a)(6).

## STANDARD OF REVIEW

When deciding a motion for summary judgment under Rule 56(c) of the Federal Rules of

Civil Procedure, made applicable to bankruptcy proceedings via Rule 7056 of the Federal Rules

of Bankruptcy Procedure:

> The pleadings, depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any, show that there is no genuine issue as to any
> material fact and that the moving party is entitled to judgment as a matter of law.
> A fact is 'material' and precludes grant of summary judgment if proof of that fact
> would have [the] effect of establishing or refuting one of the essential elements of
> the cause of action or defense asserted by the parties, and would necessarily affect
> [the] application of appropriate principle[s] of law to the rights and obligations of
> the parties. The court must view the evidence in a light most favorable to the
> nonmovant as well as draw all reasonable inferences in the nonmovant's favor.

*United States v. Certain Real Prop.*, 800 F. Supp. 547, 549-50 (E.D. Mich. 1992)

Summary judgment is only appropriate when there is no genuine issue of material fact

and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247 (1986) (emphasis added). "[T]he mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact." *Id*. at 247-48. A

genuine issue is present "'if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'" *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998) (quoting

*Anderson* at 248).

The rule also requires the dispute to be genuine. A dispute is genuine only if a reasonable

jury could return judgment for the non-moving party. *Anderson v. Liberty Lobby, Inc.* at 248.

This standard requires the non-moving party to present more than a scintilla of evidence to defeat the motion. *Id*. at 251 (citing *Improvement Co. v. Munson*, 81 U.S. 442 (1872)). The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)).

Furthermore, Fed.R.Bankr.P. 7056 provides that a motion for summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *In Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149-50 (6th Cir. 1995).

In this proceeding, no genuine issue of material fact is present because the Judgment and Opinion, finding Defendant to have defrauded the Plaintiffs, must be given preclusive effect pursuant to the principles of collateral estoppel and such findings satisfy the requisite elements of §§ 523(a)(2)(A), (a)(4), and (a)(6), thus resulting in a non-dischargeable judgment in favor of the Plaintiffs.

## <u>ARGUMENT</u>

### I. The Judgment and subsequent Opinion against Defendant must be given collateral estoppel effect in the instant adversary proceeding

*A. Collateral Estoppel, Generally*

The Full Faith and Credit Clause of the Constitution and its implementing statute, 28 U.S.C. § 1738, require "federal courts to give full faith and credit to judicial proceedings of state courts." *Bay Area Factors v. Calvert (In re Calvert)* 105 F.3d 315, 317 (6th Cir. 1997). The principle of full faith and credit is put into effect via the doctrine of collateral estoppel, which applies in dischargeability actions. *Grogan v. Garner*, 489 U.S. 279 (1991). This application of

collateral estoppel principles to the determination that a debt is nondischargeable must "begin with the fundamental principle that 'judicial proceedings [of any court of any state] shall have the same full faith and credit in every court within the United States." *Rally Hill Productions v. Bursack (In re Bursack),* 65 F.3d 51, 53 (6th Cir. 1995).

"Even though Congress intended the bankruptcy court to determine the issue of whether a debt is dischargeable, Congress did not require the bankruptcy court to redetermine all of the underlying facts." *Bldg. Communs., Inc. v. Rahaim (In re Rahaim)*, 324 B.R. 29, 34 (Bankr. E.D. Mich. 2005) (citing *Spilman v. Harley*, 656 F.2d 224, 227 (6th Cir. 1981)). A court "must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Bd. of Educ.,* 465 U.S. 75, 81 (1984). Additionally, "the Sixth Circuit has held that the application of collateral estoppel in a non-dischargeability action depends upon whether the applicable State law would give collateral estoppel effect to the judgment." *Ed Schory & Sons, Inc. v. Francis (In re Francis)* 226 B.R. 385, 388 (BAP 6th Cir. 1998) (citing *Bay Area Factors v. Calvert*, 105 F.3d 315 (6th Cir. 1997)).

If the state courts would give preclusive effect to the judgment, then the bankruptcy court must also give the judgment preclusive effect, "unless Congress has expressly or impliedly created an exception to 28 U.S.C. § 1738 which ought to apply to the facts before the federal court. *Calvert* at 317 (quoting *Marrese v. Am. Acad. of Orthopedic Surgeons*, 470 U.S. 373, 386 (1985)). Notably, the Sixth Circuit in *Calvert* specifically held that there is no such express or implied exception under 28 U.S.C. § 1738 in dischargeability actions "in the Bankruptcy Code or legislative history." *Id.* at 322.

7

B.  *Collateral Estoppel in Michigan*

The doctrine of collateral estoppel prevents an issue from being re-litigated where the issue was actually litigated and necessarily decided, and the issue was essential to the final judgment in the prior proceeding.  *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997).  In the instant proceeding, the Judgment was rendered by the Charlevoix County Circuit Court.  Thus, this Court must give that Judgment the same preclusive effect that any Michigan state court would give it.

In Michigan, collateral estoppel prevents an issue from being relitigated where the same issue of fact or law was actually litigated and necessarily determined in a prior action between the same parties.  *People v. Gates*, 434 Mich. 146, 154 (1990).  Under Michigan law, collateral estoppel applies when:

(1) There is identity of parties across the proceedings,
(2) There was a valid, final judgment in the first proceeding,
(3) The same issue was actually litigated and necessarily determined in the first proceeding, and
(4) The party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding.

*Phillips v Weissert (In re Phillips)*, 434 BR 475, 485 (B.A.P. 6th Cir. 2010).

C.  <u>*Collateral estoppel as applied to the Prepetition Litigation and this Proceeding*</u>

In the instant case, all of the elements of collateral estoppel have been met.  First, the identity of the parties in both proceedings are identical.  Second, there was a valid and final judgment rendered in the State Court Lawsuit and affirmed by the Michigan Court of Appeals.  Third, the conduct of the Defendant against the Plaintiffs was actually litigated and necessarily determined in the Prepetition Litigation.  Lastly, the Defendant had a full and fair opportunity to litigate in the Prepetition Litigation.  Consequently, the Plaintiffs are entitled to partial summary

judgment on all of the issues litigated and determined in the Prepetition Litigation in this adversary proceeding.

## Identity of Parties

First, there is identity of the parties between the Prepetition Litigation and this proceeding. Both the Plaintiffs and Defendants were parties to the Prepetition Litigation at the trial court in which the Judgment was entered and the appellate courts, in which the Opinion was entered. Thus, the first element for collateral estoppel is satisfied.

## Valid and Final Judgment

Second, there was a valid and final judgment in the State Court Lawsuit. After a trial that encompassed almost one full month, and included testimony from the Defendant himself, a jury returned a verdict in favor of the Plaintiffs and against the Defendant. The Judgment was appealed by the Defendant to the Michigan Court of Appeals, who affirmed the Judgment and rendered the Opinion. The Defendant next sought leave to appeal to the Michigan Supreme Court; however, the request was denied. Because the Judgment and Opinion are final and valid, the Plaintiffs satisfy the second requirement to apply collateral estoppel to this proceeding.

## The Same Issues Were Actually Litigated and Necessarily Determined

Third, the same issues of fraud necessary for this Court to grant the Motion and award summary judgment in favor of the Plaintiffs were actually litigated and necessarily determined in the State Court Lawsuit.

### Counts IV-VI: 11 U.S.C. § 523(a)(2)(A)

The Plaintiffs have alleged that the debts owed by the Defendant are nondischargeable pursuant to § 523(a)(2)(A) for money, property, services, or an extension, renewal, or

refinancing of credit obtained by false pretenses (Count IV), false representation (Count V), and actual fraud (Count VI). Section 523(a)(2)(A) of the Bankruptcy Code provides as follows:

> (a) A discharge under section 727, 1141, 1228 (a), 1228 (b), or 1328 (b) of this title does not discharge an individual debtor from any debt—
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A). "Section 523(a)(2)(A) of the Bankruptcy Code implements the long-standing bankruptcy policy that only those debts which are honestly incurred are entitled to the benefits of a bankruptcy discharge." *Mack v. Mills (In re Mills)*, 345 B.R. 598, 603 (Bankr. N.D. Ohio 2006). "Congress concluded that preventing fraud is more important than letting defrauders start over with a clean slate…." *Mayer v. Spanel International, Ltd. (In re Mayer)*, 51 F.3d 670, 674 (7th Cir. 1995). Stated otherwise, "perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir. 1999) (citing *Cohen v. De La Cruz*, 523 U.S. 213,217; 118 S. Ct. 1212; 140 L.Ed.2d 341 (1998)).

The court in *Shafer v. Rapp (In re Rapp)*, 375 B.R. 421 (Bankr. S.D. Ohio 2007) set forth the following standards for establishing nondischargeability under § 523(a)(2)(A):

> Section 523(a)(2)(A) is phrased in the disjunctive; it described three distinct categories of debtor misconduct that will give rise to a non-dischargeable debt – i.e., debts arising from a false representation, false pretenses, or actual fraud. 11 USC § 523(A)(2)(A). To prevail on a claim under Section 523(a)(2)(A) based on false representation, a plaintiff must establish each of the elements listed by the Sixth Circuit in *Rembert*, including an actual misrepresentation by the debtor. By contrast, an express misrepresentation by the debtor need not be shown to establish a non-dischargeable debt under Section 523(a)(2)(A) based on false pretenses for actual fraud.
>
> A "false pretense" involves an implied misrepresentation or conduct intended to create or foster a false impression. A false pretense has been

10

defined to include a "mute charade," where the debtor's conduct is designed to convey an impression without oral representation. A "false representation," on the other hand, is an expressed misrepresentation.

*James v. McCoy (In re McCoy)*, 114 B.R. 49, 498 (Bankr. S.D. Ohio 1990) (citations omitted). And the phrase "actual fraud" likewise describes misconduct that need not be based on an affirmative misrepresentation by the debtor. It encompasses "'any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another…'" *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (quoting 4 Collier on Bankruptcy, ¶ 523.08[1][E], pp. 523-45 (15th Ed., Lawrence P. King Ed., 2000)).

\* \* \*

[T]he *McClellan* court held that "the statute makes clear that actual fraud is broader than misrepresentation[,]" reasoning that

> [f]raud is a generic term which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated. *Id.* at 433-435.

*In re Rapp* at 433-35 (internal citations omitted). In *Rembert v. AT&T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277 (6th Cir. 1998), the 6th Circuit adopted a set of requirements to be established to prevail on a claim under § 523(a)(2)(A) for a false representation. In order to except a debt from discharge pursuant to § 523(a)(2)(A), a creditor must prove the following elements:

> (1) The debtor obtained money [property, services, or an extension, renewal, or refinancing of credit] through a material misrepresentation that at the time the debtor knew was false or that he made with gross recklessness as to its truth;
> (2) The debtor intended to deceive;
> (3) The creditor justifiably relied on the false representation; and
> (4) Its reliance was the proximate cause of the loss.

*Id*. at 280.

In the Prepetition Litigation, the Defendant's acts constituting false pretenses, false representations, and actual fraud were actually litigated and necessarily determined. Indeed, in the Counterclaim against the Defendant, the Plaintiffs alleged, *inter alia*,:

51. Sheldon Korn made repeated false representations to Mr. Lenchner and his companies' employees that he had utilized Abington [Development, Inc.] and Harbor [Building Company, LLC] money only for legitimate business purposes and omitted to state material facts pertaining to residential sales, necessary expenses, and expenditures for Abington and Harbor, the disclosure of which was necessary to make his statements not misleading.

52. The [Plaintiffs] were not aware that these representations and omissions were false and misleading, and they actually and reasonably relied upon the misrepresentations, and fraudulent omissions made to them by Sheldon Korn.

53. In direct reliance upon the repeated misrepresentations and fraudulent omissions made by Sheldon Korn, the [Plaintiffs] invested money in residential developments, expended money, time and effort to develop, build, and sell homes, extended bank account checking authorization to Sheldon Korn for the Abington and Harbor businesses, which was used instead for personal expenses, and extended other benefits to the Korns such as, among other things, cellular phone usage, home telephone usage, and gasoline mileage.

54. Sheldon Korn made the above stated representations knowing they were false and made them with the intent to deceive the [Plaintiffs] or made them recklessly without any knowledge of the truth as a positive assertion so that the [Plaintiffs] would act or rely upon the representations.

55. As a direct and proximate result of Sheldon Korn's misrepresentations and fraudulent omissions, the [Plaintiffs] have been and will continue to be damaged because of Sheldon Korn's deceptive and wrongful conduct.

Ex. B at pp. 12-13.

In Michigan, the following elements must be proved to establish fraud: (1) the defendant made a material misrepresentation; (2) it was false; (3) the defendant knew it was false when made, or made it recklessly, without knowledge of its truth, and as a positive assertion; (4) it was made with the intention to induce reliance by the plaintiff; (5) the plaintiff relied on it; and (6) the plaintiff thereby suffered injury. *McCallum v. Pixley (In re Pixley),* 456 B.R. 770, 780

12

(Bankr. E.D. Mich. 2011), citing *Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W. 2d 813, 815-816 (Mich. 1976). The elements required to prove fraud under Michigan law encompass the elements for fraud under 11 U.S.C. §523(a)(2)(A). *Id.* at 782.

After lengthy discovery and pretrial proceedings, the facts and evidence of the Defendant's fraudulent conduct was presented to the jury. The jury instructions provided that the jury consider the following elements when determining whether the Defendant defrauded the Plaintiffs:

> A. The defendant or counter-defendant made a representation of a material fact;
> B. The representation was false when it was made;
> C. The defendant or counter-defendant knew the representation was false when it was made or that it was made recklessly, that is, without knowing whether it was true;
> D. The defendant or counter-defendant made the representation with the intent that the plaintiff or counter-plaintiff would rely on it;
> E. The plaintiff or counter-plaintiff did rely on the representation; and,
> F. That the plaintiff or counter-plaintiff was damaged as a result of its reliance.

Ex. G at pp. 77-78. Following these instructions, which encompass the prima facie elements under Michigan law to establish fraud, the jury returned a verdict finding the Defendant guilty of fraud. Additionally, the jury considered the following elements when considering Plaintiffs' claims for silent fraud against the Defendant:

> A. That the defendant or counter-defendant failed to disclose a material fact.
> B. The defendant or counter-defendant had actual knowledge of the fact.
> C. The defendant's or counter-defendant's failure to disclose the fact caused the plaintiff or counter-plaintiffs to have a false impression.
> D. When the defendant or counter-defendant failed to disclose the fact, that defendant or counter-defendant knew the failure would create a false impression.
> E. When the defendant or counter-defendant failed to disclose the fact, that defendant or counter-defendant intended that the plaintiff or counter-plaintiff rely on the resulting false impression.
> F. That the plaintiff or counter-plaintiff relied on the false impression, and;

> G. That the plaintiff or counter-plaintiff was damaged as a result of such reliance.

Ex. G at pp. 78-79.  Following these instructions, the jury returned a verdict finding the Defendant to have committed silent fraud.

The numerous actions of the Defendant presented to the State Court and affirmed by the Michigan Court of Appeals in the Opinion clearly illustrate that all of the elements of actual fraud were met and Count VI must be granted in favor of the Plaintiffs.  First and foremost, it is undeniable that the Defendant made a material misrepresentation which was false.  Additionally, the Defendant knew it was false when made, or made it recklessly, without knowledge of its truth, and as a positive assertion.  Furthermore, as affirmed by the Michigan Court of Appeals in the Opinion, the Defendant's false representations were made with the intention to induce reliance by the Plaintiffs and the Plaintiffs relied on the false representations.  Ex. E at Pg. 5. Lastly, the Plaintiffs suffered injury as a result of the Defendant's actions.  Because all of the elements of actual fraud were actually litigated and necessarily determined, the Motion must be granted pursuant to 11 U.S.C. § 523(a)(2)(A).

Furthermore, as articulated above, the jury found that the Defendant obtained money through material misrepresentations and omissions that he knew were false, he intended to deceive the Plaintiffs, the Plaintiffs justifiably relied on the false representation Ex. E at Pg. 5, and the reliance was the proximate cause of the loss.  *Id.,* and Ex. D.  Therefore, the Plaintiffs' claims in Count V for nondischargeability based on false representation must be granted.

Lastly, the Plaintiffs are entitled to a nondischargeable judgment under § 523(a)(2)(A) because the debt owed by the Defendant was obtained by false pretenses.  "A false pretense involves an implied misrepresentation or conduct intended to create or foster a false impression." *Tweedie v. Hermoyian (In re Hermoyian)*, 466 B.R. 348, 377(Bankr. E.D. Mich.2012).  A false

pretense has been described as "usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction" *Id.* (quoting *Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr. D. Colo. 1990)). Judge Shefferly also has noted that the failure to disclose a material fact can form the basis of either a material misrepresentation or false pretense. *Id.*

Here, the Defendant was found guilty of fraud and silent fraud, thereby satisfying the elements required to render a debt nondischargeable for false pretenses under § 523(a)(2)(A) as set forth in Count IV. Indeed, the jury found that the Defendant made representations of material fact, which were false when made, that the Defendant knew the representations were false and made them recklessly. Ex. G at pp. 77-78. Furthermore, the Defendant was found to have made omissions of material fact which were done with the intent that a false impression was made with the Plaintiffs. *Id.* at pp. 78-79. After a nearly-month long trial and years of litigation, the totality of the Defendant's representations amounted to findings from the jury and confirmation from the Michigan Court of Appeals that, *inter alia,* he committed fraud and misrepresentation and silent fraud.

In sum, the Plaintiffs must be granted summary judgment pursuant to § 523(a)(2)(A) for false pretenses, false representation, and actual fraud because the prima facie elements were actually litigated and necessarily determined in the Prepetition Litigation.

### Count VII – 11 U.S.C. § 523(a)(4)

In Count VII, the Plaintiffs have alleged that the debts owed by the Defendant are nondischargeable pursuant to § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity. Section 523(a)(4) of the Bankruptcy Code provides as follows:

(a) A discharge under section 727, 1141, 1228 (a), 1228 (b), or 1328 (b) of this title does not discharge an individual debtor from any debt—

15

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

11 U.S.C. § 523(a)(4).

The Sixth Circuit has held that to find a debt nondischargeable due to fraud while acting in a fiduciary capacity, there must be evidence of the following three (3) elements: "(1) a fiduciary relationship; (2) a breach of that fiduciary relationship; and (3) a resulting loss." *R.E. America, Inc. v. Garver (In re Garver),* 116 F.3d 176, 178 (6th Cir. 1997).

For the purposes of Section 523(a)(4), embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996). "A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *Id.* at 1173. The fraud element may also be satisfied by a showing of deceit. See *In re Imbody,* 104 B.R. 830, 841 (Bankr. N.D. Ohio 1989) (stating that "most courts that have considered the issue have held that acting with deceit will satisfy the fraudulent intent requirement" of embezzlement).

Here, it is indisputable that the Judgment in favor of the Plaintiffs was awarded as a result of the Defendant's breach of his fiduciary duties to the Plaintiffs and that the issue had been litigated previously. In Count III of the counterclaim, the Plaintiffs alleged, *inter alia*,:

38. As an agent for the [Plaintiffs], Sheldon Korn agreed to supervise and manage residential construction at the Abington and Harbor projects and to sell homes as they were constructed.

39. As sales agents for Abington and Harbor, Gale, Shauna, and Ashley Korn agreed to solicit and sell the Abington and Harbor homes constructed under Sheldon Korn's supervision.

16

40. As agents of the [Plaintiffs], the Korns owed fiduciary duties and duties of loyalty, honesty, good faith nad trust to the [Plaintiffs] as follows:

    a.  To deal with utmost good faith with respect to all Abington and Harbor matters;

    b.  To act with complete fidelity and loyalty to Abington, Harbor, and Lenchner;

    c.  To refrain from taking advantage of Abington, Harbor, and Lenchner by the slightest misrepresentation, concealment, threat or adverse pressure of any kind;

    d.  To not engage in any transactions for their own benefit; and

    e.  To make full and complete disclosure of information concerning the Abington and Harbor businesses and the companies' bank accounts.

41. The Korns have breached their fiduciary duties owed to the [Plaintiffs] by failing to act in good faith on and for the benefit of the [Plaintiffs] in the following ways:

    a.  Failing to make good faith efforts to sell homes in the Abington and Harbor developments;

    b.  Misappropriating and using Abington and Harbor funds for personal use;

    c.  Failing to reveal the true disposition of funds wrongfully and fraudulently taken from the Abington and Harbor accounts and/or lines of credit;

    d.  Making unauthorized expenditures for personal use or for uses other than for the business of Abington or Harbor; and

    e.  Sheldon Korn assuming control of the funds and assets of Abington and Harbor and conducting their business in his own name and/or for his own benefit or that of Gale, Shauna and Ashley Korn and not for the benefit of Abington, Harbor and Lenchner.

42. As a direct and proximate result of Sheldon Korn's misrepresentations and fraudulent omissions, the [Plaintiffs] have been and will continue to be damaged because of Sheldon Korn's deceptive and wrongful conduct

Ex. B at pp. 10-11.  After lengthy discovery and pretrial proceedings, the facts and evidence of the Defendant's fraudulent conduct was presented to the jury.  The instructions provided to the jury regarding the Defendant's breach of his fiduciary duty were that the Plaintiffs were required to demonstrate: "(a) The existence of a fiduciary relationship; (b) Defendant or counter-defendant's breach; and that (c) Plaintiff or counter-plaintiffs were damaged as a result of defendant or counter-defendant's breach."  Ex. G at p. 87.  With these instructions as their guideline, the jury found that the Defendant breached his fiduciary duty to the Plaintiffs.  Exs. D and H.  This finding was also affirmed by the Michigan Court of Appeals.  Ex. E.

The behavior of the Defendant presented to the State Court and affirmed by the Michigan Court of Appeals in the Opinion clearly demonstrate that the Defendant had a fiduciary relationship with the Plaintiffs, breached that relationship, and that the Plaintiffs suffered a resulting loss.  Because the elements presented to the jury and further affirmed by the Michigan Court of Appeals are encompassed with those elements required for fraud while acting in a fiduciary capacity, it is undeniable that the necessary elements for a finding of § 523(a)(4) claim were actually litigated and necessarily determined.

Additionally, the jury returned fraud verdicts in favor of the Plaintiffs after considering that the Defendant was entrusted with property of the Plaintiffs, which was appropriated for a use other than that for which it was entrusted, and the circumstances indicate fraud.  Therefore, the debt owed to Plaintiffs by Defendant must be determined nondischargeable for embezzlement pursuant to § 523(a)(4).  Because the elements of breach of fiduciary duty and embezzlement claims were actually litigated and necessarily determined in the Prepetition Litigations, summary judgment as to Count VII is appropriate.

<u>Count VIII – 11 U.S.C. § 523(a)(6)</u>

Section 523(a)(6) of the Bankruptcy Code provides as follows:

(a) A discharge under section 727, 1141, 1228 (a), 1228 (b), or 1328 (b) of this title does not discharge an individual debtor from any debt—
     (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;
11 U.S.C. § 523(a)(6).

The Sixth Circuit has held that a willful and malicious injury as defined under §523(a)(6) is one where the debtor "desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it." *In re Markowitz*, 190 F.3d 455, 464 (6th Cir. 1999) (quoting Restatement (Second) of Torts § 8A, at 15 (1964)). The action must have been "malicious," or "in conscious disregard of one's duties or without just cause or excuse," and "does not require ill-will or specific intent." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986).

In this instance, the Defendant certainly desired to cause the consequences of his acts and used the Plaintiffs as his personal piggy banks. He made repeated false representations to Mr. Lenchner and his companies' employees that he had utilized Abington Development, Inc. and Harbor Building Company, LLC money only for legitimate business purposes and omitted to state material facts pertaining to residential sales, necessary expenses, and expenditures for Abington and Harbor. These repeated false representations were untrue when they were made, and the Defendant knew it. Furthermore, the false representations were made maliciously and in conscious disregard of the Defendant's duties to the Plaintiffs. Accordingly, the Plaintiffs submit that the totality of the Judgment, now in excess of $2 million, is nondischargeable pursuant to 11 U.S.C. § 523(a)(6) based on the Defendant's willful and malicious conduct which was actually litigated and necessarily determined in the prepetition litigation.

19

**Defendant Had A Full and Fair Opportunity to Litigate**

Lastly, for the purposes of a collateral estoppel analysis, it is undeniable that the Defendant had a full and fair opportunity to litigate the issue in the State Court Lawsuit. In fact, the Defendant litigated the State Court Lawsuit for years in the Charlevoix County Circuit Court, ending in an approximate 30-day trial and Judgment from a jury verdict in favor of the Plaintiffs, at the Michigan Court of Appeals, ending in the Opinion after extensive briefing, and an application to the Michigan Supreme Court for leave to appeal, which was denied. Defendant has not raised any issue that would contradict the fact that he had a full and fair opportunity to litigate. Thus, the fourth element for collateral estoppel is satisfied.

**CONCLUSION**

For the foregoing reasons, pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 7056 of the Federal Rules of Bankruptcy Procedure, and the principles of collateral estoppel, the Plaintiffs are entitled to judgment as a matter of law that the debt owed by the Defendant pursuant to the Judgment entered by the Charlevoix County Circuit Court on July 28, 2006 in the amount of $1,745,000.00, plus interest and all taxable costs, and $250,000.00, plus interest and taxable costs, and the affirmed by the Opinion of the Michigan Court of Appeals is non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A), (a)(4), and (a)(6).

> Respectfully submitted,
> **STEVENSON & BULLOCK, P.L.C.**
>
> By: /s/ Elliot G. Crowder
> Elliot G. Crowder (P76137)
> Counsel for Plaintiffs
> 26100 American Drive, Suite 500
> Southfield, MI 48034
> Phone: (248) 354-7906
> Facsimile: (248) 354-7907
> Email: ecrowder@sbplclaw.com

Dated: October 1, 2014

20

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION - DETROIT**

**IN THE MATTER OF:**

Sheldon M. Korn,

                   Debtor.

Bankruptcy Case No. 14-41173
Chapter 7
Hon. Walter Shapero

Adversary Proceeding No. 14-04408
Hon. Walter Shapero

Lawrence Lenchner; Harbor Building
Company, LLC; Northern Grading, Excavating
& Septic, LLC; Abington Development, Inc.;
Bridgestone Development, LLC; and Clarita
Commons Development, LLC

                   Plaintiffs,

v.

Sheldon M. Korn

                   Defendant.

## EXHIBIT LIST

A.     Defendant's Third Amended Complaint

B.     Plaintiffs' Counterclaim

C.     Trial Transcript (excerpt) – May 2, 2006

D.     Judgment dated July 28, 2006

E.     Opinion of Michigan Court of Appeals dated January 29, 2008

F.     Order of the Michigan Supreme Court dated July 29, 2008

G.     Trial Transcript (excerpt) – May 26, 2006

H.     Jury Verdict Forms

# EXHIBIT A

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF CHARLEVOIX

KORN FAMILY LIMITED PARTNERSHIP,
GALE KORN,
SHELDON KORN,
SHAUNA KORN, and
ASHLEY KORN,

                Plaintiffs,

-vs-

HARBOR BUILDING COMPANY, LLC,
DISCOUNT HOMES, LLC,
NORTHERN GRADING, EXCAVATING & SEPTIC, LLC,
ABINGTON DEVELOPMENT COMPANY, INC.,
BRIDGESTONE DEVELOPMENT, LLC, and
LAWRENCE LENCHNER,

                Defendants.

                Honorable Richard M. Pajtas

                Case No. 03-1723-19-CB

_____/

JOHN W. UNGER (P21679)
UNGER, GARRATT & BACHAND, PLLC
Attorneys for Plaintiffs
222 North Bridge Street
P.O. Box 1079
Bellaire, Michigan 49615
(231) 533-6566

MARK M. HILAL (P57028)
BRIDGET BROWN POWERS (P46888)
POWERS & HILAL
Attorneys for Defendants
618 Howard Street
Petoskey, Michigan 49770
(231) 347-8200

_____/

## THIRD AMENDED COMPLAINT

Plaintiffs, by and through their undersigned counsel, state as and for their Third Amended Complaint against Defendants, and each of them, jointly and severally, as follows:

## Common Allegations

1.      Plaintiff Korn Family Limited Partnership is and at all pertinent times was a Michigan limited partnership of which Plaintiff Sheldon Korn is the general partner and of which the individual Plaintiffs are the limited partners.

2.      Defendants, or some of them, are residents of and/or have their principal place of business in Charlevoix County, Michigan.

3.      This action is within the jurisdiction of this Court because the amount in controversy exceeds $25,000 exclusive of interest and costs.

4.      The term "Business", as used herein, refers to the enterprise(s), whether deemed a super-partnership, a partnership or joint venture, or a series of partnerships or joint ventures, or other form of business association(s) in which Plaintiffs engaged with Defendants that originally in 1995 used the name of Defendant Abington Development and ultimately engaged in commerce using the names of Defendants Harbor Building, Discount Homes, Northern Grading, Excavating & Septic, Bridgestone Development, and Clarita Commons Development.

## Background

5.      Plaintiffs Sheldon Korn and Gale Korn have been married to one another since 1976. Their only children are Plaintiffs Shauna Korn and Ashley Korn.

6.     Since 1984, Plaintiff Sheldon Korn and Defendant Lawrence Lenchner ("Lenchner") have been brothers-in-law; Lenchner married one of Sheldon Korn's sisters; the Lenchners also have two children.

7.     In 1995, when Plaintiffs Sheldon and Gale Korn and Defendant Lenchner began to discuss engaging in the Business together, Plaintiff Sheldon Korn had a builder's license, Plaintiffs Sheldon and Gale Korn had almost 50 years of combined experience in residential real estate development, building, and marketing, Plaintiff Sheldon Korn had a real estate broker's license, and Plaintiffs had capital to loan or invest; by contrast, Defendant Lenchner had little experience in real estate development and sales, was struggling to earn a living as a residential mortgage broker, had no real estate broker's license, and needed to borrow money to support himself and his family. Indeed, Plaintiffs had to loan Lenchner personally $4,000 on November 21, 1995, so Defendant Lenchner would have spending money for the then forthcoming holidays.

8.     After meetings during 1995, Plaintiffs Sheldon and Gale Korn and Defendant Lenchner agreed in November 1995 to engage in the Business; that Plaintiffs would receive 50% of the profits and other benefits from the Business and equal to those received by Defendant Lenchner and his family; that the Business would commence by Defendant Abington Development initially buying land in Oakland County and usually constructing residences on same before reselling the improved land; that the Business would be expanded; that the purported entities through which the Business was conducted could appear to strangers to belong to Defendant Lenchner alone; that work responsibilities|be divided according to each person's experience and interest, e.g. Plaintiffs Sheldon and Gale Korn would usually manage the design, construction,

3

marketing and sales of residential real estate, but Defendant Lenchner would usually

manage any commercial construction jobs and the computers, bookkeeping, mortgage

financing, paperwork, office management and utilize his relationship with Robert

Heinrich, President of Metro Bank, to finance the Business; and that, because Defendant

Lenchner was cash poor, Plaintiffs would cause money to be loaned to start the Business

and that Lenchner could in 1996 receive more from the Business than Plaintiffs Sheldon

and Gale Korn and that Plaintiffs would be paid the difference later.

9.　　The Business gradually expanded over the years to include Defendant

Harbor Building Company, LLC. (principally "spec" modular homes in Charlevoix

County), Defendant Discount Homes, LLC (principally manufactured HUD homes pre-

sold to individuals for their own lots), Defendant Northern Grading, Excavating & Septic,

LLC (principally earth-moving work in Charlevoix County), Defendant Bridgestone

Development, LLC. (condominiums in Oakland County), and Defendant Clarita

Commons Development, LLC (2 parcels of land in Livonia that were divided into 16

homesites and then re-sold). In 1999, Plaintiff Shauna Korn, then 21 years old, who had

a real estate salesperson's license, began to work in the Business. In 2002, Plaintiff

Ashley Korn, then age 21, who acquired a real estate salesperson's license in 2002,

continued to work in the Business. Over the years, Defendant Lenchner--who oversaw

the Business' finances--commingled the assets, income, opportunities, liabilities and

expenses of the Defendants.

10.　　Each Defendant is the <u>alter ego</u> of every other Defendant and each

Defendant is jointly and severally liable for every other Defendant's liability to Plaintiff.

The Defendants commingled their assets, liabilities, income, expenses, contractual and

business relationships, and books and records and failed to observe the legal formalities necessary to maintain Defendants Abington, Harbor, Discount Homes, Northern Grading, Bridgestone, and Clarita as the distinct legal entities they purport to be. In addition, Defendants engaged in illegal and ultra vires acts, e.g. violating federal and state income tax laws.

11. In 1995, Plaintiff Korn Family Limited Partnership or, alternatively, Plaintiff Gale Korn loaned Defendants $5,000.

12. In 1996, the Business, under the name of Defendant Abington, started construction, marketing and sales of homes under the direction of Plaintiffs Sheldon and Gale Korn; most building material and supplies were charged to the Plaintiffs' personal credit cards, in excess of $100,000 in 1996 alone; the Business through Defendant Abington began paying expenses of Plaintiffs Sheldon and Gale Korn and of Defendant Lenchner, i.e. health insurance, auto expenses, and meal, entertainment and cell phone charges; during 1996 the Business sold 3 homes and grossed $375,160.00, Plaintiffs caused at least $139,692.00 to be loaned to the Business, and the Business paid Defendant Lenchner at least $26,000.00.

13. In 1997, the Business, under the name of Defendant Abington, continued building and selling new homes and constructed a residence addition for the Business' banker, Robert Heinrich, under the management of Plaintiffs Sheldon and Gale Korn; Plaintiffs Sheldon and Gale Korn personally charged most building material and supplies of the Business to their personal credit cards; the Heinrichs paid the Business only $25,000 for an addition that cost $33,000 during 1997; the Business sold 8 homes and

5

grossed $1,068,340, paid Plaintiffs $27,400, and paid Defendant Lenchner at least
$143,678.

14.   In 1998, Plaintiffs Sheldon and Gale Korn and Defendant Lenchner
expanded the Business by commencing doing business under an additional name, that of
Defendant Bridgestone, for the development, construction and sale of 15 condominium
units; Defendant Lenchner told Plaintiffs Sheldon and Gale Korn that Defendant
Lenchner had $140,000 in credit card debt which Bank One required to be paid off in
order to finance the Bridgestone condominiums; Defendant Lenchner told Plaintiffs
Sheldon and Gale Korn that Bank One did not want Plaintiff Sheldon Korn to be a
signatory on the Bridgestone bank accounts; Plaintiffs caused money to be loaned for the
Bridgestone project; although the Business sold 12 homes and grossed $1,674,924 in
1998, Defendant Lenchner in late 1998 told Plaintiffs Sheldon and Gale Korn that
Defendant Lenchner had to borrow money to live on and that the Business and Defendant
Lenchner had inadequate money with which to pay Plaintiffs; during 1998, the Business
paid Plaintiffs Sheldon and Gale Korn $65,400 and Defendant Lenchner at least
$226,374.

15.   In 1999, when the Business' Bridgestone project was being developed and
constructed, Plaintiffs Sheldon and Gale Korn assisted with design, selection of interior
and exterior materials, landscaping design, and bids; in mid-1999 Plaintiffs Sheldon and
Gale Korn and Defendant Lenchner caused the Business to commence doing business
under an additional name, that of Defendant Clarita, to purchase 2 pieces of land in
Livonia, Michigan for development, construction and sale of 16 homes; however,
Plaintiffs Sheldon and Gale Korn and Defendant Lenchner later agreed that for the

Business to finance the Clarita Commons project might jeopardize the Business'
Bridgestone and Abington projects, and the land for the Business' Clarita project was
sold at a $250,000 profit with the express agreement that Plaintiffs Sheldon and Gale
Korn and Defendant Lenchner would split the profit equally; however, after that sale
closed, Defendant Lenchner stated to Plaintiffs Sheldon and Gale Korn that that $250,000
profit was needed to complete the Business' Bridgestone project, to which Plaintiffs
Sheldon and Gale Korn agreed; Plaintiffs Sheldon and Gale Korn also located and
handled the purchase of 16 home sites in Northern Michigan for future Abington projects
for manufactured homes; Defendant Lenchner told Plaintiffs Sheldon and Gale Korn that
the Northern Michigan manufactured home properties would be rented to produce
residual income for Plaintiffs Sheldon and Gale Korn and Defendant Lenchner; Plaintiffs
Sheldon and Gale Korn and Defendant Lenchner also expanded the Business by
commencing doing business under the name of Defendant Harbor for the Northern
Michigan project; in October, 1999, when Plaintiff Shauna Korn, then 21 years old,
became a licensed Michigan real estate salesperson and began selling homes for the
Business, she was promised by Defendant Lenchner to be paid amounts equal to 3% of
the selling price of each condominium unit and of each home in the sale of which she
participated, ½ payable at each closing and the other ½ the following year; during 1999,
the Business sold 11 homes plus a land deal and grossed $2,442,750, Plaintiffs caused the
Business to be loaned at least $540,000, and the Business paid Plaintiffs Sheldon and
Gale Korn $371,900 and Defendant Lenchner at least $265,521.

     16.    In 2000, Plaintiffs Gale and Shauna Korn set up the Business' sales office
for the Bridgestone project; Plaintiff Shauna Korn tended the project 6 days per week

selling units and also had appointments with potential buyers of homes in Abington

projects; Plaintiff Sheldon Korn managed construction and sales for the Business'

Abington and Bridgestone projects; Plaintiff Gale Korn was active in construction, sales

and advertising of the Business' homes and condominium units; Plaintiff Sheldon Korn,

Defendant Lenchner and the Business' attorney discussed becoming partners in the

purchase and development of raw land into individual lots to be resold to builders;

Plaintiffs Sheldon and Gale Korn and Defendant Lenchner agreed, given the projected

slowdown in construction generally, to not commence new construction in the Detroit

area until the economy improved there; Defendant Lenchner and Plaintiffs Sheldon and

Gale Korn discussed the Business buying a large boat suitable for use on Lake Michigan

for the equal use of both the Korn and Lenchner families; Plaintiff Sheldon and Gale

Korn and Defendant Lenchner drove to Indiana to inspect and price out Redman

manufactured homes for the Business' Northern Michigan project, and ordered 8 homes;

during that trip, Defendant Lenchner stated to Plaintiffs Sheldon and Gale Korn that the

Business' cash flow was so good that the Business would soon own its Charlevoix

County land inventory free and clear of any bank loan, that the Business would have

ample ability to borrow in the future whatever money it might need, and that Defendant

Lenchner had arranged bank financing for the Business to purchase and develop land into

individual building sites for resale to builders, to buy existing trailer home parks, and to

purchase and develop land for new trailer home parks; Plaintiff Shauna Korn, while still

working at the Business' Bridgestone project, actively took over the marketing of the one

remaining Abington home; and Defendant Lenchner told Plaintiff Sheldon Korn that the

Business' attorney and that attorney's friend intended to form a joint venture with the

8

Business to purchase from mortgage lenders real estate that was in foreclosure and to be paid by mortgage lenders to fix up and sell properties in foreclosure; Plaintiffs Sheldon and Gale Korn applied for permits, hired trades, and managed the construction of foundations, the setting of homes and the necessary construction and hookups for 8 homes in Boyne City, Michigan; and Plaintiff Ashley Korn worked part-time with Plaintiff Shauna Korn to assist with Business' Bridgestone condominium sales and marketing; during 2000, the Business sold 19 homes and grossed $4,719,677.00, paid Plaintiffs Sheldon and Gale Korn $65,604, and paid Defendant Lenchner at least $1,034,521.

17.    In 2001, Plaintiff Shauna Korn continued to handle the selling and marketing of the Business' Bridgestone condominiums and managed construction problems by scheduling and instructing the trades, and Plaintiff Ashley Korn worked part-time assisting Plaintiff Shauna Korn; Defendant Lenchner told Plaintiffs Sheldon and Gale Korn during a meeting in Charlevoix County that the Business' finished inventory in Charlevoix County was free and clear of any bank loans; due to the type of construction of the manufactured homes and others' advice regarding problems experienced, Plaintiffs Sheldon and Gale Korn and Defendant Lenchner decided not to rent the Business' 8 manufactured homes, but to sell them instead, and discussed their intentions of developing future projects for residual income; Defendant Lenchner told Plaintiff Sheldon Korn that Shore Mortgage had contracted to pay the Business to remodel commercial properties; Plaintiffs Sheldon and Gale Korn handled advertising and sales for the Business' 8 homes delivered in November 2000; Plaintiffs Sheldon and Gale Korn and Defendant Lenchner also expanded the Business by commencing doing

9

business under the name of Defendant Discount Homes to sell manufactured homes to be placed on property owned by others; Plaintiffs Sheldon and Gale Korn hired and managed individuals to work on the Business' Harbor and Discount Homes projects; Defendant Lenchner stated to Plaintiffs Sheldon and Gale Korn that Defendant Lenchner intended to purchase a new Harley Davidson motorcycle, a Sportster 883, as a birthday present for Plaintiff Sheldon Korn and gave Plaintiff Sheldon Korn a brochure picturing the motorcycle; Plaintiffs Sheldon and Gale Korn and Defendant Lenchner expanded the Business by commencing doing business under the additional name of Defendant Northern Grading, Excavating & Septic; Defendant Sheldon Korn arranged to hire employees to purchase and lease new equipment to run the Business' grading and septic installations; Defendant Lenchner told Plaintiffs Sheldon and Gale Korn that Defendant Lenchner had actively pursued and intended to actively pursue the Business' purchase of land in Lincoln Park from the Board of Education for a residential development; during the summer leading up to "September 11," 2001, Plaintiffs Sheldon and Gale Korn spent most of their business time in Charlevoix County, while Defendant Lenchner still spent most of his business time in Oakland County, and the Business' inventory in Charlevoix County consisted of a few completed homes that were being offered for sale and several modular homes that had just been delivered and needed to be set on foundations, assembled and finished in order to be resold by the next year; in the summer of 2001, Defendant Lenchner stated to Plaintiffs Sheldon and Gale Korn that the Business had provided to Lenchner only $75,000 more in cash and other benefits than the Business had provided Sheldon and/or Gale Korn, that Defendant Lenchner would provide them documents to prove that fact, and that Defendant Lenchner would cause the Business to

pay them enough money to equalize with what had been provided to Defendant Lenchner the money and benefits provided to date to Plaintiffs and to provide them equal money and benefits in the future; in August 2001, Plaintiff Sheldon Korn's sister sued Defendant Lenchner for divorce; despite an injunctive order that he preserve the status quo, Defendant Lenchner immediately tried to enlist the aid of, inter alia, Plaintiffs and the Business' banker and attorney, e.g. to have Plaintiff Shauna Korn sign back-dated documents that would make it appear that she had been a bona fide 50% owner of Defendant Harbor since before Mrs. Lenchner sued for divorce, but Plaintiffs refused to engage in Defendant Lenchner's scheme; Plaintiffs Sheldon and Gale Korn ordered 12 more manufactured homes for the Business' Northern Michigan project; after selling out the downstate inventory of condominiums and homes, Plaintiffs Shauna Korn and Ashley Korn came to Northern Michigan to assist in the preparation and sales of the Business' homes; Plaintiffs Sheldon and Gale Korn managed the preparation of the Business' land and foundations for homes to be delivered in August, 2001; Plaintiffs Sheldon and Gale Korn managed the remodeling, marketing and sale of the Business' 2 used homes in Boyne City; Plaintiff Sheldon Korn made countless trips to suppliers to pick up materials which were charged on personal charge accounts and Plaintiffs Sheldon and Gale Korn paid many trades in cash for the work they performed for the Business; although much construction was underway on the Business' Northern Michigan projects, sales nearly halted following September 11, 2001; the stock market crash that followed "September 11" caused Defendant Lenchner, who played the stock market, massive financial losses; about the same time, Plaintiff Sheldon Korn learned that Defendant Lenchner's marital reconciliation required/resulted in an $8,000 Chicago weekend for the Lenchners, a three

carat diamond ring for Mrs. Lenchner, and Lenchner's promise to demolish the Lenchner's older, modest home in Birmingham and to replace it with a new, larger, more lavish home; Plaintiff Sheldon Korn asked Defendant Lenchner how Defendant Lenchner could possibly afford all that, because Plaintiff Sheldon Korn knew that, even with the additional $75,000 (supposedly all that was owed to Plaintiffs), Plaintiffs Sheldon and Gale Korn would not have received from the Business enough to pay the cash outlays that Defendant Lenchner had and had undertaken; in the latter half of 2001, Defendant Lenchner told Plaintiffs Sheldon and Gale Korn in Charlevoix County that the Business' Bridgestone condominium project, which had been "sold out," had lost money instead of making the expected profit; so, Plaintiff Sheldon Korn told Defendant Lenchner that Plaintiff Sheldon Korn wanted to review all of the Business' records and transactions, e.g. to ascertain if and how money had been diverted from the Business; Defendant Lenchner stated that no money had been diverted (except for the aforesaid $75,000), that the Business had profitable new projects, that an accounting would be a large and unnecessary expense, that Plaintiffs could and should take from the Business enough to compensate them for the excess cash and other benefits (supposedly only $75,000) Defendant Lenchner and his family had received, and that Defendant Lenchner and Plaintiffs Sheldon and Gale Korn would be treated equally in the future by Defendant Lenchner and the Business; because the Business had some remaining scattered lots in Oakland County, Plaintiffs Sheldon and Gale Korn and Defendant Lenchner agreed to order and install 3 modular homes instead of "stick" building; during 2001, the Business sold 19 homes and one land deal and grossed $3,276,621, and the Business paid Plaintiffs Sheldon and Gale Korn $581,400 and Defendant Lenchner at least $512,000.00.

18.     In 2002, Plaintiff Ashley Korn, age 21, planning to work for the Business, acquired her license as a Michigan real estate salesperson; in early, 2002 Defendant Lenchner told Plaintiff Sheldon Korn that the Business could not provide any significant cash or other economic benefits to Defendant Lenchner or Plaintiffs Sheldon and Gale Korn, but that Defendant Lenchner and the Business intended to and would pay Plaintiff Ashley Korn an amount equal to 3% of the selling price of properties of the Business in the sale of which she participated; Plaintiff Sheldon Korn and Defendant Lenchner discussed future property acquisitions for the Business; Plaintiff Sheldon Korn inspected prospective properties, investigated building and use restrictions, drafted offers for property purchase, and worked in liaison with the architect to design new homes for Abington projects; Plaintiffs Sheldon and Gale Korn marketed the Business' existing inventory in Charlevoix County, while Defendant Lenchner typically remained in Oakland County; Plaintiff Sheldon Korn hired trades and laborers to remodel a used home that the Business acquired in the name of Defendant Harbor Building and made countless trips to suppliers, repeatedly used personal credit cards for the Business' expenses, and paid cash to trades that worked for the Business; in June, Defendant Lenchner stated to Plaintiff Sheldon Korn that the Business' banks had cut off the Business and were coming down on the Business and that the Business could no longer afford to even pay gas or other automobile expenses or health insurance premiums; in the summer, Defendant Lenchner told Plaintiff Ashley Korn, while she was working at one of the homes for sale in Oakland County, that the Business had a lot of continuous sales work for her and that numerous properties had been purchased for new homes to be built;

received approximately $1.4 million more than Plaintiffs Sheldon and Gale Korn from the Business. However, the next communication that Plaintiffs received from Defendants was a letter dated December 31, 2003 in which Defendant Lenchner purported to be the sole person entitled to any economic benefit from the Business and purported to terminate all of the relationships between Plaintiffs and every Defendant. Never before had Defendant Lenchner ever asserted that he could control the parties' inter-relationships or that Plaintiffs Sheldon and/or Gale Korn were not entitled to the same economic benefits that Defendant Lenchner and his family received from the Business.

20. Plaintiffs promptly initiated this lawsuit and sought Defendant Lenchner's deposition and all of Defendants' "written, recorded and graphic matters" relating to, inter alia, the Business. However, Defendants and their agents made one false statement after another for the purpose or with the effect of delaying and avoiding the discovery that Plaintiffs did and still seek. Ultimately, this Court ordered that Defendants produce all such matter to Plaintiffs no later than April 26, 2003. But, Defendants produced effectively nothing until late July, 2003, and some of it (especially Defendants' pre-suit computer data) has still not been produced by Defendants, i.e. as of February 9, 2004. Although this Court ordered that Defendant Lenchner's deposition commence no later than May 20, 2003, Defendant Lenchner never appeared for deposition until July 24, Defendants then refused to make Defendant Lenchner available again until August 14, and Defendants then refused to make Defendant Lenchner available again until October 20, when he did not appear Defendants also violated this Court's November 18, 2003 Order compelling discovery and as of February 9, 2004 had furnished no more discovery.

21.     Defendants used the months in which they delayed and avoided discovery to, inter alia, (a) destroy and manufacture evidence, e.g. "reclassify" how transactions were recorded on Defendants' computers and treat as a "theft loss" most of the monies paid to Plaintiffs Sheldon and/or Gale Korn for ordinary and necessary business expenses, and (b) change Defendant Lenchner's testimony. For example, before and during the first segment (July 24, 2003) of Defendant Lenchner's deposition, Defendants asserted that no Plaintiff had ever been Defendant Lenchner's partner, that Defendant Lenchner had not referred to Plaintiff Sheldon Korn as such, and that Plaintiffs were mere "agents" of Defendants and had never had any equity or other economic interest or right in the Business, thereafter, Defendants did an "about face"; in the second (August 14, 2003) segment of his deposition, Defendant Lenchner testified that he, on the one hand, and Plaintiffs Sheldon and/or Gale Korn, on the other hand, were each entitled to 50% of the Business' profits and losses.

22.     Evidence that the Business was supposed to provide benefits to Plaintiffs Sheldon and/or Gale Korn equal to those Defendant Lenchner received includes the facts that:

(a)     when the Business provided Defendant Lenchner a use of a new Ford Expedition, Lincoln Navigator and Escalade, Plaintiffs Sheldon and Gale Korn also received use of a new Ford Expedition, Lincoln Navigator and Escalade;

(b)     the Business paid for many substantially identical benefits, e.g. hospitalization insurance, for the Korn and Lenchner families;

(c) Plaintiff Sheldon Korn and Defendant Lenchner signed one another's names to various Business documents; and

(d) from 1995 to 2002, Defendant Lenchner stated, whether in Plaintiffs' presence or absence, to well over a dozen people, that Plaintiff Sheldon Korn was his partner in the Business.

23. In pertinent part, Plaintiffs Sheldon and Gale Korn not only spent thousands of hours of time but, from 1995 to 1999, caused Plaintiff Korn Family Limited Partnership or themselves to advance to the Business and for the Business hundreds of thousands of dollars.

24. Under the circumstances, the duties of a fiduciary, e.g., honesty, good faith and fair dealing, were owed by Defendants to Plaintiffs, and Plaintiffs placed trust and confidence in Defendants. The fiduciary is prohibited from placing his interest before or in conflict with the interests of the Plaintiffs, the fiduciary was required to act in the Plaintiffs' best interest in all matters connected with a shared relationship, the fiduciary was not to acquire a personal stake in any matter related to fiduciary relationship, fiduciary was not to act or agree to act during the period of his agency for persons whose interests conflicted with those of the Plaintiffs, the fiduciary was not use for himself or itself any knowledge gained or opportunity to discovered while acting in the fiduciary capacity, the fiduciary was not to take advantage of the knowledge acquired to make a profit for himself at Plaintiffs' expense, the fiduciary was not to use or communicate information confidentially acquired by the fiduciary during the course of or on account of his agency or in violation of his duties as agent, the fiduciary was to fully inform the Plaintiffs of all relevant information and not hide any relevant information

from the Plaintiffs, and the fiduciary was to be accountable and under all circumstances render true and full information to Plaintiffs and otherwise observe the highest degree of integrity, full disclosure and fairness and not seek to reap a profits of the expense of Plaintiffs.

25.     However, Defendants breached their fiduciary duties and made to Plaintiffs many broken promises, many false promises, many misrepresentations of fact and of Lenchner's intent, and many material omissions (in Defendants' statements to Plaintiffs) on which Plaintiffs relied to their detriment. For example, Defendant Lenchner, acting individually and for the other Defendants, made these assurances to Plaintiffs on which they detrimentally relied to their damage; for example:

(a)     statements, inter alia, to Sheldon and Gale Korn often in 1995, including without limitation in November, 1995 at the Korns' Oakland County residence, and often thereafter, including without limitation on a trip to Indiana in late September, 2000, that Lenchner intended that the Business ultimately provide Sheldon and Gale Korn economic benefits equal to those that the Business would provide and had provided to Defendant Lenchner and his family;

(b)     statements, inter alia, to Sheldon and Gale Korn repeatedly in 1995, including without limitation in November 1995 at their Oakland County home, to Sheldon Korn, in early 1996 while driving in a car in Farmington Hills, to Sheldon Korn in late 1999 at the Business' Birmingham office, and to Sheldon and/or Gale Korn at other times that Plaintiffs advanced or were requested to advance money for the Business, that all money Plaintiffs had advanced and did advance in the future to the Business had been and would be used only for

genuine business expenses and would not be taken by Defendant Lenchner for personal purposes;

(c) statements, inter alia, to Sheldon and Gale Korn at the Korns' Oakland County home in 1996, that Robert Heinrich, the Business' banker, had agreed to pay the Business' actual cost to remodel the Heinrichs' Oakland County residence;

(d) statements, inter alia, to Sheldon and Gale Korn in late 1998 at the Business' Birmingham office, that Defendant Lenchner had to borrow and was borrowing money just to live on;

(e) statements, inter alia, to Sheldon and Gale Korn in early 1998 at the Korns' Oakland County home, that Defendant Lenchner had numerous credit cards on which he could borrow up to $350,000-$400,000 but that he had $140,000 in personal credit card debt that the Business' bank required to be paid off in order to finance the business' Oakland County condominium project;

(f) statements, inter alia, to Sheldon Korn in 1998 at the Business' Birmingham office that Bank One did not want Sheldon Korn to be signatory on Defendants' accounts;

(g) statements, inter alia, to Sheldon and Gale Korn, inter alia, in late 1998 at the Business' Birmingham office and to Sheldon and Gale Korn in early 2000 at Walloon Lake, that Lenchner had not recently received and could not obtain any money from the Business and that Defendant Lenchner and business were incapable of paying Plaintiffs any amount;

(h)    statements, inter alia, to Sheldon Korn in 1999 at the Business'
Birmingham office and to Sheldon and Gale Korn at the Business' Oakland
County condominium project in late 1999, that Lenchner intended (as he agreed
with Sheldon Korn, as well as Shauna Korn) that the Business pay Shauna Korn
an amount equal to 3% of the selling price of each condominium unit and of each
home in the sale of which she participated and that ½ of that commission would
be paid when the condominium project was finished or when the house was sold,
as the case might be, and the other ½ would be paid the following year;

(i)    statements, inter alia, to Sheldon Korn in 1999 at the Business'
Birmingham office, to Sheldon and Gale Korn in the spring or summer of 2000 in
Boyne City, and to Gale and Sheldon Korn in February or March 2001 at Walloon
Lake, that Defendant Lenchner intended to have the Business acquire residential
real estate and develop and rent, rather than sell, same in order to provide long
term residual income which Plaintiffs wanted;

(j)    statements, inter alia, to Sheldon Korn at the office of the
Business' attorney in the spring of 2000, that the Business' attorney and Lenchner
intended to be partners with Plaintiffs Gale and Sheldon Korn in the purchase and
development of raw land into individual lots to be resold to builders;

(k)    statements, inter alia, to Sheldon and Gale Korn shortly before the
2000 closing of the Business' Clarita Commons' sale of two parcels of land in
Livonia, Michigan (at which the purchaser was to, and did, pay $250,000 more
than the Business had invested in the land) that Defendant Lenchner|and Plaintiffs
would each receive $125,000 from that closing;

Plaintiffs Gale and Sheldon Korn, Shauna and Ashley Korn, and the two children of Defendant Lenchner and his wife;

(p)    statements, inter alia, to Plaintiffs Sheldon and Gale Korn in early 2001 in Charlevoix or Emmet County, that the Business' finished inventory in Charlevoix County was free and clear of any bank loans;

(q)    statements, inter alia, to Plaintiff Shauna Korn in early 2001 at the Business' Oakland County condominium project and at the business' Birmingham office, that Defendant Lenchner intended to train Shauna Korn how to search for and select land in Oakland County to be purchased for development and/or resale and to have the Business pay Plaintiff Shauna Korn ample income in the future;

(r)    statements, inter alia, to Plaintiff Sheldon Korn in the latter half of 2000 in Bloomfield Township, that the Business' attorney and that attorney's friend intended to form a joint venture with the business to purchase from mortgage lenders real estate that was in foreclosure and to be paid by mortgage lenders to fix up and sell properties in foreclosure;

(s)    statements, inter alia, to Plaintiffs Sheldon Korn and Gale Korn on or about April 28, 2001 at both Walloon Lake and Boyne Falls, that Defendant intended to purchase Sheldon Korn a new Harley Davidson motorcycle, a Sportster 883, as a birthday present (Defendant Lenchner later gave Plaintiff Sheldon Korn a brochure picturing the motorcycle);

(t)    statements, inter alia, to Plaintiff Sheldon Korn repeatedly from 1999 to 2001 and to Plaintiffs Sheldon and Gale Korn while driving on an Indiana trip in September, 2000 and in early 2001 in Charlevoix or Emmet County, that

Defendant Lenchner and his family only needed $5,000 per month to live on from the Business and implied that Defendant Lenchner would not take more than $5,000 per month;

(u)     statements, inter alia, to Plaintiff Sheldon Korn, inter alia, at the Business' Birmingham office in about the spring of 2001, that Shore Mortgage had contracted to pay the Business to remodel commercial property; and

(v)     statements, inter alia, to Plaintiffs Sheldon and Gale Korn in 2001 at Walloon Lake and to Plaintiff Sheldon Korn on April 28, 2002 in metro Detroit, that Defendant Lenchner had actively pursued and intended to actively pursue the Business' purchase of land in Lincoln Park from the Board of Education.

26.     Defendant Lenchner:

(a)     to get money deceitfully, made false sworn statements to banks and to title companies about payments and debts to lien holders on individual job sites and false statements to lenders as to the amounts the Business had supposedly paid for or invested in individual parcels of land;

(b)     caused the Business to pay exorbitant personal expenses of Defendant Lenchner and his family, such as remodeling of Defendant Lenchner's Harbor Springs and Oakland County homes;

(c)     fabricated or caused others to fabricate documents, e.g. invoices that appear to have been prepared and sent by third persons who may or may not have furnished goods or services, sometimes fabricating dates, job locations, and/or dollar amounts;

(d)      made knowingly false sworn statements as to the names of
subcontractors and materialmen and amounts paid and owed to subcontractors and
materials on numerous real estate development projects;

(e)      falsified, in order to obtain bank loans, the values of real property
and/or the existence of and/or amounts appraisals of real property;

(f)      provided extravagant gifts to one or more bank officers, in order to
obtain bank loans, including exorbitantly priced tickets to sporting or other
entertainment events, use of a luxury motor home, and home remodeling for less
than the out-of-pocket cost of doing so;

(g)      loaned money to Defendant Lenchner's brother and paid for
repairs and improvements to real property owned by Defendant Lenchner's
brother;

(h)      paid for remodeling the home of a friend, Warren Mendelson;

(i)      diverted money that resulted from the Business' sales of real estate
to Defendant Lenchner's personal bank account and/or personal use;

(j)      obtained large construction loan advances secured by substantially
unimproved real property before substantial construction was done and sometimes
before construction began; and

(k)      cheated contractors and materialmen who furnished services,
goods and other work for the business.

27.      Defendants not only acted in bad faith and with malice, knowing full well
that they were defrauding and deceiving Plaintiffs and unjustly enriching themselves at
Plaintiffs' expense, but Defendants, including Defendant Lenchner acting outside the

scope of his lawful employment and authority for the other Defendants, have conspired

and continue to conspire with one another and non-parties, including without limitation

bankers and professionals, to damage Plaintiffs by accomplishing one or more unlawful

purposes or accomplishing one or more lawful purposes by criminal or unlawful means,

e.g. to destroy evidence, to manufacture evidence, to engage in deceit and fraudulent

transactions, to otherwise make it as expensive, time-consuming and difficult as possible

for Plaintiffs to vindicate their rights with respect to the Defendants, and to enrich

themselves and divert to Defendant Lenchner's friends and relatives money and other

benefits; in furtherance of their scheme, inter alia, while assuring Plaintiffs that Plaintiffs

had been or would be treated equally and equitably, Defendants absconded with

Plaintiffs' money, property and benefits and Defendant Lenchner absconded with and

continues to misappropriate the other Defendants' profits, assets and opportunities.

## Count I
## Money Owing For Advances

28.     Plaintiff Korn Family Limited Partnership or, alternatively, Plaintiff Gale

Korn advanced at least the following sums on or about the following dates to the

Business by checks to the following:

| Date | Amount | Payee |
|------|--------|-------|
| 12-07-95 | 1,000.00 | Abington |
| 12-19-95 | 4,000.00 | Abington |
| 2-26-96 | 43,001.31 | Abington |
| 2-28-96 | 3,000.00 | Abington |
| 3-26-96 | 1,000.00 | Abington |
| 3-07-96 | 5,000.00 | Abington |

| Date | Amount | Payee |
|------|--------|-------|
| 4-19-96 | 2,500.00 | Abington |
| 4-26-96 | 15,000.00 | Abington |
| 6-11-96 | 20,000.00 | Abington |
| 7-10-96 | 14,891.58 | Abington |
| 7-10-96 | 16,000.00 | Abington |
| 10-18-98 | 1,000.00 | Abington |
| 11-16-99 | 40,000.00 | Abington |
| 12-2-99 | 350,000.00 | Abington |
| 12-23-99 | 150,000.00 | Bridgestone |

29.     Plaintiff Sheldon Korn advanced at least the following sums on the following dates to the Business by payments to the following:

| Date | Amount | Payee |
|------|--------|-------|
| 4-18-96 | 9,500 | Abington |
| 6-25-96 | 9,800 | Abington |

30.     Those advances were loans or, alternatively, capital contributions to the Business or, alternatively, the payees.

31.     However, only $57,000 was repaid to Plaintiff Korn Family Limited Partnership and only $9,800 was repaid to Plaintiff Sheldon Korn.

32.     In addition, Defendants' books and records do or did reflect that Plaintiffs effectively advanced or were otherwise entitled to these additional sums:

| Date | Amount |
|------|--------|
| 7-10-96 | 14,891.58 |
| 8-29-96 | 2,000.00 |

| | |
|---|---|
| 12-31-97 | 29,890.44 |
| 7-13-98 | 6,197.00 |
| 12-31-98 | 12,215.58 |
| 12-31-99 | 1,050.00 |
| 12-31-99 | 5,665.04 |
| 12-31-01 | 73,539.23 |
| 01-17-01 | 100,000.00 |

33.     By not paying Plaintiffs what was owed them, Defendants breached their contractual obligations, express or implied, including without limitation those under the Uniform Partnership Act.

34.     As a consequence of non-payment, the aforesaid Plaintiffs were damaged and are entitled to a judgment against Defendants, jointly and severally, for the amounts past due and owing from Defendants.

### Count III
### Conversion

35.     The allegations in the prior paragraphs are hereby adopted and realleged in their entirety as though completely set forth herein.

36.     Plaintiffs Korn Family Limited Partnership and Sheldon and Gale Korn delivered to one or more Defendants money to be used solely for purposes of the Business.

37.     Defendants converted that money for non-business use and without the consent of Plaintiffs.

38.     Defendants have refused to pay or replace the funds wrongfully taken.

39.     Defendants also misappropriated whatever equitable interest in the Business Plaintiffs Sheldon and Gale Korn had.

40.     Defendants' conduct constitutes conversion, theft and/or embezzlement of the money and property entrusted to them by Plaintiffs.

41.     As a direct and proximate result, Plaintiffs were damaged by the loss of funds and property.

## Count IV
## Liability Under MCL 600.2919a

42.     The allegations in the prior paragraphs are hereby adopted and realleged in their entirety as though completely set forth herein.

43.     Defendants Abington and Harbor delivered Plaintiffs' money and property to Defendant Lenchner under circumstances where Defendant Lenchner knew or should have known that the funds and property were stolen, embezzled or converted.

44.     As a direct and proximate result, Plaintiffs were damaged and, in addition to any other right or remedy, are entitled to treble damages from Defendant Lenchner plus costs and reasonable attorneys' fees.

## Count V
## Misrepresentation (Fraudulent Or Innocent)

45.     The allegations in the prior paragraphs are hereby adopted and realleged in their entirety as though completely set forth herein.

46.     Defendant Lenchner has engaged in a course of conduct that operated to deceive on Plaintiffs. Defendant Lenchner's false, material representations and material omissions include the following:

(a)     statements, inter alia, to Sheldon and Gale Korn often in 1995, including without limitation in November, 1995 at the Korns' Oakland County residence, and often thereafter, including without limitation on a trip to Indiana in late September, 2000, that Lenchner intended that the Business ultimately provide Sheldon and Gale Korn economic benefits equal to those that the Business would provide and had provided to Defendant Lenchner and his family;

(b)     statements, inter alia, to Sheldon and Gale Korn repeatedly in 1995, including without limitation in November 1995 at their Oakland County home, to Sheldon Korn, in early 1996 while driving in a car in Farmington Hills, to Sheldon Korn in late 1999 at the Business' Birmingham office, and to Sheldon and/or Gale Korn at other times that Plaintiffs advanced or were requested to advance money for the Business, that all money Plaintiffs had advanced and did advance in the future to the Business had been and would be used only for genuine business expenses and would not be taken by Defendant Lenchner for personal purposes;

(c)     statements, inter alia, to Sheldon and Gale Korn at the Korns' Oakland County home in 1996, that Robert Heinrich, the Business' banker, had agreed to pay the Business' actual cost to remodel the Heinrichs' Oakland County residence;

(d)     statements, inter alia, to Sheldon and Gale Korn in late 1998 at the Business' Birmingham office, that Defendant Lenchner had to borrow and was borrowing money just to live on;

(i)     statements, inter alia, to Sheldon Korn in 1999 at the Business'

Birmingham office, to Sheldon and Gale Korn in the spring or summer of 2000 in

Boyne City, and to Gale and Sheldon Korn in February or March 2001 at Walloon

Lake, that Defendant Lenchner intended to have the Business acquire residential

real estate and develop and rent, rather than sell, same in order to provide long

term residual income which Plaintiffs wanted;

(j)     statements, inter alia, to Sheldon Korn at the office of the

Business' attorney in the spring of 2000, that the Business' attorney and Lenchner

intended to be partners with Gale and Sheldon Korn in the purchase and

development of raw land into individual lots to be resold to builders;

(k)     statements, inter alia, to Sheldon and Gale Korn shortly before the

2000 closing of Clarita Commons' sale of two parcels of land in Livonia,

Michigan (at which the purchaser was to, and did, pay $250,000 more than the

Business had invested in the land) that Defendant Lenchner and Plaintiffs would

each receive $125,000 from that closing;

(l)     statements, inter alia, to Sheldon Korn in the fall of 2000 at

Metropolitan Beach boat show and to Sheldon and Gale Korn in the summer of

2000 at Walloon Lake, that Lenchner intended that the Business purchase a boat

suitable for use on Lake Michigan and that the boat be used equally by

Lenchner's family and the Korn family;

(m)     statements, inter alia, to Sheldon and Gale Korn while driving on

an Indiana trip in September, 2000, that the Business' cash flow was so good that

the Business would soon own its Charlevoix County inventory free and clear of

any bank loan, and that the Business would have ample ability to borrow in the future whatever money it might need;

(n) statements, inter alia, to Sheldon and Gale Korn on a trip to Indiana in September, 2000 and to Sheldon Korn in the fall of 2000 at the Business' Birmingham office, that Defendant Lenchner had arranged bank financing for the Business to purchase and develop land into individual building sites for resale to builders and to buy existing trailer home parks and to purchase and develop land for new trailer home parks;

(o) statements, inter alia, to Shauna Korn in the fall of 2000 at the Business' Oakland County condominium project and to Sheldon Korn in the fall of 2000 at the Business' Birmingham office, that Lenchner intended to have the Business construct four separate homes on the Business' land on First Street in Walloon Village and, after renting them for a period, to give one of each of the four homes to each of the four children, namely, the two children of Plaintiffs Gale and Sheldon Korn, Plaintiffs Shauna and Ashley Korn, and the two children of Defendant Lenchner and his wife;

(p) statements, inter alia, to Sheldon and Gale Korn in early 2001 in Charlevoix or Emmet County, that the Business' finished inventory in Charlevoix County was free and clear of any bank loans;

(q) statements, inter alia, to Shauna Korn in early 2001 at the Business' Oakland County condominium project and at the Business' Birmingham office, that Defendant Lenchner intended to train Plaintiff Shauna Korn how to search for and select land in Oakland County to be purchased for

development and/or resale and to have the Business pay Plaintiff Shauna Korn
ample income in the future;

(r)     statements, inter alia, to Sheldon Korn in the latter half of 2000 in
Bloomfield Township, that the Business' attorney and that attorney's friend
intended to form a joint venture with the Business to purchase from mortgage
lenders real estate that was in foreclosure and to be paid by mortgage lenders to
fix up and sell properties in foreclosure;

(s)     statements, inter alia, to Sheldon Korn and Gale Korn on or about
April 28, 2001 at both Walloon Lake and Boyne Falls, that Defendant intended to
purchase Sheldon Korn a new Harley Davidson motorcycle, a Sportster 883, as a
birthday present (Lenchner later gave Sheldon Korn a brochure picturing the
motorcycle);

(t)     statements, inter alia, to Sheldon Korn repeatedly from 1999 to
2001 and to Sheldon and Gale Korn while driving on an Indiana trip in
September, 2000 and in early 2001 in Charlevoix or Emmet County, that
Lenchner and his family only needed $5,000 per month to live on from the
Business and implied that Lenchner would not take more than $5,000 per month;

(u)     statements, inter alia, to Sheldon Korn, inter alia, at the Business'
Birmingham office in about the spring of 2001, that Shore Mortgage had
contracted to pay the Business to remodel commercial property; and

(v)     statements, inter alia, to Sheldon and Gale Korn in 2001 at
Walloon Lake and to Sheldon Korn on April 28, 2002 in metro Detroit, that

Lenchner had actively pursued and intended to actively pursue the Business'

purchase of land in Lincoln Park from the Board of Education.

47.    Defendants' statements to Plaintiffs of purported facts and of Defendants'

supposed intent were false.

48.    Plaintiffs were not aware of the falsity of Defendants' misrepresentations,

and Plaintiffs reasonably and detrimentally relied upon Defendants' misrepresentations.

For example, Plaintiffs continued to advance money and expend time and effort to

develop the Business rather than cease doing so.

49.    Defendants made the above stated misrepresentations knowing they were

false and with the intent to deceive Plaintiffs or made them recklessly or without

knowledge of the truth and as a positive assertion. Alternatively, if Defendants made

those false statements innocently, Defendants made them in the context of the parties'

contractual and business relationships and the injuries suffered by Plaintiffs have inured

to the benefit of Defendants; inter alia, Defendant Lenchner has, among other things,

obtained money and other benefits from the Business to which Plaintiffs were entitled.

50.    As a direct and proximate result, Plaintiffs have been and will continue to

be damaged, including without limitation loss of income and property and rights and

increased expenses.

### Count VI
### Silent Fraud

51.    The allegations in the prior paragraphs are hereby adopted and realleged in

their entirety as though completely set forth herein.

52.    Defendants made not only material false representations to Plaintiffs as

aforesaid but omitted to disclose material facts to Plaintiffs during the parties'

relationship, the disclosure of which was necessary to make Defendants' statements and other conduct not misleading. For example, Defendant Lenchner never disclosed to Plaintiffs that Defendant Lenchner had received over $1,000,000 more from the Business than Plaintiffs Sheldon and Gale Korn had.

53. Plaintiffs were not aware that Defendants' material omissions were false and misleading, and reasonably relied on Defendants' misrepresentations and misleading omissions. For example, Plaintiffs continued to advance money and expend time and effort to develop the Business rather than cease doing so.

54. As a direct and proximate result, Plaintiffs have been and will continue to be damaged, including without limitation loss of income, property and rights and increased expenses.

## Count VII
## Bad Faith Promises

55. The allegations in the prior paragraphs are hereby adopted and realleged in their entirety as though completely set forth herein.

56. Defendants committed fraud on Plaintiffs by Defendants making bad faith promises to Plaintiffs. For example, Defendants' false statements of purported fact and of purported intent were promises to Plaintiffs, e.g. that Defendants would furnish Plaintiffs cash and other benefits equal to those that Defendants Lenchner and his family had received from the Business, when in fact Defendants either intended not to keep that promise or had not decided whether to keep that promise.

57. Defendants made their bad faith promises to induce Plaintiffs to rely, for example, to cause Plaintiffs:

(a)    to believe Defendants were adequately dealing with the Business and were not converting and/or stealing from the Business or Plaintiffs; and

(b)    to continue to invest time and money in the Business.

58.    Plaintiffs reasonably relied upon Defendants' bad faith promises. For example, Plaintiffs continued to believe that Defendants were faithfully and competently dealing with the Business and Plaintiffs continued to spend time and money for the Business.

59.    As a direct and proximate result, Plaintiffs have been and will continue to be damaged, including without limitation loss of income, property and rights and increased expenses.

### Count VIII
### Breach Of Fiduciary Duty

60.    The allegations in the prior paragraphs are hereby adopted and realleged in their entirety as though completely set forth herein

61.    Whether as partners or joint ventures or due to the familial and business relationships, each Defendant owed to each Plaintiff the duty of a fiduciary, including without limitation:

(a)    to deal in Plaintiffs with good faith with respect to all matters;

(b)    to act with fidelity and loyalty toward Plaintiffs;

(c)    to refrain from taking advantage of Plaintiffs by misrepresentation, concealment, threat or adverse pressure of any kind; and

(d)    to completely disclose to Plaintiffs all information concerning the business and its opportunities.

62.    Each Defendant breached its fiduciary duties in, inter alia, the following ways:

(a)     Defendants misappropriated Plaintiffs' funds and property;

(b)     Defendant Lenchner misappropriated the Business' assets and opportunities;

(c)     Defendants failed to reveal the true disposition of the Business' funds property, and opportunities;

(d)     Defendants made unauthorized expenditures of Business funds for uses other than the Business;

(e)     Defendants conducted the Business for Defendant Lenchner's benefit to the detriment of Plaintiffs; and

(f)     Defendants engaged in misrepresentations and fraudulent and deceitful conduct as aforesaid.

63.     As a direct and proximate result, Plaintiffs have been and will continue to be damaged, including without limitation loss of income, property and rights and increased expenses.

## Count IX
## Tortious Interference

64.     The allegations in the prior paragraphs are hereby adopted and realleged in their entirety as though completely set forth herein.

65.     As alleged above, Plaintiffs had advantageous contractual and other business relationships and expectancies with the Business and each Defendant.

66.     Each Defendant tortiously interfered with each Plaintiff's relationship with the Business and every other Defendants, e.g., for the wrongful purpose of misappropriating the money and other benefits to which Plaintiffs were entitled and which Plaintiffs expected to receive.

67.     As a direct and proximate result, Plaintiffs have been and will continue to be damaged, including without limitation loss of income, property and rights and increased expenses.

## Count X
## Discharge/Termination In Violation of Public Policy, Or Alternatively, Violation of The Whistle-Blowers' Protection Act

68.     The allegations in the prior paragraphs are hereby adopted and realleged in their entirety as though completely set forth herein.

69.     Plaintiffs Sheldon, Gale, Shauna and Ashley Korn, and each of them, had contractual relationships and/or advantageous business relationships and/or expectancies with the Business and Defendants; alternatively, within the meaning the Whistle-blowers' Protection Act, Plaintiffs, or some of them, were employees within the meaning of the Whistle-blowers Protection Act, e.g. an individual performing a service for remuneration under a contract of hire, written or oral, express or implied.

70.     Contrary to public policy or, alternatively, the Whistle-blowers' Protection Act, Defendants purported to discharge Plaintiffs because Plaintiffs or someone acting on behalf of Plaintiffs was about to report a violation or a suspected violation of a law, including without limitation the Internal Revenue Code, to a law enforcement agency or other public body.

71.     Specifically, on or about December 31, 2002, Defendants purported to discharge Plaintiffs, and each of them, and terminate Plaintiffs' contractual relationships and business relationships or expectancies with Defendants because Plaintiffs or someone acting on their behalf, was about to report Defendants' unlawful conduct to a law enforcement agency, including without limitation the Internal Revenue Service.

72.     As a direct and natural result, Plaintiffs have been and will continue to be damaged, including without limitation the loss of income, property and rights and increased expenses. In addition, if the Whistle-blowers' Protection Act is applicable, Plaintiffs are entitled to reinstatement, payment of back wages and fringe benefits and the costs of litigation, including reasonable attorneys' fees and witness fees.

**Count XI**
**Civil Conspiracy**

73.     The allegations in the prior paragraphs are hereby adopted and realleged in their entirety as though completely set forth herein.

74.     All Defendants willfully, intentionally, and through concerted action conspired among themselves and with others, including bankers and professionals, to convert Plaintiffs' property, to violate MCL 600.2919a, to cheat and defraud all Plaintiffs, to commit silent fraud on Plaintiffs, to make bad faith promises to Plaintiffs, to breach fiduciary duties owed Plaintiffs, and to tortiously interfere with Plaintiffs' advantageous contractual and other business relationships and expectancies.

75.     Defendants alone or with others, knowingly and intentionally conspired and acted in concert to accomplish an unlawful purpose, e.g., to misappropriate obtain and keep Plaintiffs' money and the benefit of Plaintiffs' services and to deprive Plaintiffs of the cash and other benefits from the Business to which Plaintiffs were entitled, or to accomplish a lawful purpose by unlawful means, e.g., to increase Defendants' wealth by Defendants' aforesaid fraudulent and deceitful conduct.

76.     In furtherance of the conspiracy, the conspirators committed overt acts by, inter alia, making the aforesaid conversions, fraudulent statements of fact and intent, bad faith promises and material omissions of fact.

77.     As a direct and proximate result, Plaintiffs have been and will continue to be damaged, including without limitation loss of income, property and rights and increased expenses; and personal injuries

## Count XII
## Breach Of Contract

78.     The allegations in the prior paragraphs are hereby adopted and realleged in their entirety as though completely set forth herein.

79.     Defendants' promises and statements of intent were agreements or contractual obligations, express and/or implied, for which there was good and valuable consideration.

80.     Defendants expressly or impliedly agreed, inter alia, that each of the individual Plaintiffs would be reasonably and adequately compensated for their money and services to the Business, including without limitation that Plaintiffs Shauna and Ashley Korn would receive 3% of the selling prices of properties of the Business in the sale of which they participated and that Plaintiffs Sheldon and/or Gale Korn would receive cash and other benefits from the Business equal to those that Defendant Lenchner and his family received.

81.     Defendants breached their promises and agreements.

82.     As a direct and proximate result, Plaintiffs have been and will continue to be damaged, including without limitation loss of income, property, and rights and increased expenses.

## Count XIII
## Promissory Estoppel

83. The allegations in the prior paragraphs are hereby adopted and realleged in their entirety as though completely set forth herein.

84. Defendants' aforesaid statements of purported fact and of Defendants' purported intent to Plaintiffs were promises.

85. Defendants did or reasonably should have expected to induce Plaintiffs to take action of a definite and substantial nature in reliance on Defendants' promises.

86. Defendants' promises induced and produced reliance by Plaintiffs, e.g. Plaintiffs allowed Defendant Lenchner to continue his position of trust in the Business for years.

87. As a direct and proximate result, Plaintiffs have been and will continue to be damaged, including without limitation loss of income, property and rights and increased expenses.

## Count XIV

88. The allegations in the prior paragraphs are hereby adopted and realleged in their entirety as though completely set forth herein.

89. As an alternative and/or in addition, in whole or in part, to Plaintiffs' right to recover under the foregoing Counts, Plaintiffs Sheldon and Gale Korn may be equitably entitled to own 50% of the Business or, alternatively, of each Defendant, except for Defendant Lenchner.

90. In that event:

(a) Defendant Lenchner had fiduciary duties with respect to the Business and the other Defendants, e.g., to act in good faith, with the care an ordinarily prudent person in a like position would act under similar circumstances, in

a matter Defendant Lenchner reasonably believed to be in the best interest

of the other Defendants, and not to divert a business opportunity for

personal gain; and

(b)     because Defendant Lenchner exercised control in directing much of the

other Defendants' finances, Defendant Lenchner had fiduciary duties to

those Plaintiffs who equitably owned such interests.

91.     As alleged above, Defendant Lenchner violated his fiduciary obligations

to the other Defendants and to Plaintiffs, e.g., illegal, fraudulent or willfully unfair and

oppressive conduct and using "squeeze-out" techniques including refusing to make

distributions to Plaintiffs, misappropriating the Business' checking and savings accounts

by paying exorbitant sums to Defendant Lenchner and those connected with him,

depriving Plaintiffs of the benefits of their contractual relationships and business interests

and expectancies with the Defendant entities, and fraudulently transferring assets from

the other Defendants to Defendant Lenchner or his designee Woodbridge Development,

LLC.

92.     As a direct and proximate result, Plaintiffs have been and will continue to

be damaged, including without limitation loss of income, property and rights, and

increased expenses.

## Count XV
## Exemplary Damages

93.     The allegations in the prior paragraphs are hereby adopted and realleged in

their entirety as though completely set forth herein.

94.     Defendants' conduct was willful, wanton or in reckless disregard of

Plaintiffs' rights and expectancies.

95.     Consequently, Plaintiffs are entitled to recover exemplary damages.

WHEREFORE, Plaintiffs request that this Court enter a judgment in their favor and against Defendants and each of them, jointly and severally for whatever monetary relief in excess of $25,000 to which Plaintiffs are found to be entitled, treble damages, costs and attorney fees to Plaintiffs pursuant to MCL 600.2929a, exemplary damages, interest, costs, attorney fees, and such other relief as this Court deems appropriate.

**UNGER, GARRATT & BACHAND, P.C.**

By: _John W. Unger_/no
    John W. Unger (P21679)
Attorneys for Plaintiffs
222 North Bridge Street, P.O. Box 1079
Bellaire, MI 49615
(231) 533-6566

Dated: February 9, 2004

# EXHIBIT B

# STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF CHARLEVOIX

KORN FAMILY LIMITED PARTNERSHIP,
GALE KORN, SHELDON KORN, SHAUNA
KORN, and ASHLEY KORN,

        Plaintiffs and             Case No. 03-1723-19-CB
        Counter-Defendants,

v.                             Hon. Richard M. Pajtas

HARBOR BUILDING COMPANY, LLC,
DISCOUNT HOMES, LLC, NORTHERN
GRADING, EXCAVATING & SEPTIC, LLC,
ABINGTON DEVELOPMENT COMPANY,
INC., BRIDGESTONE DEVELOPMENT, LLC,
and LAWRENCE LENCHNER,



        Defendants and
        Counter-Plaintiffs.

---

John W. Unger (P21676)       David H. Oermann (P36696)
Unger, Garratt & Bachand, PLLC    Dana J. LaKritz (P59584)
Attorneys for Plaintiffs and Counter-   Butzel Long, P.C.
Defendants                   100 Bloomfield Hills Parkway, Suite 200
222 North Bridge Street         Bloomfield Hills, Michigan 48304-2949
P.O. Box 1079                 (248) 258-1412
Bellaire, Michigan 49615            and
(231) 533-6566                Scott T. Beatty (P24202)
                              111 State Street, #1
                              Charlevoix, Michigan 49720
                              (231) 547-4059
                              Co-Counsel for Defendants and Counter-
                              Plaintiffs

---

## DEFENDANTS' ANSWER,
## AFFIRMATIVE DEFENSES AND COUNTERCLAIM

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

RECEIVED
FEB 21 2003
By

## ANSWER

Defendants, Harbor Building Company, LLC, Discount Homes, LLC, Northern Grading, Excavating & Septic, LLC, Abington Development, Inc., Bridgestone Development, LLC and Lawrence Lenchner ("Defendants"), by their attorneys, answers Plaintiffs' Complaint as follows:

## COMMON ALLEGATIONS

1.    Defendants admit the allegations of paragraph 1.

2.    Defendants admit that Defendants Harbor Building Company, LLC, Discount Homes, LLC and Northern Grading, Excavating & Septic, LLC have or have had their principal place of business in Charlevoix County, Michigan. The remaining allegations of paragraph 2 are denied for the reason that the same are untrue.

3.    Defendants admit the allegations of paragraph 3; however, they deny that they are liable to Plaintiffs in any amount.

## COUNT I

4.    Defendants neither admit nor deny the allegations of paragraph 4 for the reason that they lack knowledge or information sufficient to form a belief as to the truth thereof.

5.    Defendants deny the allegations of paragraph 5 for the reason that the same are untrue.

6.    Defendants deny the allegations of paragraph 6 for the reason that the same are untrue.

7.    Defendants deny the allegations of paragraph 7 for the reason that the same are untrue.

8.    Defendants deny the allegations of paragraph 8 for the reason that the same are untrue.

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

## COUNT II

9.      Answering paragraph 9, Defendants admit only that during the past six (6) years there have been oral agreements between some of the Defendants and Plaintiffs whereby certain Plaintiffs could earn money for real estate sales work or construction supervision performed on behalf of those entities. The remaining allegations of paragraph 9 are neither admitted nor denied for the reason that Defendants lack knowledge or information sufficient to form a belief as to the truth thereof.

10.     Defendants deny the allegations of paragraph 10 for the reason that the same are untrue.

11.     Defendants deny the allegations of paragraph 11 for the reason that the same are untrue.

*WHEREFORE,* Defendants request that Plaintiffs' Complaint be dismissed, in whole or in part or, alternatively, that a Judgment of no cause of action be entered thereon in favor of Defendants with attorneys' fees and costs to be taxed against Plaintiffs.

## AFFIRMATIVE DEFENSES

For their Affirmative Defenses against Plaintiffs, Defendants state as follows:

1.      The Complaint, in whole or in part, fails to state a cause of action upon which relief can be granted.

2.      If Plaintiffs are damaged as alleged, which is not admitted, such damages resulted in whole or in part from Plaintiffs' actions for which Defendants are not responsible.

3.      If Plaintiffs are damaged as alleged, which is not admitted, such damages resulted, in whole or in part, from the breach of contract by Plaintiffs for which Defendants are not responsible.

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

4.     Plaintiffs are estopped to assert any and all claims against Defendants.

5.     All or some of the claims asserted against Defendants are subject to set-off amounts owing from Plaintiffs to Defendants which exceed the amounts claimed by Plaintiffs.

6.     All or some of the claims asserted against Defendants are barred by Plaintiffs' misrepresentations and fraudulent inducement to enter into the contracts alleged in Plaintiffs' Complaint.

7.     Plaintiffs' cause of action is barred by the "unclean hands doctrine".

8.     Because of Plaintiffs' fraud, breaches of fiduciary duty and other unlawful conduct set out fully in the Counterclaim alleged below, Plaintiffs would be unjustly enriched if they were permitted to recover damages in the amount alleged.

9.     All or some of the claims asserted against Defendants are barred by the statute of frauds.

10.    Defendants reserve the right to add such other Affirmative Defenses as may become known to them through the course of their investigation and discovery of this matter.

Respectfully submitted,

Dated: February 20, 2003          By: _____

David H. Oermann (P36696)
Dana J. LaKritz (P59584)
100 Bloomfield Hills Parkway, Suite 200
Bloomfield Hills, Michigan 48304-2949
(248) 258-1412
AND
Scott T. Beatty (P24202)
111 State Street, #1
Charlevoix, Michigan 49720
(231) 547-4059
Co-Counsel for Defendants/Counter-Plaintiffs

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

## COUNTERCLAIM

Harbor Building Company, LLC ("Harbor"), Abington Development, Inc. ("Abington") and Lawrence Lenchner ("Mr. Lenchner"), (collectively "the Lenchner entities"), by their attorneys, state as follows for their Counterclaim against Plaintiffs/Counter-Defendants, Korn Family Limited Partnership, Gale Korn, Sheldon Korn, Shauna Korn and Ashley Korn (collectively "the Korns"):

### Preliminary Statement of Factual Predicate

1.  This Counterclaim is premised on the willingness of Michigan courts to protect citizens generally from unlawful conduct, and in particular, from being taken unfair advantage of by the Korns, once trusted agents and fiduciaries who utilized a scheme to siphon off business and corporate funds through a clear pattern of fraud and manipulation. This case is also about unrestrained personal greed by the Korns.

2.  The Korns' scheme is not new: Using their family relationship with Mr. Lenchner, the Korns set out to lull him into a complete sense of trust to obtain access to Mr. Lenchner's companies' business bank accounts and then feigned as though that money was needed for business purposes, so that they could drain over $700,000 from those accounts for personal use.

3.  Sheldon Korn has honed his skills as a master schemer and a professional litigant, and as such, his attempt to end run the law is not new. Indeed, he has been involved in roughly 50 lawsuits, mostly as a defendant, and he has millions of dollars in outstanding judgments against him. The only difference now is that he utilizes the services of his wife, Gale Korn, and his adult daughters on a part-time basis to further his unlawful objectives.

4.     Sheldon and Gale Korn's unseemly business practices are already on display before the Court in Case No. 01-118-19-NZ. In that matter, Sheldon and Gale Korn along with other defendants manipulated an elderly woman to sell a valuable price of real estate on Walloon Lake at a price well below market price, so that they could flip the home a short time later for a tidy profit of hundreds of thousands of dollars.

5.     Now, the Korns have chosen to prey upon their brother-in-law, Larry Lenchner, and the Lenchner entities.

6.     As a result of the Korns' unlawful conduct, Mr. Lenchner and the Lenchner entities have suffered roughly $1 million in damages.

### The Parties

7.     Harbor is a Michigan Limited Liability Company with its principal place of business at 770 S. Adams, Suite 210, Birmingham, in Oakland County, Michigan. Harbor's sole member and owner is Larry Lenchner.

8.     Abington is a Michigan Corporation with its principal place of business at 770 S. Adams, Suite 210, Birmingham, in Oakland County, Michigan. Abington's sole stockholder is Larry Lenchner.

9.     The Korns allege that they are residents of Charlevoix County, Michigan.

10.    Counter-Defendant Korn Family Limited Partnership is a Michigan limited partnership.

11.    The Korns were agents for Harbor and/or Abington from approximately 1997 until their termination on or about December 28, 2002.

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

## Jurisdiction and Venue

12.     The amount in controversy in this Counterclaim exceeds $25,000 exclusive of interest and costs.

13.     Venue is proper in this Court because the events giving rise to this Counterclaim occurred, in part, in Charlevoix County and involves the Korns, who are alleged to be residents of Charlevoix County. (Plaintiffs' Complaint, ¶1).

14.     Venue and jurisdiction are also proper because the Korns have submitted themselves to the jurisdiction of this Court by having filed the underlying Complaint in this action.

## Common Allegations

15.     The allegations in paragraphs 1 through 14 are hereby adopted and realleged in their entirety as though completely set forth herein.

16.     In 1997, Sheldon and Gale Korn began to work as independent sales agents for Abington in connection with the sale of homes in various Abington residential housing developments in the Farmington Hills, Michigan area.  Sheldon Korn also worked for Abington as an independent contractor helping to supervise the construction of Abington home construction.

17.     In 2001, Sheldon and Gale Korn began to work in the same capacities alleged above for Harbor in connection with the construction and sale of homes in Harbor's residential housing project in the Village of Walloon Lake, County of Charlevoix, Michigan.

18.     In 2001, Counter-Defendants Shauna and Ashley Korn also worked from time to time as independent sales agents for Harbor.

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

19. Abington and Harbor's sole owner, Mr. Lenchner, was responsible for providing the financing and acquiring the land for the Abington and Harbor housing developments and provided the builder's license and insurance for all construction.

20. To allow Sheldon Korn to perform his duties as an agent of Abington and Harbor and because Mr. Lenchner trusted his brother-in-law, Mr. Lenchner gave Sheldon Korn authority to write and sign checks against Abington and Harbor's business checking accounts. This authorization was limited only for the purpose of providing Sheldon Korn with a source of funds for legitimate business expenses relating to the Abington and Harbor housing projects.

21. At no time did Abington, Harbor or Lenchner authorize Sheldon Korn to write and sign checks on these business bank accounts and lines of credit for reasons other than legitimate business expenses relating to home construction or home sales for Abington and Harbor.

22. Contrary to Mr. Lenchner's instructions and authorization, Sheldon Korn wrote and signed checks to pay his own personal expenses and conspired with Gale, Shauna and/or Ashley Korn to obtain hundreds of thousands of dollars for themselves and to funnel money for the Korns' personal expenses unrelated to Abington and Harbor. These personal expenses included, but are not limited to, labor and materials for construction and equipment for his family horse farm in Northern Michigan, labor for construction on his homes in West Bloomfield and Walloon Lake, personal American Express bills, automobiles, a down payment for a home purchased by Cranbrook Properties, L.L.C. of which Gale Korn is sole shareholder, and other everyday living expenses for Sheldon, Gale, Shauna and Ashley Korn.

23. During the Korns' nearly two (2) years of working as sales agents for Harbor as an example, they constructed nine (9) homes and sold only one (1) home in total while diverting over $700,000 to themselves above and beyond the money needed to construct the nine homes.

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

24.     The Korns purposefully schemed with each other and simply accepted money for sales they knew never existed and for work that they knew was never performed.

25.     In furtherance of their scheme, the Korns took Abington's and Harbor's money and used it for their own purposes, while representing to Mr. Lenchner and his company's employees that such monies were being used only for business purposes related to Abington and/or Harbor properties.

26.     Counter-Defendants acted in concert, in bad faith and with malice, knowing full-well that they were defrauding the Lenchner entities out of hundreds of thousands of dollars.

### Count I—
### Conversion

27.     The allegations in paragraphs 1 through 26 are hereby adopted and realleged in their entirety as though completely set forth herein.

28.     Unbeknownst to the Lenchner entities, Sheldon Korn wrote and signed checks from the Abington and Harbor bank accounts for personal use without any lawful right to do so.

29.     Unbeknownst to the Lenchner entities, the Korns knowingly accepted and negotiated the checks, drawn against the Abington and Harbor accounts and written and signed by Sheldon Korn without any lawful right to do so.

30.     The Korns have both expressly and by their silence refused to repay the Korn entities the funds wrongfully taken.

31.     The Korns have knowingly accepted and negotiated checks, written and signed by Sheldon Korn from the Abington and Harbor accounts, amounting to over $700,000.

32.     The acts described above constitute an unlawful conversion of the Lenchner entities' property, resulting in damages to them.

Document: 000118892/0003/399821/c6xd01_

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

## Count II—
## Civil Conspiracy to Commit Conversion

33. The allegations in paragraphs 1 through 32 are hereby adopted and realleged in their entirety as though completely set forth herein.

34. Upon information and belief, Counter-Defendants willfully, intentionally, fraudulently and through concerted action conspired among themselves, and perhaps with others, to write, sign and negotiate checks from the Abington and Harbor accounts for purposes unrelated to Abington and Harbor business.

35. In furtherance of the conspiracy and for the purpose of carrying it out, the Korns conspired among themselves, and perhaps with others, to write, sign and negotiate checks from the Abington and Harbor accounts for purposes unrelated to Abington and Harbor business.

36. As a direct and proximate result of the Korns' concerted actions in connection with the unlawful conversion of the Lenchner entities' property, they have been damaged because of the Korns' wrongful conduct.

## Count III—
## Breach of Fiduciary Duty

37. The allegations in paragraphs 1 through 36 are hereby adopted and realleged in their entirety as though completely set forth herein.

38. As an agent for the Lenchner entities, Sheldon Korn agreed to supervise and manage residential construction at the Abington and Harbor projects and to sell homes as they were constructed.

39. As sales agents for Abington and Harbor, Gale, Shauna and Ashley Korn agreed to solicit and sell the Abington and Harbor homes constructed under Sheldon Korn's supervision.

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

40. As agents of the Lenchner entities, the Korns owed fiduciary duties and duties of loyalty, honesty, good faith and trust to the Lenchner entities as follows:

    a. To deal with utmost good faith with respect to all Abington and Harbor matters;

    b. To act with complete fidelity and loyalty to Abington, Harbor and Lenchner;

    c. To refrain from taking advantage of Abington, Harbor and Lenchner by the slightest misrepresentation, concealment, threat or adverse pressure of any kind;

    d. To not engage in any transactions for their own benefit; and

    e. To make full and complete disclosure of information concerning the Abington and Harbor businesses and the companies' bank accounts.

41. The Korns have breached their fiduciary duties owed to the Lenchner entities by failing to act in good faith on and for the benefit of the Lenchner entities in the following ways:

    a. Failing to make good faith efforts to sell homes in the Abington and Harbor developments;

    b. Misappropriating and using Abington and Harbor funds for personal use;

    c. Failing to reveal the true disposition of funds wrongfully and fraudulently taken from the Abington and Harbor accounts and/or lines of credit;

    d. Making unauthorized expenditures for personal use or for uses other than for the business of Abington or Harbor; and

    e. Sheldon Korn assuming control of the funds and assets of Abington and Harbor and conducting their business in his own name and/or for his own benefit or that of Gale, Shauna and Ashley Korn and not for the benefit of Abington, Harbor and Lenchner.

42. As of result of the Korns' self dealing and flagrant breaches of their fiduciary obligations, the Lenchner entities have been and will continue to be damaged.

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

## Count IV—
## Civil Conspiracy To Commit Breach Of Fiduciary Duty

43. The allegations in paragraphs 1 through 42 are hereby adopted and realleged in their entirety as though completely set forth herein.

44. The Korns knew or should have known of each other's fiduciary duties owed to the Lenchner entities.

45. The Korns knew or should have known that they were each breaching their fiduciary duties of loyalty, honesty, good faith and trust to the Lenchner entities.

46. The Korns knowingly and intentionally conspired and acted in concert to breach the fiduciary duties owed by them to the Lenchner entities.

47. This concerted action by the Korns was done to accomplish the unlawful purpose of obtaining money for work that was never performed and for personal use unrelated to the business of Abington and Harbor.

48. As a direct and proximate result of the breach of fiduciary duties owed to the Lenchner entities and the active participation of each of the Korns, the Lenchner entities have been and will continue to be damaged because of the Korns deceptive and wrongful conduct.

## Count V—
## Fraud

49. The allegations in paragraphs 1 through 48 are hereby adopted and realleged in their entirety as though completely set forth herein.

50. By reason of the Korns' conduct as set forth above, the Korns have engaged in a practice and course of conduct that has operated as a fraud and a deceit on the Lenchner entities.

51. Sheldon Korn made repeated false representations to Mr. Lenchner and his companies' employees that he had utilized Abington and Harbor money only for legitimate

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

Do14-04408-tt92/dDoc3271/ceFiled 10/01/14   Entered 10/01/14 18:57:30   Page 82 of 255

business purposes and omitted to state material facts pertaining to residential sales, necessary expenses, and expenditures for Abington and Harbor, the disclosure of which was necessary to make his statements not misleading.

52. The Lenchner entities were not aware that these representations and omissions were false and misleading, and they actually and reasonably relied upon the misrepresentations, and fraudulent omissions made to them by Sheldon Korn.

53. In direct reliance upon the repeated misrepresentations and fraudulent omissions made by Sheldon Korn, the Lenchner entities invested money in residential developments, expended money, time and effort to develop, build and sell homes, extended bank account checking authorization to Sheldon Korn for the Abington and Harbor businesses, which was used instead for personal expenses, and extended other benefits to the Korns such as, among other things, cellular phone usage, home telephone usage and gasoline mileage.

54. Sheldon Korn made the above stated representations knowing they were false and made them with the intent to deceive the Lenchner entities or made them recklessly without any knowledge of the truth as a positive assertion so that the Lenchner entities would act or rely upon the representations.

55. As a direct and proximate result of Sheldon Korn's misrepresentations and fraudulent omissions, the Lenchner entities have been and will continue to be damaged because of Sheldon Korn's deceptive and wrongful conduct.

### Count VI—
### Silent Fraud

56. The allegations in paragraphs 1 through 55 are hereby adopted and realleged in their entirety as though completely set forth herein.

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

57. The Korns had an obligation to disclose to the Lenchner entities and to act in utmost good faith on all business matters for the benefit of Abington, Harbor and Mr. Lenchner.

58. The Korns have breached their duties of disclosure and good faith in the following ways:

    a.    Failing to make good faith efforts to sell homes in the Abington and Harbor developments;

    b.    Misappropriating and using Abington and Harbor funds for personal use;

    c.    Failing to reveal the true disposition of funds taken from the Abington and Harbor bank accounts;

    d.    Making unauthorized expenditures for personal use or for uses other than for the business of Abington or Harbor; and

    e.    Sheldon Korn assuming control of the funds and assets of Abington and Harbor and conducting their business in his own name and/or for his own benefit or that of Gale, Shauna and Ashley Korn and not for the benefit of Abington, Harbor and Lenchner.

59. The Lenchner entities relied upon the Korns' omissions and misrepresentations.

60. As a direct and proximate result of such reasonable reliance, the Lenchner entities have been and will continue to be damaged because of the Korns' deceptive and wrongful conduct.

## Count VII—
### Innocent Misrepresentation

61. The allegations in paragraphs 1 through 60 are hereby adopted and realleged in their entirety as though completely set forth herein.

62. Sheldon Korn made repeated material false representations in his discussions with Mr. Lenchner during the Korns' agency relationship with the Lenchner entities when he repeatedly told Mr. Lenchner that the Harbor project was proceeding in due course, that all of the

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

Harbor expenditures were necessary and that he was taking Harbor and Abington funds for business purposes only.

63. The Korns made repeated material omissions during their agency relationship with the Lenchner entities when they repeatedly omitted to tell Mr. Lenchner that the Harbor project was not proceeding in due course, that certain Harbor expenditures were unnecessary and that he was taking money from the Harbor accounts for more than business purposes only, the disclosure of which was necessary to make his statements not misleading.

64. The Korns made the above fraudulent omissions and representations to induce the Lenchner entities to believe that:

        a.    the Korns were adequately handling Abington and Harbor business;

        b.    the Lenchner entities should continue to invest the time and money to continue the Harbor project;

        c.    the Korns should remain in their agency relationships; and

        d.    Sheldon Korn was making only necessary expenditures and not converting and/or stealing money from the Lenchner entities.

65. The Lenchner entities were not aware that Sheldon Korn's representations and the Korns' omissions were false and misleading, and they actually and reasonably relied on the statements made to them by Sheldon Korn and on the omissions by the Korns.

66. The injuries suffered by the Lenchner entities have inured to the benefit of the Korns in that the Korns have, among other things, embezzled and converted hundreds of thousands of dollars from the Lenchner entities.

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

67.    As a direct and proximate result of such false representations and fraudulent omissions, the Lenchner entities have been and will continue to be damaged because of the Korns' deceptive and wrongful conduct.

## Count VIII—
### Conspiracy To Commit Fraud, Silent Fraud And Innocent Misrepresentation

68.    The allegations in Paragraphs 1 through 67 are hereby adopted and realleged in their entirety as though completely set forth herein.

69.    The Korns willfully, intentionally, fraudulently and through concerted action conspired among themselves, and perhaps with others, to cheat and defraud the Lenchner entities by concealing from them the information and dealings of the Abington and Harbor businesses as described herein.

70.    In furtherance of the conspiracy and for the purpose of carrying it out, the Korns conspired among themselves, and perhaps with others, to conceal the information and dealings of the Abington and Harbor businesses as described herein.

71.    As a direct and proximate result of acting in reasonable reliance upon the Korns' fraudulent representations, fraudulent omissions, and innocent misrepresentations, in connection with the concealment of the information and dealings of Abington and Harbor businesses as described herein, the Lenchner entities have been and will continue to be damaged because of the Korns' deceptive and wrongful conduct.

## Count IX—
### Promissory Estoppel

72.    The allegations in paragraphs 1 through 71 are hereby adopted and realleged in their entirety as though completely set forth herein.

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

73. The Korns have repeatedly made misrepresentations or fraudulent omissions to the Lenchner entities concerning the Abington and Harbor projects, expenditures for same, and the use of business funds for other than Abington and Harbor business.

74. The Korns reasonably should have expected to induce the Lenchner entities to take action of a definite and substantial nature in reliance on the above-stated misrepresentations or fraudulent omissions.

75. The facts alleged above unequivocally establish that the Korns' misrepresentations, fraudulent omissions and conspiracy actually produced reliance by the Lenchner entities in that they allowed the Korns to continue their agency relationship and their positions of trust with Abington and Harbor for several years.

## Count X—
## Unjust Enrichment

76. The allegations in paragraphs 1 through 75 are hereby adopted and realleged in their entirety as though completely set forth herein.

77. As a result of the Korns' unlawful conduct described above, they have been unjustly enriched.

78. It is inequitable for the Korns to retain the substantial unearned and unjustified funds they paid to themselves out of the Abington and Harbor bank accounts.

## Count XI—
## Constructive Trust

79. The allegations in paragraphs 1 through 78 are hereby adopted and realleged in their entirety as though completely set forth herein.

80. The Korns had a fiduciary relationship with the Lenchner entities.

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

81.    The Korns assumed a relationship of trust and confidence with the Lenchner entities.

82.    In their agency relationships, the Korns, among other things, were obligated to act only in the best interests of the Lenchner entities.

83.    As a result of the Korns' unlawful conduct described above, including, but not limited to, the siphoning off of Abington and Harbor funds to the Korns personally, a constructive trust should be imposed on all of the Korns' property in their possession and in the Korn Family Limited Partnership.

84.    The Korns utilize a family partnership to hide assets. The Korn Family Limited Partnership holds some of the Lenchner entities' property which was wrongfully taken, converted, stolen and used by the Korns.

85.    The Court should impose a constructive trust on property which is acquired by fraud or other circumstances that render it unconscionable for wrongdoers, like the Korns, to retain title to or benefit from such property.

86.    Because the Lenchner entities' property was obtained by the Korns' conversion, fraud and breaches of fiduciary duties, it would be unconscionable for the Korns and the Korn Family Limited Partnership to retain the benefits of the Lenchner entities' money and other property.

### Relief Requested

*WHEREFORE*, the Lenchner entities request that this Court enter judgment in their favor and against the Korns, jointly and severally, as follows:

1. Award damages to the Lenchner entities in an amount to which they are found to be entitled and awarding them costs, expenses and attorneys' fees pursuant to statute;

2. Award treble damages, costs and attorney fees to the Lenchner entities pursuant MCLA 600.2929a, i.e., the "Buying, receiving, or aiding in the concealment" statute;

3. Impose a constructive trust for the benefit of the Lenchner entities, to protect and preserve their property that was wrongfully taken, stolen, converted and used;

4. Award Mr. Lenchner exemplary damages; and

6. Award the Lenchner entities such other relief as this Court deems appropriate.

Respectfully submitted,

Dated: February 20, 2003

By: _____

David H. Oermann (P36696)
Dana J. LaKritz (P59584)
100 Bloomfield Hills Parkway, Suite 200
Bloomfield Hills, Michigan 48304-2949
(248) 258-1412
AND
Scott T. Beatty (P24202)
111 State Street, #1
Charlevoix, Michigan 49720
(231) 547-4059
Co-Counsel for Defendants/Counter-Plaintiffs

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

## PROOF OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Defendants' Answer, Affirmative Defenses and Counterclaim was served on John W. Unger, Esq., Unger, Garratt & Bachand, PLLC, 222 North Bridge Street, PO Box 1079, Bellaire, MI, 49615, counsel for plaintiffs, on this 20th day of February, 2003, by placing a copy of said document in the United States mail with postage fully prepaid thereon and depositing the same into the United States mail in Bloomfield Hills, Michigan.

*Donna L. Larson*

Donna L. Larson

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

# EXHIBIT C

STATE OF MICHIGAN

33RD JUDICIAL CIRCUIT COURT (CHARLEVOIX COUNTY)


KORN FAMILY LIMITED PARTNERSHIP,
GALE KORN, SHELDON KORN,
SHAUNA KORN and ASHLEY KORN,

        Plaintiffs,

v                                  File No. 03-1723-19-CB

HARBOR BUILDING CO., LLC,
DISCOUNT HOMES, LLC, NORTHERN
GRADING, EXCAVATING & SEPTIC, LLC,
ABINGTON DEVELOPMENT CO., LLC,
CLARITA COMMONS DEVELOPMENT, LLC,
and LAWRENCE LENCHNER,

        Defendants.
_____/

VIDEO JURY TRIAL - VOLUME II OF XIII

BEFORE THE HONORABLE RICHARD M. PAJTAS, CIRCUIT COURT JUDGE

Charlevoix, Michigan - Tuesday, May 2, 2006

APPEARANCES:

For the Plaintiffs:  MR. ALLEN R. TELGENHOF  (P43114)
                     MR. MICHAEL I. CONLON  (P43954)
                     P O Box 490
                     Charlevoix, Michigan  49720
                     (231) 547-8990

For the Defendants:  MR. MARK HILAL (P57028)
                     MS. BRIDGET BROWN POWERS  (P46888)
                     618 Howard Street
                     Petoskey, Michigan  49770
                     (231) 347-8200

Transcribed by:    Theresa's Transcription Service
                     P O Box 21067
                     Lansing, MI  48909-1067
                     (517) 882-0060

1

TABLE OF CONTENTS

PAGE

Motion to exclude testimony                                    5

<u>WITNESSES:  PLAINTIFF</u>

SHELDON KORN

    Continued direct examination by Mr. Conlon         12
    Motions                                            65
    Recess                                             70
    Continued direct examination by Mr. Conlon         70
    Recess                                            109
    Continued direct examination by Mr. Conlon        110
    Motions in limine                                 139
    Recess                                            160
    Cross-examination by Mr. Hilal                    160
    Recess                                            212
    Continued cross-examination by Mr. Hilal          212

TABLE OF CONTENTS (Continued)

EXHIBITS:                                IDENTIFIED    RECEIVED

Plaintiff's Exhibit No. 19                   33          34
Plaintiff's Exhibit No. 20                   34          35
Plaintiff's Exhibit No. 21                   36          37
Plaintiff's Exhibit No. 22                   42          42
Plaintiff's Exhibit No. 23                   49          50
Plaintiff's Exhibit No. 24                   50          52
Plaintiff's Exhibit No. 25                   70          70
Plaintiff's Exhibit No. 26                   71          72
Plaintiff's Exhibit No. 27                   72          73
Plaintiff's Exhibit No. 28                   89          89
Plaintiff's Exhibit No. 29                  100         100
Plaintiff's Exhibit No. 30                  100         103
Plaintiff's Exhibit No. 31                  112         113
Plaintiff's Exhibit No. 32                  119
Plaintiff's Exhibit No. 33                  124         125
Plaintiff's Exhibit No. 34                  130         130
Plaintiff's Exhibit No. 35                  131         132
Defendant's Exhibit No. 1                   170
Defendant's Exhibit No. 2                   181         181
Defendant's Exhibit No. 3                   187         191
Defendant's Exhibit No. 4                   210         210
Defendant's Exhibit No. 5                   211         211
Defendant's Exhibit No. 6                   212         215
Defendant's Exhibit No. 7                   219
Defendant's Exhibit No. 8                   225
Defendant's Exhibit No. 9                   229         229
Defendant's Exhibit No. 10                  236         237

```
 1                    Charlevoix, Michigan

 2                    Tuesday, May 2, 2006 - 9:03 a.m.

 3                    THE COURT:  Good morning.

 4                    (Response of good morning from several people)

 5                    THE COURT:  We are on the record, and I have an

 6          exhibit list.  Jerry.  Please feel free to suggest any

 7          corrections or changes.

 8                    (At 9:03 a.m., court bailiff hands documents to

 9                    attorneys)

10                    THE COURT:  Are we ready for the jury?

11                    MR. TELGENHOF:  We are, your Honor.  Just one

12          thing with respect to these motions in limine.  I just want

13          to--I just had mentioned to Mr. Hilal I think Mr. Conlon is

14          probably within an hour or so in his direct of when the

15          first--actually, the issue that's raised in their motion in

16          limine will be coming up.  So I didn't know if--I know the

17          Court had said yesterday that we would take that as it

18          comes.

19                    THE COURT:  Which issue is that?

20                    MR. TELGENHOF:  The divorce, Mr. Lenchner's

21          divorce.

22                    THE COURT:  I read the response yesterday evening.

23          Why don't we take it up right now?

24                    MR. TELGENHOF:  Thank you.

25                    DVD 2006-26 5-2-06 9:04:38
```

4

```
1          back out.  And then we're ready for cross, right?

2                    MR. HILAL:  Yes, your Honor, we will be in a few

3          minutes.  We've just go to move some documents around, if

4          we--

5                    THE COURT:  Yeah, we'll take a 10-minute break.

6                    (At 2:18 p.m., court recessed)

7                    (At 2:34 p.m., court reconvened)

8                    THE COURT:  Jury, please.

9                    (At 2:35 p.m., jury enters courtroom)

10                   COURT BAILIFF:  You may be seated.

11                   THE COURT:  Cross-examination.

12                   MR. HILAL:  Thank you, your Honor.

13                             CROSS-EXAMINATION

14         BY MR. HILAL:

15         Q    Mr. Korn, I guess I can't help it, I'm just--out of

16              curiosity, have you hired anybody to assist you with

17              preparing your testimony today?

18         A    No.  What do you mean, like my attorneys, representing me?

19         Q    Have you hired a professional, is all I was asking?

20         A    No, not at all.

21         Q    Okay.  Have you testified a lot before?

22         A    I've testified, but not a lot.

23         Q    Have you testified more than five times?

24         A    Maybe.  Maybe not.

25         Q    I'm sorry.  By testifying, I mean in a court of law or in a
```

160

| 1 | | deposition when you're under oath? |
|---|---|---|
| 2 | A | Oh, in a deposition, yes. |
| 3 | Q | Okay.  Is it fair to say that you've testified under oath |
| 4 | | more than 15 times? |
| 5 | A | I can say I've testified a few times. |
| 6 | Q | Okay.  Now, I recall, when we were looking at Plaintiff's |
| 7 | | Exhibit 1, you had a list of what appeared to be your |
| 8 | | accomplishments with regard to real estate transactions.  Do |
| 9 | | you recall that exhibit? |
| 10 | A | Sure. |
| 11 | Q | I don't want to pull it out, that's okay.  Just as long as |
| 12 | | you recall it. |
| 13 | A | Yes. |
| 14 | Q | In all of those transactions--would you agree with me that |
| 15 | | there were more than one page of transactions? |
| 16 | A | Yes. |
| 17 | Q | Okay.  In all those transactions, did you do all of those |
| 18 | | developments by yourself? |
| 19 | A | What do you mean, by myself? |
| 20 | Q | Did you have anybody who was involved with you in creating |
| 21 | | those developments? |
| 22 | A | I mean, I was in charge of the developments.  I was an owner |
| 23 | | in the company, but I don't know what you mean by--I had |
| 24 | | architects who worked for me, I had engineers-- |
| 25 | Q | Did you have other owners? |

```
1   A    --who worked for me.  Pardon me?

2   Q    Did you have other owners?

3   A    Well, sure.

4   Q    Let's use that word since that's--

5   A    Yes.

6   Q    Typically, how would you--how many owners would you have in

7        those types of deals?

8   A    They're different.  It depends.

9   Q    Okay.  What would be--just describe one of them.

10  A    Any one?

11  Q    Sure, pick one out.

12  A    Okay.  Fine.  Don Barton Pines in Novi, Michigan.

13  Q    Okay, who were your co-owners?

14  A    It was myself, Harold Beznos, and the Beztak Group.

15  Q    Okay.  What does that mean, the Beztak Group?  How many

16       names, people?  Can you name names?

17  A    Well, I mean, I know the two main guys, Harold Beznos, Jerry

18       Luptak, but they had--there's probably eight, ten different

19       groups, people that are with them.

20  Q    Were they--did you consider them your partners?

21  A    Sure.

22  Q    Did you have written agreements to that effect?

23  A    We might have.

24  Q    I'm just curious because you seem to recall something like

25       snowflakes falling and meeting people at 9, 10 a.m., but you
```

162

```
 1        can't seem to recall if you have a written agreement with--
 2        it seems like it was a fairly large development, from what
 3        you described.
 4    A   It was a nice-size development, but they owned things--they
 5        were attorneys, also, so they had things set up with
 6        different trusts, revocable, and different types of things,
 7        which that's how they had their ownership and would give
 8        some maybe to their kids, their wife, their this.  And
 9        that's fine, but that's how it was.
10    Q   But you don't recall whether you had a written agreement?
11    A   I'm not sure if we had a real written agreement.
12    Q   So you don't recall that?
13    A   I do not.
14    Q   Okay.  But you recall that you had partners; you considered
15        them partners, right?
16    A   Oh, yes, sure, I did.
17    Q   And in many of these other ventures that you were involved
18        with, did you have partners?
19    A   Many of them, I did, of course.
20    Q   So you knew what a partner is?
21    A   Sure.
22    Q   Okay.  Do you recall testifying under oath in the matter of
23        Triad Mechanical versus Bridgestone Development and stating
24        that you don't have any partners?
25    A   Yes.
```

| | | |
|---|---|---|
| 1 | Q | Do you recall denying that Mr. Lenchner was your partner? |
| 2 | A | Well, no, I recall stating that I didn't have any partners |
| 3 | | then. |
| 4 | Q | Okay. Do you recall, in response to the question, how long |
| 5 | | have you known Mr. Lenchner, probably about 18 years, I'm |
| 6 | | guessing? |
| 7 | A | Yes, I do. |
| 8 | Q | Do you recall asking if you've ever been a business partner |
| 9 | | with him in any capacity and answering no? |
| 10 | A | Correct. |
| 11 | Q | So you have denied, in fact, under oath, that Mr. Lenchner |
| 12 | | was your partner? |
| 13 | A | Well, that was different because Mr. Lenchner was right next |
| 14 | | to me. He was there and because of the bank-- |
| 15 | Q | The question was, did you or did you not-- |
| 16 | A | I was answering your question, sir. I'm sorry. |
| 17 | Q | Well, I just want you to answer my question without |
| 18 | | narrative. Narrative, you can do-- |
| 19 | A | But no, but I can answer--I have the right, sir, to answer, |
| 20 | | I believe, if the judge lets me, I have the right to answer |
| 21 | | your question. We went in. Mr. Lenchner was sitting right |
| 22 | | next to me at that deposition, and before we got in, Mr. |
| 23 | | Lenchner, Larry, said to me, "Sheldon, if they--the banks |
| 24 | | know that you are going to be a partner, they're going to |
| 25 | | take our loans away. Don't. Whatever you do, don't." |

164

```
 1                    Therefore, did I not admit?  Yes.  Was I evasive?

 2          Most definitely, yes, I was.  Yes.

 3     Q    So it doesn't bother you--you were under oath, right?

 4     A    I was under oath, and I was evasive, yes.

 5     Q    You swore to tell the truth?

 6     A    Yes.

 7     Q    Just like you did in this particular instance, just like

 8          you've told Judge Pajtas and swore before this jury, right?

 9     A    Yes.

10     Q    And all it took was your what you perceived to be partner to

11          say, "Just lie for me," is that what you're telling this

12          jury?

13     A    No.

14     Q    Well, that's what I heard.  Why is it that you decided that

15          you were going to deny that Mr. Lenchner was your partner

16          under oath in a court proceeding?

17     A    It's not--I went ahead, and I was very evasive when I said

18          that.  That--and I--do I feel bad about it?  Yes, I

19          shouldn't have.

20     Q    That's not my question; my question is why.

21     A    But I did.

22     Q    Why?

23     A    Because I said what Mr. Lenchner and I had discussed.

24     Q    So it was because Mr. Lenchner asked you; that's your--

25          that's what you're telling the jury?
```

165

| | | |
|---|---|---|
| 1 | A | Not asked me.  We discussed it, and we couldn't afford to |
| 2 | | have--basically, couldn't afford to have the banks pull our |
| 3 | | lines over there. |
| 4 | Q | Our lines?  Were you signed on those lines, Mr. Korn? |
| 5 | A | I'm the one, sir, that had the money up within these |
| 6 | | projects.  When something was given to the banks, that was |
| 7 | | the Korn money, also, that was still there given as |
| 8 | | collateral.  The collateral was ours. |
| 9 | Q | I'm asking you a specific question, Mr. Korn.  Do you know-- |
| 10 | | do you have any personal knowledge, recollection, of signing |
| 11 | | on any specific loan made out to the companies?  When I say |
| 12 | | companies, I'm talking about defendant companies, Abington, |
| 13 | | Bridgestone, Harbor; let's just use those three. |
| 14 | A | Are you talking when I used my credit cards to pay bills, |
| 15 | | sir? |
| 16 | Q | I asked any time of specific signing a loan, a loan, a loan |
| 17 | | document that needs to be repaid, not a credit card. |
| 18 | A | Does that include the loans that we gave from our checkbook |
| 19 | | to the company? |
| 20 | Q | Did you sign for a loan, sir? |
| 21 | A | Well, the Korn family went ahead and signed-- |
| 22 | Q | I asked you, did you-- |
| 23 | A | --the check to give the money. |
| 24 | Q | That's signing a check.  Did you sign a loan? |
| 25 | A | At the bank? |

```
1    Q    I believe this jury knows what a loan is.

2    A    Well, at the bank, is that what you're referring to?

3    Q    A loan.  A loan is a loan, from anywhere.  Did you sign any

4         document stating that you were assuming responsibility,

5         financial responsibility, to repay a loan, repay monies

6         advanced to you that you therefore put in to any of these

7         companies?

8    A    No.

9    Q    Thank you.  Do you recall denying that you had any ownership

10        interest in Bridgestone?

11   A    If you're talking to the same deposition from the Triad

12        lawsuit, yes.

13   Q    Okay.  So you recall the fact that you denied under oath,

14        once again, that you had any ownership interest whatsoever

15        in Bridgestone?

16   A    Yes.

17   Q    And that was, again, I presume, because Mr. Lenchner told

18        you, gee, our line is going to be--our line, that you're not

19        responsible for, is going to be pulled, right?

20   A    That's correct.

21   Q    Okay.  Do you recall testifying that you were not

22        compensated in any way for anything that you did with

23        Bridgestone?

24   A    Are you referring to the same, the Bridgestone dep?

25   Q    Under oath.  Sure, we'll stay with Triad Mechanical for the
```

167

```
 1        moment.

 2    A   Okay.

 3    Q   Okay?  Under oath, do you recall denying, in the Bridgestone

 4        lawsuit, being compensated for any work that you did for

 5        Bridgestone?

 6    A   I wasn't personally compensated.

 7    Q   Do you recall, sir, my question is, testifying under oath

 8        that you were not compensated for anything that you were

 9        doing for Bridgestone?

10    A   Yes.

11    Q   Thank you.  Do you in fact recall denying that you did

12        anything for a living in terms of compensation because you,

13        quote, "have an income coming in myself?"

14    A   Yes.

15    Q   And so you did not have to work.  And you responded, "I

16        don't."  Do you recall that?

17    A   Yes, I do.

18    Q   Do you recall denying that you've ever been involved in any

19        business with Mr. Lenchner at all?

20    A   No.

21    Q   Okay.  Do you recall, if I read you the question:

22                    "Oh, you have never been involved in any

23                business with Mr. Lenchner, correct?

24                    Answer:  No."

25                Do you recall that?
```

168

| | | |
|---|---|---|
| 1 | A | No. Yes, I do. And the word is no, that is not correct. |
| 2 | | The answer is no, sir, that is not correct. Thank you. |
| 3 | Q | Okay. So it's a matter of semantics to you when it comes |
| 4 | | down to answering under oath, isn't it? |
| 5 | A | No, sir. |
| 6 | Q | Do you recall answering the question, "By the way, what is |
| 7 | | Abington Development?" And your answer, "I believe it is |
| 8 | | one of my brother-in-law's companies, but I'm not sure." Do |
| 9 | | you recall that? |
| 10 | A | Yes. |
| 11 | Q | So I guess I'm a bit confused, Mr. Korn. If that's all it |
| 12 | | took to get you to lie under oath during the Triad |
| 13 | | Mechanical lawsuit, what would it take to have you lie under |
| 14 | | oath in this circumstance? |
| 15 | A | I believe-- |
| 16 | Q | The fact that there are millions of dollars, potentially, at |
| 17 | | stake in your words; would that be enough? |
| 18 | A | No, it was the idea that--I believe, if you take a look at |
| 19 | | the evidence, sir, you'll see who put the money in and who |
| 20 | | did the work. |
| 21 | Q | Okay, we will look at who-- |
| 22 | A | Thank you. |
| 23 | Q | --put the money in. |
| 24 | A | Thank you. |
| 25 | Q | Certainly. |

169

1          MR. HILAL:  Your Honor, since we have cited from

2     the record, we will submit excerpts.  We have the whole

3     deposition, if you want, but we're trying to keep it simple

4     for the jury.

5          MR. CONLON:  What is this?

6          MR. HILAL:  This is excerpts from the Triad

7     Mechanical, Bridgestone Development lawsuit.

8          MR. CONLON:  All right.  That wouldn't be an

9     admissible exhibit because it's impeachment material.

10          THE COURT:  It's not being offered.

11          MR. HILAL:  Your Honor, I move for its admission.

12          THE COURT:  Have you put a number on it and so

13     forth?

14          MR. HILAL:  Yes, your Honor, Defendant's Exhibit

15     No. 1, excerpts from the Triad Mechanical, Inc. versus

16     Bridgestone Development lawsuit, Pages 18 through 21, Pages

17     22 through 25, Pages 34 through 37, Pages 38 through 41, and

18     Pages 86 through 89.

19          THE COURT:  Response?

20          MR. CONLON:  Your Honor, I don't think the

21     impeachment evidence from a prior deposition is an exhibit

22     that's admissible, number one.  Number two, the whole

23     deposition should come in.

24          THE COURT:  You have to speak up a little bit.

25          MR. CONLON:  The whole deposition should come in,

170

```
 1          but I don't--it's--my understanding is impeachment evidence
 2          would not come in as an exhibit.
 3                    THE COURT:  Do you have a citation, Counsel?
 4                    MR. HILAL:  For introducing impeachment evidence?
 5                    THE COURT:  No, for introducing the deposition.
 6          You've already introduced prior inconsistent statements, and
 7          that's permissible as an exception to the hearsay rule, but
 8          do you have any authority to admit the deposition itself?
 9                    MR. HILAL:  It's a public record, your Honor.  It
10          was introduced into the lawsuit of Triad Mechanical versus
11          Bridgestone Development, LLC.
12                    THE COURT:  No, I'm going to sustain the
13          objection, Counsel.
14                    MR. HILAL:  Okay.
15    BY MR. HILAL:
16    Q    Mr. Korn, have you ever denied under oath in any other
17         proceeding having any interest in real estate other than
18         your Walloon Lake home or your down state home?
19    A    I don't understand the question.
20    Q    Do you own a home in down state Michigan?
21    A    Yes, I do.
22    Q    Where is that?
23    A    West Bloomfield.
24    Q    Okay.  And do you own a house in Walloon Lake?
25    A    Yes, I do.
```

| | | |
|---|---|---|
| 1 | Q | Have you ever denied under oath owning any other real estate |
| 2 | | in 2002 other than those two properties? |
| 3 | A | I had the Korn Family Limited Partnership.  I apologize. |
| 4 | Q | The question is, do you recall denying that under oath? |
| 5 | A | Denying I owned the Korn Family?  No, I do not recall that. |
| 6 | Q | Denying that you owned any other real estate other than |
| 7 | | those two real estate properties that I just described? |
| 8 | A | I, personally? |
| 9 | Q | Yes. |
| 10 | A | Because, I'm sorry, the question's a little confusing. |
| 11 | Q | Do you recall testifying in the matter of Holshler versus |
| 12 | | Voice (phonetically) on March 19, 2002?  In response to the |
| 13 | | question, "Is there any real estate that you have any |
| 14 | | interest in other than the two homes, the one in Walloon and |
| 15 | | the one down state?" and your answer--do you recall that you |
| 16 | | answered, "No, that's it." |
| 17 | A | That is my two homes.  I'm sorry, I agree I have the two |
| 18 | | homes, but I don't know what else you're getting at, excuse |
| 19 | | me. |
| 20 | Q | Okay.  Did you not understand the question, quote, "Is there |
| 21 | | any real estate that you have any interest in other than the |
| 22 | | two homes, the one on Walloon and one down state," end |
| 23 | | quote? |
| 24 | A | No, I still--I do own the two homes, that is correct. |
| 25 | Q | Did you understand that question? |

172

```
1   A   I still think I do.  I own the two houses.

2   Q   Okay, Walloon and down state, that's it?  So you're saying

3       that when you answered the question, "Do you have any real

4       estate interest in any other--other than the two homes,"

5       your view was that that means--

6   A   Those are my two homes.

7   Q   I haven't finished the question.

8   A   I'm sorry, excuse me.  Go ahead.

9   Q   When I read the question, "Is there any real estate that you

10      have any interest in other than the two homes, the one on

11      Walloon and one down state," okay, you didn't understand

12      that that question meant is there any real estate other than

13      those two homes that you have an interest in?

14  A   No, those are the two homes that he asked me about.  I mean,

15      that's the two homes, and those are my two homes.  I still

16      have them.

17  Q   I think the jury understands your answer, sir.

18          Now, do you recall spending a considerable amount

19      of time over the past two days--

20          MR. CONLON:  Your Honor, could I move to strike

21      that last comment?  That's not appropriate.

22          THE COURT:  So ordered.

23  BY MR. HILAL:

24  Q   Do you recall over the past two days spending a considerable

25      amount of time discussing what Gale Korn has done with
```

173

```
 1          respect to what you've been terming the family business?

 2     A    Most definitely, yes.

 3     Q    Okay.  You talked forever about how she was on, for example,

 4          her hands and knees scrubbing houses; do you recall that?

 5     A    That was just about an hour and a half ago, if that.

 6     Q    Okay.

 7     A    Not houses, the floors, sir.

 8     Q    Do you recall responding to the question, again under oath,

 9          again in the same Holshler matter, the question was, "Does

10          your wife do anything else other than manage the family

11          interest for her income?"  Do you recall testifying, "I

12          don't even know;" do you recall that?

13     A    No, I don't.

14     Q    Do you recall responding to the question, "You don't know if

15          your wife works?" with your answer "Well, I don't know what

16          she does.  She goes out and plays with her horses.  She

17          takes care of our family stuff and that's it."  You don't

18          recall that?

19     A    Yes, I do.

20     Q    Is that true today?  It seems like you have a much better

21          recall today than you did when you were under oath than you

22          did when you were under oath in the Holshler matter.

23     A    Well, it's still the same family stuff.

24     Q    This was March 19, 2002.

25     A    Correct.
```

174

1   Q    Right at the height of what you were testifying about today

2        in terms of how hard you were working and your wife was on

3        her hands and knees cleaning houses for Harbor Building

4        Company, that's when you're testifying under oath in the

5        Holshler matter, and you answer, "You don't know if your

6        wife works?"  Quote, "Well, I don't know that--I don't know

7        what she does.  She goes out and plays with her horses.  She

8        takes care of our family stuff and that's it."

9   A    And that is still correct, our family stuff, our family

10       business.

11  Q    Oh, okay.  So our family stuff was intended to communicate

12       to that person who was questioning you the Korn Family

13       Limited Partnership, with all its holdings down state and

14       the family business, which includes all of the properties

15       that you recited for Abington, all the properties that you

16       recited for Bridgestone, all the properties that you recited

17       for Harbor Building Company; is that what you want this jury

18       to believe?

19  A    That's what it is.

20  Q    Okay.  Well, it's interesting also, since you have testified

21       at length over the past two days as to how hard you were

22       working during the periods of, well, 2002 particularly, do

23       you recall testifying in the Holshler matter that you were

24       retired?

25  A    Yes, and I--from my business that I've always--my big

175

```
 1        business, yes.

 2    Q   From your big business.  So--

 3    A   Correct.

 4    Q   --in other words, when you said retired, I'm retired, you

 5        didn't mean to communicate I'm retired as normal people

 6        would understand that word; you meant I'm retired from some

 7        things that I want to tell you I'm retired from?

 8    A   No, retired is if you could do the job that I used to always

 9        do, and I can't.  So that I don't do.

10    Q   Well, we've had at length testimony as to what your previous

11        job was, which was real estate development, right?

12    A   Yes.

13    Q   And isn't that what Abington Development, Bridgestone

14        Development, Harbor Building Company, isn't that the

15        business that they're in?

16    A   Nowhere to the magnitude whatsoever, no.  We were a lot

17        smaller.

18    Q   I see.  So we have to know what you're thinking when you

19        respond in order to understand what it is that you're

20        actually saying on the record under oath, isn't that true?

21    A   No, it's not.

22    Q   How many partners are there in the Korn Family Limited

23        Partnership?

24    A   Four.

25    Q   And who are they?
```

176

| 1 | A | My wife, Gale Korn; my daughter, Shauna Korn; my daughter, |
| 2 | | Ashley Korn. |
| 3 | Q | And the daughters are what kind of partners? |
| 4 | A | They're partners within the company, within the Korn family. |
| 5 | Q | Are there a differentiation between partners, for example, |
| 6 | | general and limited partners? |
| 7 | A | There probably is. |
| 8 | Q | There probably is? |
| 9 | A | My attorney set it up for me, so I can't tell you how he |
| 10 | | broke that out, but... |
| 11 | Q | So if you signed an affidavit, for example, that said I am |
| 12 | | the sole general partner for Korn Family Limited |
| 13 | | Partnership, you knew something at that time that you don't |
| 14 | | know today? |
| 15 | A | No.  It could be that I'm the sole general partner or it |
| 16 | | could be that Gale and myself are sole generals or she's a |
| 17 | | general or it could be my daughters are.  However my |
| 18 | | attorneys did draft the papers, that's exactly how it still |
| 19 | | stands today.  It has not changed. |
| 20 | Q | Okay.  Do you recall testifying, and I'm going to go back to |
| 21 | | the Triad Mechanical for a moment.  Do you recall testifying |
| 22 | | that you have no ownership interests in any companies at |
| 23 | | all? |
| 24 | A | On paper, no.  I do remember that, yes. |
| 25 | Q | On paper? |

177

```
1   A    On paper.

2   Q    Okay, so today, if I were to ask you that question and I

3        said, do you have any ownership interests in any companies

4        at all, and you answered no, this jury would need to

5        understand that you really meant, no, not on paper; is that

6        what you're trying to tell me?

7   A    Well, that's what I just said; I said not on paper.

8   Q    In Triad, did you say not on paper?

9   A    I don't believe so.

10  Q    No, in fact, you said, "Companies?  No, I don't, not in

11       companies," period.

12            Now, do you recall testifying, in response to,

13       "Have you had any ownership interests in any companies in

14       the last five years?"  Quote, "Five years?  No, I have not."

15  A    I haven't.  The Korn family is different than myself.

16  Q    Do you recall testifying, "Have you ever had any ownership

17       interests in any companies in the last five years?"  Do you

18       recall testifying, "Five years?  No, I have not."

19  A    Correct.

20  Q    You do recall that?

21  A    Sure.

22  Q    Do you recall denying that you had any ownership interest

23       whatsoever in Bridgestone Development, LLC?

24  A    That I did, correct.  I do.

25  Q    Why is it, Mr. Korn, that this jury is supposed to believe
```

178

```
 1          you today when you say Larry's my partner?

 2     A    Because he represented it; I relied on him.  The money that

 3          we put in, the work that we labored.  The Korn family is the

 4          one that put the money in that actually made these companies

 5          work and made them go, and we built them.

 6     Q    Do you recall, when you testified that you were retired,

 7          that you said you had been retired for ten or 12 years?

 8     A    Yes.

 9     Q    Is that true, sir?

10     A    From what I did, most definitely.  After my breakdown, I--

11          that exactly was about the time when I retired.

12     Q    So if someone were to ask you, are you working, you, I would

13          presume, would respond, well, that depends on what you

14          define as work, because if you're saying work means what I

15          used to do, then no, so it's okay for me to say no.  Is that

16          the way you answer questions under oath?

17     A    He asked if I was working and it's I'm not.  If I'm doing

18          something, I'll tell you I'm doing it.

19               MR. HILAL:  Your Honor, may I approach the

20          witness?

21               THE COURT:  Yes, sir.

22     BY MR. HILAL:

23     Q    Mr. Korn, I'm going to hand you what has been marked

24          Defendant's Exhibit No. 1.

25                         DVD 2006-26 5-2-06 3:01:32
```

```
1    A    Okay.

2    Q    Could you take a look at that document, sir, and tell me

3         whether you've ever seen that document before?

4    A    Yes, I have.

5    Q    Where have you seen that document before, sir?

6    A    My attorney's office.

7    Q    Okay.  Can I direct your attention to Page 2 of the second--

8         I guess the problem is there's two pages, so the last

9         document.  Do you see the paragraphs labeled 1, 2, 3, 4

10        there, sir?

11   A    Yes, sir, I do.

12   Q    Okay.  When you look at the first page and the second page,

13        okay, and then the third page, between the second and third

14        page, there are certain questions on that document?

15   A    There's, yes, certain writings here, yes.

16   Q    And you've seen those questions before, right, sir?

17   A    I believe so, yes.

18             MR. HILAL:  Okay.  Your Honor, for the record, the

19        document is entitled, "Defendants/Counter-Plaintiffs'

20        request for Admission to Plaintiff/Counter-Defendant Sheldon

21        Korn."  It's a two-page document, with another two-page

22        document attached to it, which is "Plaintiff/Counter-

23        Defendant Sheldon Korn's Response to Request for Admission."

24        And I would move that it be admitted.

25             THE COURT:  It would be Defendant's No. 2?
```

180

```
 1                    MR. HILAL:  As Defendant's No. 2, yes, your Honor.

 2                    THE COURT:  Response?

 3                    MR. CONLON:  No--no objection, your Honor.

 4                    THE COURT:  It may be received.

 5                    (At 3:02 p.m., Defendant's Exhibit No. 2 is

 6                    received)

 7                    MR. HILAL:  I'll need to remark that.

 8                    THE WITNESS:  There we go.

 9                    MR. HILAL:  Sorry.

10                    THE WITNESS:  No problem.

11      BY MR. HILAL:

12      Q    Mr. Korn, if you would just turn to the last page, I'd

13           appreciate it.  In response to the question, "For Plaintiff

14           Sheldon Korn, please admit that you are not and never have

15           been a member or shareholder of any of the Defendants."

16           What was your answer to Question No. 1, sir?

17      A    It says, "This request is admitted."

18      Q    Okay, and for Question No. 2, "For Plaintiff Sheldon Korn,

19           please admit that you are not and never have been an

20           employee of any of the Defendants."  What is your response?

21      A    The same.

22      Q    Thank you.  Is it--

23      A    You're welcome.

24      Q    --true, sir, that you are not a legal owner of any sort

25           other than your claim from some partnership theory of
```

181

| 1 | | Defendant Abington Development, Inc.? |
| 2 | A | I'm sorry, can you please rephrase that? |
| 3 | Q | You are not an owner of Abington Development, Inc., are you? |
| 4 | A | On the paper?  No, I'm not. |
| 5 | Q | Okay.  On paper.  What is your understanding of company, |
| 6 | | sir?  You seem to have had a lot of them.  Does it mean |
| 7 | | something to have a legal right on paper to ownership |
| 8 | | interest in a company? |
| 9 | A | No. |
| 10 | Q | It means nothing? |
| 11 | A | Not that it doesn't mean anything, but no.  You can be an |
| 12 | | owner and not be on paper. |
| 13 | Q | Okay.  So the reason for forming a company isn't to |
| 14 | | determine who has rights to the interests involved in that |
| 15 | | company's affairs? |
| 16 | A | I'm sorry, repeat that. |
| 17 | Q | You've formed a lot of companies, sir; I would presume that |
| 18 | | you understand the reason for forming companies, right?  Why |
| 19 | | would you form a company? |
| 20 | A | To do business. |
| 21 | Q | Why is it important to have a name? |
| 22 | A | Typically, if you do business, you need a name. |
| 23 | Q | Are you announcing to the world whether you are in fact |
| 24 | | legally formed as a company; is that the purpose? |
| 25 | A | Well, I can't tell you what it is, but to get like a |

| | | |
|---|---|---|
| 1 | | builder's license put in the company name, things like that, |
| 2 | | yes, you do need it.  You can pull some on your own, but |
| 3 | | typically, you do form a company. |
| 4 | Q | Okay. |
| 5 | A | It may be in writing or verbal. |
| 6 | Q | Now, Mr. Korn, you said that you've been involved in |
| 7 | | companies before, and you--you named Beztak Homes as one of |
| 8 | | them, didn't you? |
| 9 | A | Well, I said Beztak Group owned part of, like, one of my |
| 10 | | companies, but I have been involved in Beztak Homes, too. |
| 11 | Q | Okay.  And you were involved in litigation in that matter? |
| 12 | A | Yes, I was. |
| 13 | Q | And you admitted that you had an outstanding judgment? |
| 14 | A | Yes, I did. |
| 15 | Q | What was the amount of the judgment? |
| 16 | A | Just under three million. |
| 17 | Q | Okay.  Are you certain that it wasn't a more than four |
| 18 | | million dollar judgment that was joint and several between |
| 19 | | you and others? |
| 20 | A | Well, when you--there's 11 of us on the judgment.  It was, |
| 21 | | actually, I think, around four million, but then they went |
| 22 | | ahead and paid part of it off, and they actually ended up |
| 23 | | buying the whole piece, not with me; they bought it from the |
| 24 | | bank.  And then their responsibility was to actually take |
| 25 | | care of my portion of the judgment, which they never did. |

183

|   |   |   |
|---|---|---|
| 1 | Q | Okay.  Do you understand what a joint and several judgment |
| 2 |   | means? |
| 3 | A | Yeah, it's together, I believe. |
| 4 | Q | Meaning that any one of you is responsible for the whole? |
| 5 | A | Yeah, we were all together on it.  There's 11 people on the |
| 6 |   | judgment. |
| 7 | Q | Do you understand that they could sue you personally, you |
| 8 |   | only, meaning not you and the other 11, but they could sue |
| 9 |   | you personally for the whole amount of that judgment? |
| 10 | A | Yes, I do. |
| 11 | Q | So when you had a joint and several judgment for four |
| 12 |   | million dollars-- |
| 13 | A | I never had a joint--it was never four million just against |
| 14 |   | me. |
| 15 | Q | Okay, but you do remember that it was joint and several? |
| 16 | A | There was a joint, joint and several.  There was a lawsuit |
| 17 |   | for the whole thing, and the judgment against me was a |
| 18 |   | little under three million dollars.  I mean, that's part of |
| 19 |   | what I did say, and that still stands. |
| 20 | Q | Now, you've testified, sir, that as early as, I believe it |
| 21 |   | was, 1991, if I have my dates correct, that you suffered |
| 22 |   | your nervous breakdown? |
| 23 | A | Correct. |
| 24 | Q | Is that correct?  And as a result, you went to your |
| 25 |   | disability company, is that correct? |

184

```
 1    A    Correct.

 2    Q    And you testified that your disability company simply agreed

 3         with you, after your medical eval--or examinations, right,

 4         and paid you, isn't that what you testified?

 5    A    No, I didn't.  I said they sent me to the hospital in Ann

 6         Arbor, and the doctor did go ahead and said I was completely

 7         disabled.

 8    Q    Okay.

 9    A    I was severe depression, severe anxiety, and sleep disorder.

10    Q    Okay.  And then, after the doctor said that, the insurance

11         company just said, okay, Mr. Korn, here you go and started

12         writing you your checks?

13    A    No.

14    Q    Is that what happened?

15    A    No.

16    Q    What happened?

17    A    We had to go ahead and had to put a suit against the

18         insurance company.

19    Q    Okay.

20    A    Which we did prevail.

21    Q    Okay.  So in 1991, you filed a suit against your insurance

22         company in order to obtain benefits that you say they

23         accepted?  I mean, that's what you said yesterday under

24         oath.  You said, "I went to a medical examination and the

25         insurance company paid me my benefits."  Do you recall that?
```

185

```
1    A    Sir, I think you're twisting my words, and I'm sorry if I

2         have to say it like that.  But, yes, I did go.  I did get--

3         they did say, yes, you're disabled.  They did give it to the

4         insurance company, yet they did not send me a check right

5         away.  No, they did not.

6    Q    Okay.

7    A    And I did get it, and once we ahead and the suit was

8         started, we did prevail; they did start paying.

9    Q    Did you disclose to this jury that you had to sue Berkshire

10        Disability Company?

11   A    Pardon me?

12   Q    Did you disclose to this jury that you had to sue the

13        company in order to get your benefits?

14   A    I don't believe it was--

15             MR. CONLON:  Your Honor, I'm going to object

16        because I didn't ask, I think, Sheldon that question, so

17        that's not a fair question.  I would have been happy to ask

18        him the question, but he's--he wasn't asked that question on

19        direct, is all I'm saying.

20             MR. HILAL:  Your Honor, I don't understand that

21        there's an objection now, but my line of questioning was

22        when he was asked about--to explain how he got his insurance

23        benefits, he merely recited the fact that he filed his

24        application, was referred to a medical examiner, and then

25        was paid.
```

186

```
 1                THE COURT:  Overruled.

 2    BY MR. HILAL:

 3    Q    So, in other words, if this jury is going to be able to

 4         understand your testimony, they'd have to understand what

 5         you leave out as well in order to get the whole picture,

 6         isn't that true?

 7    A    No.

 8    Q    Mr. Korn, I'm going to--I'm going to hand you what has been

 9         labeled Deposition Exhibit--Defendant's Exhibit 3.

10    A    Yes.

11    Q    Mr. Korn, have you ever seen that first page?

12    A    Yes, I have.

13    Q    If you look down about the middle of the page, in this

14         approximate area, is that your signature, sir, on the line

15         that says, "Signature?"

16    A    Yes, it is.

17    Q    Would you look at the page--the second page?  Have you seen

18         that document before?

19    A    Yes, I did.  I have.

20    Q    And, again, is that your signature on the signature line?

21    A    Yes, it is.

22    Q    Third page?

23    A    Yes.

24    Q    It's your signature as well?

25    A    I'm sorry, I said yes.
```

```
 1    Q    Okay, making sure.  The fourth page?

 2    A    Yes.

 3    Q    The fifth page?

 4    A    Yes.

 5    Q    Sixth page?

 6    A    Yes.

 7    Q    Seventh page?

 8    A    Yes.

 9    Q    Eighth page?

10    A    Yes.

11    Q    Ninth page?

12    A    Yes.

13    Q    Next page, which would be the tenth page?

14    A    Yes.

15    Q    Eleventh page?

16    A    Yes.

17    Q    Twelfth page?

18    A    Yes.

19    Q    Thirteenth page?

20    A    No.

21    Q    Okay, we must be off on our pagination.  I thought that was

22         the thirteenth.

23    A    I don't have that, no.

24    Q    Let's see.

25    A    It just says the thirteenth.  I have the twelfth; this is
```

188

```
1           the twelfth.

2     Q     Okay.  I must have miscounted.

3     A     No problem.

4     Q     Okay.  On the thirteenth page, do you see some writing and

5           handwriting on that page?

6     A     Yes, I do.

7     Q     Do you recognize that handwriting?

8     A     Well, I see who it's signed by, so I can say yes, I

9           recognize the signature.

10    Q     Whose handwriting is that?

11    A     Gale Korn, my wife.

12    Q     The next page, do you see your signature?

13    A     Yes.

14    Q     Next page?

15    A     Yes.

16    Q     The second to the last page there?

17    A     Yes.

18    Q     And the last page?

19    A     Yes.

20    Q     Okay.  Mr. Korn, right under your signature on the first

21          page, could you read the date?

22    A     One ten ninety-five.

23                MR. HILAL:  Okay.  Your Honor, I would move to

24          admit Defendant's Exhibit 3, which is a progress report.

25          It's a package--
```

189

```
 1                  THE COURT:  Ask him if he can identify the

 2          document and hopefully give it a name.

 3                  MR. HILAL:  I'm sorry if I didn't.

 4      BY MR. HILAL:

 5      Q   Mr. Korn, can you identify this document and recite what's

 6          at the top of the document?

 7      A   Oh, it's a progress report, accident or sickness, and it's

 8          signed by my doctor and signed by myself.

 9      Q   All right, was this a document and a series of documents

10          afterwards that were submitted by you to Berkshire Life

11          Insurance Company?

12      A   Actually, it was--it was submitted by--the doctor had to

13          submit them.  He mailed--

14      Q   You were requesting--

15      A   But I signed them.  Oh, sure, I signed them.

16      Q   You were requesting that it be submitted to the doc--to the

17          life insurance company?

18      A   Not the life insurance--well, the insurance company.  They

19          gave it to me, and then I had to give it to the doctor, then

20          he had to send them in.

21      Q   Okay, up at the upper left-hand corner there, can you read

22          the name of the company?

23      A   Berkshire Life Insurance Company.

24      Q   Okay, so let's just--to be clear for the jury--

25      A   Oh, sure.
```

1    Q    --are these documents that you submitted or asked someone

2         else to submit on your behalf to Berkshire Life Insurance

3         Company?

4    A    Yes, they are.

5              MR. HILAL:  Okay.  Your Honor, I'd move that

6         Defendant's Exhibit 3 be admitted.

7              THE COURT:  Any objection?

8              MR. HILAL:  No objection.

9              THE COURT:  It may be received.

10             (At 3:14 p.m., Defendant's Exhibit No. 3 is

11             received)

12   BY MR. HILAL:

13   Q    Mr. Korn, you read the date on the first page?

14   A    Yes.

15   Q    January 10, 1995?

16   A    That is correct.

17   Q    Is that your recollection of when you first made an

18        application for disability benefits?

19   A    Application, no.

20   Q    Is that the first time you asked for the insurance company

21        to pay you for disability?

22   A    No, sir.

23   Q    When was that?

24   A    I believe it was in '91.  It was in '91.

25   Q    Okay.  Isn't January 10--I'm sorry, 1995.  I apologize.

191

```
1    A    No problem.

2    Q    Okay.  Could you turn to the last page?

3    A    The last--yes.

4    Q    Do you see the date there under the signature?

5    A    Yes, July 29th, 1998.

6    Q    Okay.  And as you stated, January 10, 1995 was not the first

7         time that you submitted or that you requested life insurance

8         benefits be paid, right?

9    A    Well, that was the first time maybe I gave this report, but

10        it was in '91 when I first ahead to get the insurance.

11   Q    Okay, do you recall signing similar documents in 1991 in

12        order to make your application to get the benefits?

13   A    Not--no, not similar to this, no.

14   Q    Okay.

15   A    It was other things.

16   Q    Okay.

17             THE COURT:  I think you said life insurance

18        benefits.

19             THE WITNESS:  I'm sorry, it's not life insurance.

20             MR. HILAL:  I apologize, your Honor, if I did.

21        Let me be real clear.

22             THE WITNESS:  Did I say life insurance?

23             THE COURT:  No, he did.

24             THE WITNESS:  Okay, excuse me.

25             MR. HILAL:  I think I did.
```

192

```
1    BY MR. HILAL:

2    Q    You recall, just to clarify the record, you recall in 1991

3         first requesting disability payments from Berkshire Life

4         Insurance Company?

5    A    In 1991, that's correct.

6    Q    Okay.  Do you recall submitting a similar application in

7         1991 for those benefits?

8    A    No, sir.

9    Q    Okay.  On the first page, can you please read where it says

10        on the line--

11             MR. HILAL:  If I may approach the witness, your

12        Honor.

13   BY MR. HILAL:

14   Q    --describe how this is occupied, and outline what activity--

15        let me ask this another way.

16             Do you see the line where it says, quote,

17        "Describe how time is occupied and outline what activities

18        you engage in at present?"

19   A    Yes.

20   Q    Could you read what you--is that your handwriting there?

21   A    Yes, it is.

22   Q    Could you read what you wrote there, sir?

23   A    Sure.  "Spend time with my family.  I watch TV in my room.

24        I play with my dogs.  I see my doctors."

25   Q    Okay, and this is January 10 of 1995?
```

193

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Do you understand that what you wrote there, you were asking |
| 3 | | Berkshire Life Insurance Company to rely on that |
| 4 | | representation? |
| 5 | A | I actually wrote the same thing throughout the entire time. |
| 6 | Q | That's not my question.  I'm asking that when you wrote that |
| 7 | | on that document, were you aware that Berkshire Life |
| 8 | | Insurance Company was going to rely on that statement? |
| 9 | A | No, they just--they asked me what I did, and I wrote that |
| 10 | | down.  I could have maybe wrote another couple sentences, |
| 11 | | but that's all we had here, and that's what I wrote. |
| 12 | Q | So Berkshire Life Insurance Company asks you a question that |
| 13 | | they don't really intend for you to answer honestly; is that |
| 14 | | what you're telling us? |
| 15 | A | No.  No.  No.  No.  No.  I wrote that.  Maybe I could have |
| 16 | | written a few more lines on it, but the doctor, on the very |
| 17 | | bottom, where the doctor says, "Severe anxiety, depression, |
| 18 | | sleep disorder"-- |
| 19 | Q | Mr. Korn-- |
| 20 | A | --and a lot of other things-- |
| 21 | Q | --my question is--it has nothing to do with what else it |
| 22 | | says on the document.  My question to you, sir, is-- |
| 23 | A | Well, it's all part of it. |
| 24 | Q | That's not--that does not respond to my question. |
| 25 | A | I'm sorry. |

194

```
1    Q    My question is, when you wrote those words in response to

2         the question, "Describe how time is occupied and outline

3         what activities you engage in at present."

4    A    Yes.

5    Q    When you wrote a response to that, did you understand that

6         Berkshire Life Insurance Company was going to rely on the

7         words that you wrote on that document?

8    A    Yes.

9    Q    Were they in fact true?

10   A    Well, I mean, I could have wrote more down there, but that's

11        what I put down.  Maybe I should have written a few more

12        lines.

13   Q    So, in other words, Berkshire Life Insurance Company, in

14        order to rely on what you wrote on this document, would have

15        to know that what you really meant was I could have written

16        some other things; I didn't really mean to just describe the

17        fact that I only spend time with my family, I watch TV in my

18        room, I play with my dogs, I see my doctors; that's all you

19        were doing?  They're not going to think that that's all

20        you're doing, right?

21   A    Well, I think they relied more on what the doctor had to say

22        about me, but no, I mean, I could have written more.

23   Q    Okay, so you don't think that the life insurance company

24        really wanted you to tell them how do you spend your time,

25        what are you doing?  They really wanted to know what your
```

195

| | | |
|---|---|---|
| 1 | | doctors thought of that, right? |
| 2 | A | Well, that's why I had to go to the doctor and the doctor |
| 3 | | had to fill these out every so often. |
| 4 | Q | Okay. You've been calling the family business the family |
| 5 | | business for two days, do you recall that? |
| 6 | A | Of course. |
| 7 | Q | Okay. To you, business means something, right? |
| 8 | A | I believe so, yes. |
| 9 | Q | And you even recited that our business had an office located |
| 10 | | at Abington Development at 770 Adams Street; do you recall |
| 11 | | testifying to that? |
| 12 | A | Definitely do. |
| 13 | Q | And then when you moved up to Harbor Springs, you stated |
| 14 | | that you had a place of business there in your house; do you |
| 15 | | recall that? |
| 16 | A | No. |
| 17 | Q | You had an office; do you recall that? |
| 18 | A | No. |
| 19 | Q | The pink room? |
| 20 | A | Walloon Lake, not Harbor Springs. |
| 21 | Q | Excuse me. |
| 22 | A | No problem. |
| 23 | Q | When you moved up to run the Harbor Building Company? |
| 24 | A | Yes. |
| 25 | Q | Okay. Do you recall saying that you had a place of business |

| 1 | | in your home? |
|---|---|---|
| 2 | A | I do; it's the pink bedroom, actually. |
| 3 | Q | Okay, so if you could read the question just below your |
| 4 | | written words, where it says, "State when you first"--excuse |
| 5 | | me.  Read your answer to the response--or to the question, |
| 6 | | "State when you first went to your place of business since |
| 7 | | you became disabled and for what purpose." |
| 8 | A | "Haven't gone.  Unable to do anything." |
| 9 | Q | Okay.  Did you expect Berkshire Life Insurance Company to |
| 10 | | rely on that statement? |
| 11 | A | In '95, I wasn't--in 1995, I was not up north, and it was-- |
| 12 | | it still--go ahead. |
| 13 | Q | No.  No.  Keep going. |
| 14 | A | No, that's fine. |
| 15 | Q | Okay.  Do you think that Berkshire Life Insurance Company |
| 16 | | put that question on this document expecting you to respond |
| 17 | | to it as honestly and candidly as you possibly could? |
| 18 | A | Yes. |
| 19 | Q | Did you? |
| 20 | A | I guess I could have put a little more down there. |
| 21 | Q | "Unable to do anything."  What else would you have put down |
| 22 | | there? |
| 23 | A | This was filled out the first time by my doctor, and I just |
| 24 | | kept writing the same thing. |
| 25 | Q | I thought you said that those were your words.  Is that your |

197

```
1           handwriting?

2      A    Oh, sure, it is.

3      Q    Okay, so you put it down there?

4      A    I definitely wrote it.

5      Q    And you wrote, "Unable to do anything?"

6      A    Yes.

7      Q    Okay.  Then the very next line, "What was the date and the

8           purpose of your most recent visit to your place of

9           business?"  Why don't you read your response?

10     A    "None.  I haven't gone there."

11     Q    Now, 1995, was Abington formed yet?

12     A    No.

13     Q    Okay.  When did you say it was formed?

14     A    Well, we formed it in the middle of '95, but not in January.

15     Q    Okay, so the middle of '95, is that around June, July,

16          August, September; what's the middle of '95 to you?

17     A    The middle, June, July, August, something like that.

18     Q    Okay.  You have such an incredible recollection, I was

19          noticing the past two days.  You were remembering when

20          people had ice cream with you.  You remember meeting them at

21          9, 10 a.m.  You're remembering the soft snow, as I recall,

22          falling during one meeting.

23     A    No, snow falling, not soft.

24     Q    Oh, you remember the words?  That's good.

25     A    I remember.
```

```
1    Q    Okay.

2    A    Because it was snowing.

3    Q    But you don't remember when, when I'm asking you the

4         question, when was Abington formed?

5    A    It was the middle of '95.

6    Q    Okay.  When?

7    A    I can't tell you the date.

8    Q    That's very interesting.  Okay.

9    A    I'm not the one that sign--that wrote the papers out and

10        sent it in.  Larry did that for us.

11   Q    Okay.  Let's move on then to--will you agree with me that

12        middle of '95 would not include December; that would be

13        after the middle of '95?

14   A    Yes.

15   Q    Okay.  So Abington, as you call it, your company, your

16        family business, was begun well into December of 1995?

17   A    We had begun--I mean, we went ahead in November, I think, we

18        put the deposit on property in '95.

19   Q    Was Abington formed as of or prior to December 5th, 1995?

20   A    I believe it was, unless Mr. Lenchner didn't get the papers

21        back, but I think we had an offer to purchase that Abington

22        was buying the first three lots, and that was before

23        December 5th, 1995.

24   Q    Okay.  All right.  Why don't you turn to Page 8.  Just flip

25        through, count pages, if you wouldn't mind.  Page 8.  Do you
```

| | | |
|---|---|---|
| 1 | | see your signature, sir, on that page? |
| 2 | A | Yes, I do. |
| 3 | Q | And right below that, there's a date? |
| 4 | A | Yes. |
| 5 | Q | Could you read that date? |
| 6 | A | October 22nd, 1996. |
| 7 | Q | You must have gone farther than I did, I guess. But we'll |
| 8 | | use that date. |
| 9 | A | I went eight pages. |
| 10 | Q | That's fine. We'll use October 22nd, 1996. According to |
| 11 | | your testimony yesterday, Abington was up and running. If I |
| 12 | | recall correctly, you were testifying as to how hard you |
| 13 | | were looking for property and hiring trades and working, you |
| 14 | | know, madly to get this business going. Isn't that what you |
| 15 | | testified? |
| 16 | A | Yes, I did. |
| 17 | Q | Okay. Could you read what you wrote in response to, |
| 18 | | "Describe how time is occupied and outline what activities |
| 19 | | you engage in at present?" |
| 20 | A | It's the same thing as I wrote the first time. |
| 21 | Q | Go ahead and read it, please. |
| 22 | A | "Spend time with my family. I watch TV in my room. I play |
| 23 | | with my dogs. I see my doctors." |
| 24 | Q | And in response to, "State when you first went to your place |
| 25 | | of business since you became disabled and for what purpose?" |

| | | |
|---|---|---|
| 1 | A | "Haven't gone. Unable to do anything." |
| 2 | Q | And that's your handwriting, right? |
| 3 | A | Yes, it is. |
| 4 | Q | And in response, "What was the date and purpose of your most |
| 5 | | recent visit to your place of business?" |
| 6 | A | "None. I haven't gone there." |
| 7 | Q | Okay. "What duties are you now performing in any work |
| 8 | | activity?" |
| 9 | A | "None." |
| 10 | Q | Are those statements true, sir? |
| 11 | A | Well, I was with my wife, who as I said before-- |
| 12 | Q | Well, are they true? |
| 13 | A | Pardon me? |
| 14 | Q | Are they true? |
| 15 | A | Are they true? No, not totally. |
| 16 | Q | Okay. What's not totally true about none? |
| 17 | A | Well, I went with my wife. My wife was the one that |
| 18 | | actually, as I stated earlier, in the beginning took me |
| 19 | | around. |
| 20 | Q | So part of the time, none didn't mean none, is that what |
| 21 | | you're saying? |
| 22 | A | No. When you're depressed and you have depression, you have |
| 23 | | good days, you have bad days. |
| 24 | Q | So some days you could work, but-- |
| 25 | A | Will you let me finish? I apologize. I've let you finish |

```
1        every time.

2    Q   Okay, go ahead and try.

3    A   You know what?  Sometimes your bad days get further and

4        further and you--you're doing very nicely.  Sometimes your

5        good days start spreading apart, and you get to do

6        something.  So that's why, when I was stating things, my

7        wife and I, that's what--that's exactly how we did it.  She

8        was very adamant for me to try to get out of the house and

9        try to do something with her.

10   Q   Okay, now, my question--

11   A   And I did.

12   Q   --sir, was sometimes none means none, and sometimes it does

13       not; isn't that true?  Isn't that what my question was?

14   A   I'm sorry, no, I--

15   Q   Okay, so none to you, making a representation to an

16       insurance company for the purposes of paying you money, none

17       to you truly means, well, I was out, working like a mad dog,

18       trying to get Abington Development going?

19   A   This is not--you've got to understand, any work activity.

20       My work activity, to what I did, this is nothing like the

21       work activity that I did.  This is onesie, twosies on houses

22       when I had 250 people then that I went ahead and ran.

23   Q   So, in other words, work to you means what you mean it to

24       mean, not what everybody else would think it means, right?

25   A   No, work was what I did.  From what I--I could not nor will
```

```
1              I ever be the same person I was back then.

2       Q      So you're not working today, are you?

3       A      I don't--no, this is not work.  No.

4       Q      You have no job now?

5       A      No, I'm not.

6       Q      What are you doing to make money--

7       A      This lawsuit's been my job.  My job.

8       Q      This lawsuit has been your job?

9       A      Yes.

10      Q      So, for example--

11      A      Chasing our money.

12      Q      --if you were to be out trying to make a real estate

13             transaction come together for the purpose of making some

14             money from that transaction, would that be work to you, sir?

15      A      If it wasn't the same magnitude.  I mean, putting a deal

16             together?  Yes, it is work, but it's not the same magnitude

17             to what I did at all.

18      Q      Describe for me, if you would, what putting a deal means to

19             you, putting a deal together means to you.

20      A      It depends.  Small deal, big deal?  Going ahead and finding

21             the property, completely developing it, bringing in the

22             streets, the sewer, the water, putting up four or five

23             models, hiring a sales staff, marketing homes, doing all

24             that, that's a real deal.

25      Q      Okay.  So at what point in doing some activity towards
```

```
1              putting that deal together does it become work to you?

2         A    Once you get it together, once--

3         Q    So when it's all done, that's when you would say to somebody

4              I was working?

5         A    When you get that whole deal put together, that's real work.

6         Q    See, Mr. Korn, what I'm trying to understand is how could I

7              or the judge or your attorneys or the jury understand what

8              you were thinking when you responded to the question, "What

9              duties are you now performing in any work activity," and you

10             answered none, what were you thinking?  That's what I'm

11             trying to get to.

12        A    Just what I explained, putting a real--a real deal together.

13        Q    Okay.  To save time, Mr. Korn, will you agree with me that

14             your answers to those same questions for each of the

15             documents in Defendant's Exhibit 3 are the same?

16        A    Yes, I will, and the doctor's writing is also the same.

17        Q    I didn't ask you that question, but that's fine.

18        A    Okay, I just wanted to let you know because that's

19             depression, anxiety, sleep disorder.

20        Q    So will you agree with me, Mr. Korn, that at least as far as

21             Berkshire Life Insurance Company is concerned, you

22             represented to them, from January 10, 1995 through July 29,

23             1998, at least as far as this exhibit is concerned, that you

24             were not doing any duties--excuse me, that what your duties

25                        DVD 2006-26 5-2-06 3:31:32
```

1    are--that in response to the question, "What duties--are you

2    now performing any work activity," Berkshire Life Insurance

3    Company thinks your answer is none?

4  A  Okay.

5  Q  Do you agree that that's what Berkshire is going to be

6    thinking?

7  A  You know what?  I can't tell you what Berkshire is thinking

8    because that, I don't know, but I do know that on the--on

9    these forms, the way they were filled out, as I said, I know

10   my days got good and my days were bad.  Certain days, I

11   could

12   --it was great three or four days at a time; certain days, I

13   couldn't.

14 Q  Did you make any money from any activity other than your

15   disability pay?  Let me ask this question first.  What did

16   you get paid for your disability?  What was your monthly

17   paycheck from your disability?

18 A  I ended up with like $4200, something like that.

19 Q  What was the total check that was paid from Berkshire Life

20   Insurance Company?

21 A  Sixty-one hundred.

22 Q  And where did the rest go?

23 A  To the attorney.

24 Q  Okay.  So other than that money, did you make any money from

25   any other activity whatsoever between January 10, 1995 and

```
1        July 29, 1998?

2   A    Well, Korn Family, sure.

3   Q    Okay.  What else besides the Korn Family?

4   A    I can't tell you.  Because you know what?  I don't have--

5        can't tell you exactly what other monies came in or

6        whatever, but I know the Korn Family.

7   Q    So it's possible you were making some other money?

8   A    It's possible.

9   Q    And it's possible you weren't?

10  A    It's possible.

11  Q    Okay.  Now, let me ask this question then.  If you obtained

12       a dollar from the family business, as you're calling it,

13       obtained it in any fashion, would you consider that making

14       any money during the period 1995 to 1998 in response to my

15       last

16       question?

17  A    It could be making money; it could be repayment of loan.

18  Q    Okay.  And if it was specifically earmarked repayment of

19       loan, you would know that, right?

20  A    Sure, should.

21  Q    Should?

22  A    Can't say--should.  You can never tell the way things were--

23       the way Mr. Lenchner wrote checks.

24  Q    Okay.  I thought I heard you testify that your wife, Gale

25       Korn, was very good at keeping records.  Didn't you testify
```

206

| 1 | | to that two days ago or yesterday? |
|---|---|---|
| 2 | A | No, my wife, she does a nice job of keeping records, but I |
| 3 | | don't know if I testified to that. |
| 4 | Q | You don't recall testifying to that? |
| 5 | A | I mean, she does a nice job of doing it. I don't want to |
| 6 | | say, yes, I did testify it, but she does. |
| 7 | Q | Okay. Well, let me ask you this then. Would the fact that |
| 8 | | you put out a, let's say, a $10,000 loan be important enough |
| 9 | | to keep a record of whether it was repaid or not? |
| 10 | A | If I put out a $10,000 loan? |
| 11 | Q | Yes. |
| 12 | A | Depends where I lent the money. I mean, if I lent it, say, |
| 13 | | to our company, there'd be a canceled check, and I |
| 14 | | definitely would have a record of it, sure. |
| 15 | Q | What about a $100,000 loan? |
| 16 | A | Same thing, I would have a canceled check and I would have a |
| 17 | | record of it. |
| 18 | Q | What about a $350,000 loan? |
| 19 | A | Same thing; there'd be some type of a check and there'd be a |
| 20 | | record of it. |
| 21 | Q | But you wouldn't keep any kind of records with regard to |
| 22 | | whether you got any other payments other than these larger |
| 23 | | repayments of loan? |
| 24 | A | I think the $350,000 was a loan that we made to the company, |
| 25 | | not the company gave to us. |

```
 1   Q   Okay, I'm asking about your record keeping, sir, so...

 2   A   I don't keep the family records.  I don't do it.

 3   Q   Okay.  So to you, whether you made money on any work

 4       activity, as you've described it, putting a deal together,

 5       whatever it is, you don't keep a record of that; that's Gale

 6       Korn's function in your relationship?

 7   A   Yes.

 8   Q   So you don't know whether you're making any money?

 9   A   Well, no, of course you know if you're building houses, you

10       know how much money you're making, but you're not taking a

11       weekly or monthly paycheck.

12   Q   Do you have any idea what your total payments were from the

13       Berkshire Life Insurance Company?

14   A   No, I don't.

15   Q   Do you recall whether Berkshire Life Insurance Company at

16       some point stopped paying you?

17   A   Yes, they did.

18   Q   Why did they stop paying you?

19   A   They went ahead and they changed the policy, and they asked

20       me to sign it.

21   Q   Okay.

22   A   And I turned it in to--I gave it to my attorney, who handled

23       it before, and then he told me what to do.

24   Q   Okay.  Did you--did him telling you what to do result in

25       filing another lawsuit against Berkshire Life Insurance
```

```
1           Company?

2     A     Yes, it did.

3     Q     Okay.  And what was the result of that lawsuit?

4     A     We did prevail.  We won the lawsuit.  They--they went ahead

5           and we won, that's the easiest way to say it; we won the

6           suit.

7     Q     Presumably, the reason you're winning these suits is because

8           you were able to convince Berkshire Life Insurance Company

9           or a court, depending upon whether you went to trial on the

10          merits or whether you settled the case, that you were truly

11          disabled, right?

12    A     My attorney handled it, and I can't tell you how we won the

13          case.  That, I do not know.  I did not attend the different

14          things such as I am here today.

15    Q     Were you 100 percent disabled, unable to work, in 1998 when

16          you filed that second lawsuit?

17    A     To doing what I did before?  Yes, to doing the job I did

18          before.

19    Q     Okay.  Do you recall, Mr. Korn, in a response to the first

20          lawsuit with Berkshire, that that resulted in a payment to

21          you of about $110,000?

22    A     You mean to my attorney and myself?

23    Q     Yes.

24    A     There was a check, but I can't tell you how much it was for,

25          but I know it was like over 100,000.
```

```
 1    Q    Okay.  And the second time, was that a payment of

 2         approximately $400,000?

 3    A    To the attorneys and myself, yes.

 4              MR. HILAL:  Your Honor, may I approach, please?

 5    BY MR. HILAL:

 6    Q    Mr. Korn, I'm going to hand you what has been labeled

 7         Defendant's Exhibit No. 4.  Can you identify that document,

 8         sir?

 9    A    It's called a settlement agreement.

10    Q    If you look at that document, have you seen it before?

11    A    I mean, I know I've seen it, but I don't remember everything

12         on it.

13    Q    If you turn to the last page, is that your signature?

14    A    Yes, it is.

15    Q    Do you remember signing for this settlement in Berkshire

16         Life Insurance Company?

17    A    Yes, I do.

18              MR. HILAL:  Okay.  Your Honor, I'd move that

19         Defendant's Exhibit 4 be entered.

20              THE COURT:  Any objection?

21              MR. CONLON:  No, your Honor.

22              THE COURT:  It may be received.

23              (At 3:40 p.m., Defendant's Exhibit No. 4 is

24              received)

25              THE WITNESS:  You want both these?
```

```
1              MR. HILAL:  No, you can keep them.

2    BY MR. HILAL:

3    Q    I'm handing you Defendant's Exhibit No. 5.

4    A    Okay.

5    Q    Sir, can you identify that document?

6    A    It's on Berkshire Life Insurance Company.  It's--I don't

7         know if it's a fax transmittal sheet, but it says--on the

8         second page it says, "Agreement with Berkshire Insurance."

9    Q    If you turn to the last page, is that your signature, sir?

10   A    Yes, it is.

11   Q    Do you remember signing this document, sir, the settlement

12        agreement?

13   A    Yes, I do.

14             MR. HILAL:  Your Honor, I'd move that Defendant's

15        Exhibit 5 be admitted.

16             THE COURT:  Any objections?

17             MR. CONLON:  No, your Honor.

18             THE COURT:  It may be received.

19             (At 3:41 p.m., Defendant's Exhibit No. 5 is

20             received)

21             MR. HILAL:  Thank you.  Your Honor, would this be

22        a time for your break?  I don't know if you're taking an

23        afternoon.  I don't know--

24             THE COURT:  Yeah, we could take a break.

25             MR. HILAL:  Okay, thank you.
```

```
 1                    THE COURT:  We'll take a 15-minute break.

 2                    COURT BAILIFF:  All rise.

 3                    (At 3:41 p.m., court recessed)

 4                    (At 4:02 p.m., court reconvened)

 5                    MR. HILAL:  Thank you, your Honor.

 6                    CONTINUED CROSS-EXAMINATION

 7     BY MR. HILAL:

 8     Q    Mr. Korn, do you recall our discussion just a few moments

 9          ago about how you were defining work, just recall that

10          generally?  I asked you what work was, and you were telling

11          me--

12     A    Yes.

13     Q    And what you were describing was putting a deal together; do

14          you recall that?

15     A    Yes.

16                    MR. HILAL:  Okay.  Your Honor, may I approach the

17          witness?

18                    THE COURT:  Yes, sir.

19                    MR. HILAL:  Your Honor, is this Defendant's 6?

20                    THE COURT:  Six.

21     BY MR. HILAL:

22     Q    Mr. Korn, I'm going to hand you a document labeled

23          Defendant's Exhibit 6.  Can you identify that document, sir?

24     A    Affidavit of Sheldon Korn.

25     Q    Is that your signature at the bottom there, sir?
```

212

| | | |
|---|---|---|
| 1 | A | Yes, it is. |
| 2 | Q | Okay.  Do you recognize that document? |
| 3 | A | I know I see it says JW Realty, but I'm not sure, you know-- |
| 4 | | I've not seen this document before.  I signed it, but my |
| 5 | | attorney gave it to me to sign. |
| 6 | Q | So you signed it without seeing it? |
| 7 | A | Well, I looked at it, but I was--I'm a witness for another |
| 8 | | case, so I--he said sign it, and I'm a witness on it. |
| 9 | Q | Okay.  And the document behind that? |
| 10 | A | Yes. |
| 11 | Q | And you've seen that document before in the same JW Realty |
| 12 | | case? |
| 13 | A | This document here? |
| 14 | Q | Yes. |
| 15 | A | I know about it.  I'm not going to say I saw this one--this |
| 16 | | one page here.  I didn't sign it, and I don't believe I did |
| 17 | | see it. |
| 18 | Q | So is it yes or is it no that you've seen that document |
| 19 | | before? |
| 20 | A | I don't believe I saw it, but I might have seen it.  I mean, |
| 21 | | I'm not sure.  I'm looking at it.  It's an affidavit, but it |
| 22 | | was not my affidavit, so... |
| 23 | Q | Okay. |
| 24 | A | Very possible. |
| 25 | | THE COURT:  Could we move that easel back a little |

```
1        bit there?

2                    THE WITNESS:  Oh, sure.

3                    MR. HILAL:  I'll do it.  If I don't break

4        something in the process.

5                    THE COURT:  Thank you.

6                    MR. HILAL:  If I could have the exhibit back,

7        please?

8                    THE WITNESS:  Oh, sure.

9   BY MR. HILAL:

10   Q    Mr. Korn, do you recall signing that affidavit?

11   A    This one?  Yes, I do.

12   Q    And was that in the matter of JW Realty versus Shauna Korn?

13        Excuse me, I'm sorry, Shauna Korn versus JW Realty?

14   A    That's correct, she's suing them, yes.

15   Q    Okay.  All right.  And you're a witness in that matter?

16   A    I'm sorry, am I witness?

17   Q    You are a witness in that matter?

18   A    Yes, I am.

19   Q    And an affidavit was made by you under oath?

20   A    Yes, it was.

21                   MR. HILAL:  Okay.  Your Honor, I move to admit

22        Defendant's Exhibit 6.

23                   THE COURT:  Proposed 6, Counsel?

24                   MR. CONLON:  Your Honor, I've never seen this

25        document before, but I don't see any reason why not to admit
```

214

```
 1        it.

 2                    THE COURT:  It may be received.

 3                    (At 4:05 p.m., Defendant's Exhibit No. 6 is

 4                    received)

 5                    MR. HILAL:  Thank you.

 6   BY MR. HILAL:

 7   Q    Mr. Korn, would you please read Paragraph 2?

 8   A              "In December of 2003 and January of 2004, I did--I

 9                    did communication and negotiations and agreement with

10                    JW Realty, pursuant to which I agreed to provide

11                    consulting services for the development of Blackberry

12                    Estate Condominium project and to assist in acquiring

13                    financing to construct homes."

14   Q    Okay.  Mr. Korn, first let me ask you, do you wear reading

15        glasses?

16   A    No.

17   Q    Okay.

18   A    But in my--

19   Q    So you don't need glasses in order to--

20   A    --in my depression, I just get very nervous and that.  I

21        can't--I can read myself; it's very difficult to read out

22        loud.

23   Q    Okay.  Let me read--

24   A    My doctor went ahead and I had medication at one time for

25        it.
```

1   Q   Okay, let me read it and just tell me if you disagree with

2       my reading of it then.

3   A   Okay.

4   Q       "In December 2003 and January 2004, I," that would

5       be you, Sheldon Korn, "did communicate and negotiate an

6       agreement with JW Realty, LLC, pursuant to which I

7       agreed to provide consulting services for the

8       development of its Blackberry Estates Condominium

9       project and to assist it in acquiring financing to

10      construct model home therein."

11        Do you disagree with my reading of that?

12   A   No.

13   Q   Okay.  This is a statement under oath.  Is that what you

14      were doing in December and January--December of 2003,

15      January 2004?

16   A   Yes.

17   Q   Okay.  Do you recall, Mr. Korn, just testifying earlier,

18      when I asked you what you were doing now, these days, and

19      you said nothing, you've been doing nothing but this

20      lawsuit?

21   A   This is 2006.

22   Q   Okay, and when was this lawsuit initiated?

23   A   Two thousand three.

24   Q   At what time in 2003?

25   A   January.

```
1    Q    January 15th, isn't it?

2    A    Right around there, yes.

3    Q    Okay.  So December 2003 would be somewhere between January

4         15, 2003 and today, would it not?

5    A    Yes.

6    Q    Okay.  So when I asked you what have you been doing since

7         the family business, as you called it, you broke up, you

8         responded nothing but this lawsuit; do you recall that?

9    A    Yes.  But if you look, and you showed me the second page, as

10        it said, I'm a witness on this because I put this together,

11        and my daughter, Shauna, is the one, as you did see, she's

12        the one that filed the lawsuit, and I helped her get

13        together with JW Realty.  That is correct.

14   Q    Okay.  So:

15             "...communicate and negotiate an agreement with JW

16             Realty, LLC, pursuant to which I agreed to provide

17             consulting services for the development of its

18             Blackberry Estates Condominium project and to assist it

19             in acquiring financing to construct model home

20             therein," is not work to you?

21             You can do that activity and honestly sit there--

22   A    Well, no, that is work.

23   Q    Let me finish my question.

24   A    Go ahead.

25   Q    And honestly sit there, under oath, and say I'm doing
```

217

| | | |
|---|---|---|
| 1 | | nothing but this lawsuit; is that what you're telling us? |
| 2 | A | No.  Back here, I did put this together for my daughter, I |
| 3 | | definitely did. |
| 4 | Q | Okay.  What consulting services were you going to provide? |
| 5 | A | Well, not going to, I did.  I went ahead and I went over his |
| 6 | | prints, Shauna and I, in fact, and Ashley.  We went over the |
| 7 | | prints.  We changed his plans around, changed some of his |
| 8 | | trades around, and got him to where he could build the homes |
| 9 | | cheaper and sell them more affordably.  Make the same profit |
| 10 | | and sell them for less money.  And, therefore, my daughters |
| 11 | | went ahead and listed the property. |
| 12 | Q | And that's not work to you, right? |
| 13 | A | Well, as I said, I did it for my daughters, so-- |
| 14 | Q | So it's not work to you? |
| 15 | A | --is it work?  Yes.  Okay, yes, it's work.  You want me to |
| 16 | | say it?  Yes, it's work.  Yes, sir. |
| 17 | Q | I want you to tell the truth, Mr. Korn.  I want you to tell |
| 18 | | the truth. |
| 19 | | Mr. Korn, have you ever been accused of not paying |
| 20 | | one of your tradesman because that tradesman would not hide |
| 21 | | a bill from one of your partners? |
| 22 | A | No. |
| 23 | Q | Never? |
| 24 | A | Never. |
| 25 | Q | Do you remember a gentleman by the name of Chris Wolf? |

1    A    Chris Wolf?  No, I don't.

2              MR. HILAL:  Your Honor, may I approach the

3         witness?

4    BY MR. HILAL:

5    Q    Mr. Korn, I'm going to hand you what has been labeled as

6         Defendant's Exhibit 7 and ask you if you can identify that

7         document?

8    A    It's an affidavit and claim of small claims court, February

9         22nd, 1988.

10   Q    Okay.

11   A    And some of it, I can't--I can't--is your copy any better

12        than mine?

13   Q    That's okay.  I'm just asking if you can identify the

14        document?

15   A    Sure, it's someone by the name of Chris Wolf, Empire Two

16        Construction.

17   Q    Okay, it says, "Affidavit and Claim, Small Claims," do you

18        see that?

19   A    Affidavit, small--I read that, affidavit and small claims.

20   Q    I just want to make sure.  Okay.

21   A    Yes.

22             MR. HILAL:  Your Honor, I would move to admit this

23        as it's a public document.

24             MR. CONLON:  Your Honor, I'm going to object

25        because I've never seen this document before.  It's from

```
1        1988 and, as far as I know, wasn't--actually dated December
2        21st, '87.  I don't think it's relevant to this lawsuit, but
3        it's never been produced ahead of time, so I've never seen
4        it before.
5             MR. HILAL:  Your Honor, it's rebuttal.  I asked
6        Mr. Korn if he's ever been accused of the things that I
7        believe that the document states.
8             THE COURT:  It's not rebuttal, but it may be used
9        for impeachment--
10            MR. HILAL:  I'm sorry.
11            THE COURT:  --as prior inconsistent statement?
12            MR. HILAL:  Yes.  I apologize.
13            THE COURT:  Well, you can use it for that purpose,
14       but I don't believe it's admissible as a document itself.
15            MR. HILAL:  It's a complaint made in a court
16       proceeding, your Honor, public record.
17            THE COURT:  Yes, but it's used for impeachment.
18            MR. HILAL:  That's fine, your Honor.  That's okay.
19            THE COURT:  So you may cross-examine on it if it's
20       a prior inconsistent statement, but the objection in regards
21       to admitting it into evidence is sustained at this point.
22            MR. CONLON:  Your Honor, another objection is it
23       calls for hearsay because it's signed by someone, and it
24       contains a statement by this individual, who I have never
25       heard of and don't have the ability to cross-examine.
```

220

```
 1                    THE COURT:  Well, I sustained your objection.  If
 2            it's a prior inconsistent statement, it's an exception to
 3            the hearsay rule.  However, the document itself is not
 4            admissible into evidence.  You can cross-examine on it.
 5                    MR. HILAL:  Thank you.
 6                    MR. CONLON:  Your Honor, I was--I don't--
 7                    THE COURT:  Unless you offer it.
 8                    MR. CONLON:  No.  What I'm saying is it's not a
 9            statement from this witness; it's a statement from somebody
10            else.
11                    MR. HILAL:  Your Honor, it's an exception to the
12            hearsay rule because it is a public document.  The question
13            that I asked Mr. Korn was, have you ever been accused of the
14            things that I believe this particular complaint states.  So
15            I want to ask Mr. Korn if this refreshes his recollection.
16            I probably should not have moved for it to be admitted, but
17            I want to ask Mr. Korn if this refreshes his recollection.
18                    THE COURT:  You may do that.
19                    MR. HILAL:  Okay.  Thank you.
20       BY MR. HILAL:
21       Q    Mr. Korn, can you read under "Reasons for claim," and I'll
22            help you where you need to, what it says there?
23       A    No.  "Refuse to pay because I will not hide" something,
24            "bill," and I can't read the rest of it, "carpentry."  I
25            mean, first of all, I've never heard of this guy.
```

221

```
1    Q    I'm just asking you if you--

2    A    And it's 1987.  No, you know something?  I apologize.  It

3         has a home that I lived on in 1987.  If I remembered, I'd be

4         happy to tell you.  The other things they say, no, I don't

5         even know who this guy is or what he claimed he did.

6    Q    Okay, thank you.  So you have no recollection that a

7         gentleman by the name of Chris Wolf accused you in small

8         claims court of refusing to pay a bill because he would not

9         hide that bill from your business partner?

10   A    Not at all, no.

11   Q    Okay.  Mr. Korn, who is Alan Gottlieb?

12   A    He's a former partner.

13   Q    A former partner in what?

14   A    Southwood Construction.  We had a couple different--few

15        different companies together.

16   Q    Name them, please.

17   A    Actually, he still owns, I think, a couple of my--our

18        apartment complexes.

19   Q    Mr. Gottlieb owns a few of your apartment complexes?

20   A    Well, I think he's still a partner, either him or his wife

21        or his trust.  I don't know how he owns it, but I believe he

22        still is.

23   Q    Okay, when did you first meet Mr. Gottlieb?

24   A    Back in probably early sixties, late fifties.

25   Q    How did you meet him?
```

| 1 | A | School. |
|---|---|---|
| 2 | Q | What school?  I mean, was that grade school-- |
| 3 | A | Grade school. |
| 4 | Q | --high school? |
| 5 | A | Grade school. |
| 6 | Q | Grade school.  About how old do you think you were? |
| 7 | A | Pardon me? |
| 8 | Q | How old do you think you were? |
| 9 | A | Thirteen, 12.  Twelve, ten. |
| 10 | Q | And how long did you know him before you went into |
| 11 | | partnership with him? |
| 12 | A | Eleven years, approximate. |
| 13 | Q | So you went into partnership with him approximately when |
| 14 | | then, sixties, is that-- |
| 15 | A | No.  No.  It's about '71, something like that. |
| 16 | Q | Nineteen seventy-one-ish, okay. |
| 17 | A | Yeah. |
| 18 | Q | And what was your first business that you became partnered |
| 19 | | with him in? |
| 20 | A | It was Southwood Construction. |
| 21 | Q | Did that grow to include Premier Homes Building Company, |
| 22 | | Inc.? |
| 23 | A | Sure. |
| 24 | Q | That was a Michigan corporation, is that right? |
| 25 | A | Yes.  Yes, it is.  Or it was. |

```
 1    Q    Do you recall being in a lawsuit with Mr. Gottlieb?

 2    A    Yes, I do.

 3    Q    Did he sue you?

 4    A    He sued me, and there was a claim against--I sued him, yes.

 5    Q    So you counterclaimed back, is that right?

 6    A    Yes.

 7    Q    And do you recall him accusing you of withdrawing over

 8         $750,000 from Lifestyle Homes?

 9    A    That had the same suit as Beztak.  It was the same as the

10         Beztak suit.

11    Q    I'm asking you a question.  Do you recall--let me finish my

12         question, please, sir.

13    A    Okay.

14    Q    Do you recall that he accused you of withdrawing in excess

15         of $750,000 from Lifestyle Homes?  Do you recall that?

16    A    Yes.

17    Q    Do you recall that he claimed that he had withdrawn less

18         than $80,000 from that same company?

19    A    Yes.

20    Q    And that he said you were 50 percent partners, right?

21    A    Correct.

22    Q    And so, therefore, you had withdrawn well in excess, almost,

23         what was that, nine times as much money, that's his

24         accusation, nine times?

25    A    That's not the outcome, but that was his accusation, yes.
```

```
1    Q    Okay.  For the record, what was the outcome?

2    A    The outcome was, the money was given to our other partners'

3         girlfriends, and that's where the money actually went to.

4    Q    And who gave it to them?

5    A    I did, and Harold Beznos.  It was Harold Beznos' girlfriend

6         and Jerry Luptak's girlfriend.

7              MR. HILAL:  Okay.  Your Honor, may I approach?

8    BY MR. HILAL:

9    Q    I'm going to hand you, Mr. Korn, Defendant's Exhibit 8 and

10        ask if you can identify that document?

11   A    It's the starting of the lawsuit between Alan Gottlieb and

12        myself.  Back in May 12th of 1992.

13   Q    Do you recognize that document, sir?

14   A    Oh, I've seen it before, yes.

15             MR. HILAL:  Your Honor, I'd move that Defendant's

16        Exhibit 8 be entered.  And I recognize that Counsel's just

17        being handed to it because I couldn't find my copy for him

18        at the moment.

19             MR. CONLON:  Just a moment, your Honor.

20             Your Honor, I'm going to object just because I

21        have never seen it before; it hasn't been produced.

22             MR. HILAL:  Your Honor, it's a public record; it's

23        a complaint.

24             MR. CONLON:  I mean, there's a lot of public

25        records out there, but I mean, we were supposed to, my
```

1    understanding is, know ahead of time what documents we're

2    going to get, and I've never seen it before.  I'm seeing it

3    for the first time now.

4              THE COURT:  Has it been disclosed, Counsel?

5              MR. HILAL:  Your Honor, it's a public record.  I'm

6    not aware that we have any duty, if we go and do an

7    investigation in public records and find a public record, to

8    disclose, but if that's the case, if the Court feels that

9    that's what we're supposed to do, obviously, then we didn't

10   do it.

11             THE COURT:  I'll sustain the objection.

12             MR. HILAL:  Okay.

13   BY MR. HILAL:

14   Q    Mr. Korn, do you recall that that complaint was filed--and

15        I'm happy to hand it back to you just to refresh your

16        recollection, but about approximately April of 1992?  And

17        I'm happy to show--

18   A    I think I said I saw May, but--

19   Q    April, May?

20   A    --I'll go along with April, if you want to say it.  I mean,

21        I'll believe you.

22   Q    Let's say May, May of '92?

23   A    That's fine.

24   Q    Mr. Korn, do you recall having another judgment entered

25        against you in the amount of $720,674.45 from Comerica Bank?

```
1   A   No.  No, I don't remember a judgment.

2   Q   Okay, I can refresh your recollection.

3   A   This is actually--it's like a--it's a mortgage that we had

4       with them.

5   Q   Okay, with Comerica Bank?

6   A   Sure.  Well, it used to be called Manufacturer's National

7       Bank, then they changed it to Comerica, and we don't--I

8       don't believe there is a judgment served right now at all.

9   Q   You don't believe there's a judgment?

10  A   No, I do not.

11  Q   No, I'm not asking now.  Was there a judgment entered

12      against you from that lawsuit?

13  A   Well, if you show me that it is a judgment, then I'll

14      believe you that it is, but I apologize, there is no--there

15      is no--this case was settled.

16  Q   Oh, you do recall the case?

17  A   Oh, yes, I definitely do.

18  Q   And it was settled?

19  A   Yes, it was.  We went ahead--

20  Q   Do you recall--I'm sorry.

21  A   I'm sorry, go ahead.

22  Q   Do you recall whether you had to pay somebody as a result of

23      that settlement?

24  A   Comerica, of course.

25  Q   So that was settled with respect to some kind of a judgment
```

227

```
1              being entered against you?

2      A       No, it was just--they had property.

3      Q       A debt?

4      A       It's a debt, definitely is, and it's been paid.  I mean,

5              we're paying on it even presently.

6      Q       Okay.

7      A       Oh, no definitely.

8      Q       Thank you.  So sometime after February of 1993, the case was

9              settled, is that your recollection?

10     A       That was the same thing, all part of the Beznos, Beztak,

11             Alan Gottlieb.  Everything you've been showing me is part of

12             the same suit.  It's all trickled down.

13     Q       But that's not the same as that two, almost three million

14             dollar judgment that you already--

15     A       Of course, it is, definitely.

16     Q       Pardon me?

17     A       Yes, sir, it is.

18     Q       It's the same?

19     A       Yes, sir.

20     Q       Okay.  Do you recall having another lawsuit filed against

21             you, Citizens and Southern Mortgage in 19--April 1993?

22     A       That's the same suit, sir, that we're talking about with the

23             judgment for the three million dollars.

24     Q       But it's a separate lawsuit; it just all culminated, is that

25             what you're saying?
```

228

```
1    A    It was all, yes, all the same people in it and, yes, sir.

2    Q    And that resulted in a settlement, right, all of that?

3    A    Yes.

4    Q    And was that settlement--that settlement occurred

5         approximately June of 1994, is that right?

6    A    I'm not sure, but...

7    Q    Sir, I'm going to hand you what is labeled Defendant's

8         Exhibit 9.

9    A    Yes, sir.

10   Q    Can you identify this document, sir?

11   A    It's called a settlement agreement.

12   Q    Do you recall this settlement agreement, sir?

13   A    Yes, I do.

14             MR. HILAL:  Your Honor, I would move to have

15        Defendant's Exhibit 9 entered.

16             THE COURT:  Any objection?

17             MR. CONLON:  No objection, your Honor.

18             THE COURT:  It may be received.

19             (At 4:28 p.m., Defendant's Exhibit No. 9 is

20             received)

21             MR. HILAL:  I'm sorry, it appears that I gave away

22        my highlighted version.  Did I give you a highlighted--I'm

23        sorry.

24   BY MR. HILAL:

25   Q    Mr. Korn, is there a part highlighted on there?
```

| 1 | A | I'm sorry, what's that? |
| 2 | Q | I'm trying to move things along here, sorry. |
| 3 | A | That's okay. |
| 4 | Q | Is there a part highlighted? |
| 5 | A | Part highlighted? |
| 6 | Q | Yes. |
| 7 | A | It's upside down now.  Can you give me a page, please? |
| 8 | Q | Well, I can't at the moment because this is... |
| 9 | | I found my highlighted copy.  Page 9. |
| 10 | A | I must have missed it. |
| 11 | Q | Page 9, Paragraph 3. |
| 12 | A | Excuse me.  There is no highlighting. |
| 13 | Q | Let me make sure it's the right one. |
| 14 | A | It's nine. |
| 15 | Q | It's not the right one.  Here, I'll hand you-- |
| 16 | A | That's okay. |
| 17 | Q | --what is now going to be Defendant's Exhibit 9.  Here's |
| 18 | | Exhibit 9.  Make sure that's the same document.  Do you |
| 19 | | recognize that document, sir? |
| 20 | A | Yes. |
| 21 | Q | Okay.  Do you see on Page 9 the highlighted portions? |
| 22 | A | Yes. |
| 23 | Q | Can you read that portion that's highlighted? |
| 24 | | DVD 2006-26  5-02-06  4:31:40 |
| 25 | A | Yes. |

1                    "If the financial statement reflects a positive

2                    net equity, then the Lifestyle Plaintiff shall be

3                    entitled to entry of a judgment against Korn,

4                    individually, in the Lifestyle Homes case in the amount

5                    of any positive net worth, but not to exceed 300,000."

6      Q      Okay, and--

7      A      And they were supposed to pay three million dollars for me,

8             so...

9      Q      Okay, now, next question.

10     A      Yes.

11     Q      Can you read the next portion?

12     A      Yes.  It says:  "Within 30 days after submission of the

13            financial statement, Korn, upon at least 10 business days'

14            prior written notice, will submit to a creditor's exam."

15     Q      Is it fair to say, Mr. Korn, it's your recollection that

16            what ended up happening with result to this particular

17            settlement was that you were to submit to a creditor's

18            examination, and if they found that you had a positive net

19            worth in the amount of $300,000, you'd have to pay that?

20     A      That if I did, yes.  Well, at the same time, they were

21            supposed to pay the three million dollar--almost three

22            million dollar judgment off.  That is correct, sir.

23     Q      Okay.  Did they ever find that positive net worth, Mr. Korn?

24     A      Of mine, no.

25     Q      Okay.  And the document is dated June 30, 1994.  You're

231

| 1 | | supposed to submit within 30 days to a creditor's exam, |
|---|---|---|
| 2 | | right? |
| 3 | A | Correct. |
| 4 | Q | And that would be then upon 10 days' notice, if I recall |
| 5 | | reading it correctly, so is it fair to say that no earlier |
| 6 | | than, say, July of 1994, you were submitting to a creditor's |
| 7 | | exam? |
| 8 | A | Correct. |
| 9 | Q | Okay.  How long did that process take?  I mean, I imagine |
| 10 | | you had to put together some, as the document says, a |
| 11 | | personal financial statement of some kind and submit it to |
| 12 | | them, right? |
| 13 | A | Yes. |
| 14 | Q | And I imagine that took some time, right? |
| 15 | A | Not really.  I mean, my attorneys did it with the |
| 16 | | accountants. |
| 17 | Q | Okay.  So sometime July, June, July, August time frame of |
| 18 | | 1994, you have no positive net worth, is that right? |
| 19 | A | Well, right, I did not. |
| 20 | Q | And you had an outstanding judgment of almost three million? |
| 21 | A | Correct. |
| 22 | Q | And this judgment or whatever it would have been, |
| 23 | | requirement debt to pay $300,000 if certain-- |
| 24 | A | Well, that one was to be paid off if they paid off the three |
| 25 | | million dollar judgment that I had.  That was their |

232

| | | |
|---|---|---|
| 1 | | obligation, and my obligation was to then pay 300,000. |
| 2 | Q | So but you had no net worth as of June of 1994? |
| 3 | A | I did not. |
| 4 | Q | Okay. I will refer you back, sir, to Plaintiff's Exhibit 34 |
| 5 | | and 35. I'm going to hand those to you. |
| 6 | A | Sure. |
| 7 | Q | Mr. Korn, do you recall testifying that you made cash |
| 8 | | payments to individuals such as Ian, Tim, and Lisa? |
| 9 | A | Definitely do, yes. |
| 10 | Q | Okay. Did you do a W-2 for those individuals? |
| 11 | A | They were just subcontractors. They were people that worked |
| 12 | | for us. |
| 13 | Q | So they were independent contractors? |
| 14 | A | If you want to call it that, sure. |
| 15 | Q | Okay, well, I'm asking you. |
| 16 | A | They were individuals. Well, they were individuals that |
| 17 | | worked. |
| 18 | Q | You ran a company of 200 employees, you testified, right? |
| 19 | A | Actually, about 250, correct. |
| 20 | Q | Okay, so you know what an employee is versus an independent |
| 21 | | contractor, right? |
| 22 | A | Well, yes, but they were just--they were individuals. I |
| 23 | | wouldn't say they're-- |
| 24 | Q | I'm just asking if you know the difference. |
| 25 | A | They were individuals that did work for us, correct. |

| 1 | Q | Okay, but you know the difference between an independent |
| 2 | | contractor and an employee? |
| 3 | A | Yes. |
| 4 | Q | Okay.  You understand the requirement to pay taxes on an |
| 5 | | employee, right? |
| 6 | A | Well, there's certain things you pay for employees, correct. |
| 7 | Q | Taxes, being one of them? |
| 8 | A | Well, yes. |
| 9 | Q | Okay. |
| 10 | A | Different things. |
| 11 | Q | And if those taxes are not paid, somebody gets in trouble, |
| 12 | | right?  You understand that concept? |
| 13 | A | Okay.  They have to pay--people have to pay taxes, of |
| 14 | | course. |
| 15 | Q | Okay.  If they're an independent contractor, does the |
| 16 | | company want to give them something like a 1099 to record |
| 17 | | the fact that these people made or received payments? |
| 18 | A | Sure. |
| 19 | Q | Why would that be? |
| 20 | A | So they can send it in themselves. |
| 21 | Q | So the company could and for tax purposes, right? |
| 22 | A | Well, the company sends it in, and then they--you have to |
| 23 | | give them a form so they can send it in for their income, |
| 24 | | sure. |
| 25 | Q | Okay.  So paperwork on these kinds of payments is important, |

234

```
1          is it not?

2     A    No paperwork.  I mean, receipts, yes, we did have--we have

3          receipts, yes.

4     Q    You're saying that "we have receipts."  Who's we has

5          receipts?

6     A    Well, as the company, we had receipts.

7     Q    Where did they get this receipt?  Did Ian sign something?

8     A    Sure.  It could be on a piece of paper; it could be on a

9          napkin.  Even our office, the main office went ahead and

10         made some of these receipts up.

11    Q    Do you have a specific recollection, sir, for example, for

12         Check No. 1352--or excuse me, 1315, the very first entry,

13         the one you testified about earlier with great recollection,

14         1315, do you have any recollection of having Ian sign any

15         document verifying that he received those funds?

16    A    He would sign a waiver; therefore, yes, the waiver would be

17         a receipt, definitely.

18    Q    You have a specific recollection of that?

19    A    Well, whenever I gave people money, just so we wouldn't get

20         any liens on the property and Larry, I know, needed it for

21         the closing, we had to have signed waivers; we had to have

22         everyone sign a waiver so they couldn't back at us and say

23         you never paid me for what I did.

24    Q    Do you have a specific recollection in this instance of Ian

25         signing anything, a waiver or anything?
```

235

```
 1   A    I'm not going to tell you the specific one right here, but

 2        typically, I had everyone sign waivers.  Am I going to tell

 3        you I remember this one exactly when Ian signed it?  No, but

 4        I  had guys sign waivers.

 5   Q    Do you recall our conversation in deposition about Mr.

 6        Barkley?

 7   A    Yes, sure, Walter Barkley.

 8   Q    Did Mr. Barkley do any work for the companies?

 9   A    No, he did not.

10              MR. HILAL:  Okay.  After this, your Honor, I'll be

11        finished after this if you want to break for tomorrow.

12              (At 4:38 p.m., discussion between Mr. Hilal and

13              Mr. Conlon)

14   BY MR. HILAL:

15   Q    Mr. Korn, I'm going to hand you what is labeled Defendant's

16        Exhibit No. 10.

17   A    Sure.

18   Q    And to expedite things, I'm going to point--direct your

19        attention to exhibit stamp in the bottom right-hand corner

20        that shows that it's Deposition Exhibit No. 11.

21   A    That's fine.

22   Q    Okay.  Do you recall testifying regarding entries on this

23        particular document?

24   A    Yes, I do.  Well, I remember seeing the document, yes.

25   Q    Okay, is this a check register from Abington Development?
```

```
 1   A    Yes, it is.

 2   Q    Okay.  You recognize this document?

 3   A    Yes, I do.

 4             MR. HILAL:  Okay.  I'd move that it be admitted.

 5             MR. CONLON:  I have no--

 6             THE COURT:  Any objection?

 7             MR. CONLON:  No objection.

 8             THE COURT:  It may be received.

 9             (At 4:39 p.m., Defendant's Exhibit No. 10 is

10             received)

11   BY MR. HILAL:

12   Q    Okay.  If you would turn to the first tabbed page, which

13        should be Page 28.

14   A    Yes, it is.

15   Q    And if you look at the one entry that's highlighted there.

16        I'll read it to you.  You can tell me if you disagree, but

17        you may recall.  It says, "Wally Barkley, 8-15-98, Check No.

18        3047."  Do you see that?

19   A    Well, yeah, I mean, it's very difficult, but yes, I

20        definitely do.  It's for Walter Barkley and Check 3047.

21   Q    Okay.  The amount is $2,780?

22   A    That is correct.

23   Q    And in the description portion, it says, "21--or 21698

24        Roosevelt?"

25   A    That is correct.
```

| 1 | Q | And it also says, "Fieldstone materials?" |
| 2 | A | That is correct. |
| 3 | Q | Okay. Where is 21698 Roosevelt? |
| 4 | A | It's down state, Farmington Hills. |
| 5 | Q | Okay, is that one of the properties owned by Abington |
| 6 | | Development? |
| 7 | A | Yes, it is. |
| 8 | Q | Okay. Did Mr. Barkley do work on the Roosevelt property? |
| 9 | A | No, never did. |
| 10 | Q | Okay. I'd like to turn your attention to the next tabbed |
| 11 | | page, which should be 31. Fourth line down should be |
| 12 | | highlighted. |
| 13 | A | It is. |
| 14 | Q | Walter Barkley. |
| 15 | A | Walter Barkley. |
| 16 | Q | Go ahead. |
| 17 | A | I can see Walter Barkley, and then I'm with you. I see |
| 18 | | Check 3089. |
| 19 | Q | Okay. Six thousand dollars? |
| 20 | A | Six thousand. |
| 21 | Q | And it's 21328 Hamilton? |
| 22 | A | Yes. Well, I can't say that, but I'll--I see 213--yes. |
| 23 | | Yes. |
| 24 | Q | It's Hamilton? |
| 25 | A | Yes, it is. |

```
1    Q    Okay.  And then there's also 21342 Hamilton, cabinets,

2         underneath that?

3    A    I'm sorry, but I'll believe you.  I see Hamilton.  Yes.

4         Yes, it does.  There I can read it.

5    Q    Okay.  Where is Hamilton, sir?

6    A    In Farmington Hills.

7    Q    Okay, did Mr. Barkley did work on that property?

8    A    No, he didn't.

9    Q    Is this your handwriting, sir?

10   A    Oh, yes.

11   Q    Okay, both, and the other--the other entry was your

12        handwriting as well?

13   A    The other one was, too, of course.

14   Q    Okay.  And the next tab, Page 33.  Third up from the bottom.

15        It says, "W.T. Barkley, 21621 Albion."

16   A    Sorry.  Show me where.  I don't see it highlighted--I don't-

17        -okay.

18   Q    Oops, there's another one at the top on that page.  Is that

19        the wrong page?

20   A    No, 34.

21   Q    It's 33.  Go back one page.

22   A    Oh, didn't you say 34?

23   Q    I did, probably.  I'm trying to move along too fast here.

24   A    No problem.

25   Q    Third one; see it's highlighted there for you?
```

239

```
1    A    Yes, I do.

2    Q    W.T. Barkley?

3    A    Yes.

4    Q    21621 Albion?

5    A    Yes.

6    Q    Check No. 3128?

7    A    Correct.

8    Q    Forty-five hundred dollars?

9    A    That's correct.

10   Q    And it appears to be split up, $2500 to the Albion, and then

11        there's another entry, 21618 Colgate?

12   A    Correct.

13   Q    For 2,000?  Do you see that?

14   A    I'll believe you, yes.

15   Q    Okay.  Did Mr. Barkley do anything on Albion or Colgate?

16   A    No.

17   Q    That's your handwriting?

18   A    Yes, it is.

19   Q    And now to Page 34, and it will be the top entry.  W.T.

20        Barkley?

21   A    Correct.

22   Q    29474 Almondwood?

23   A    Correct.

24   Q    To buy dirt?

25   A    Correct.
```

| 1 | Q | 3131, 2,000? |
| 2 | A | Check No. 3131, right. |
| 3 | Q | Okay. |
| 4 | A | Two thousand, that's correct. |
| 5 | Q | Did he ever do any--where's Almondwood? |
| 6 | A | Almondwood's in Farmington Hills. |
| 7 | Q | Did Mr. Barkley ever do any work for that property? |
| 8 | A | No, he didn't. |
| 9 | Q | Did he ever buy dirt? |
| 10 | A | Oh, he bought dirt, of course, but-- |
| 11 | Q | For where? |
| 12 | A | --no, not for that property. |
| 13 | Q | What property did he buy dirt for? |
| 14 | A | It was for my daughter's farm. |
| 15 | Q | Your daughter's farm.  Isn't it true that all of those |
| 16 | | entries that we just went over were payments to Mr. Barkley |
| 17 | | for work done on your daughter's farm? |
| 18 | A | Definitely. |
| 19 | | MR. HILAL:  Okay.  Your Honor, I don't have |
| 20 | | anything more for today if you want to break. |
| 21 | | THE COURT:  Okay.  Let's recess for the day. |
| 22 | | Remember it's still not time to discuss any aspect of the |
| 23 | | case, ladies and gentlemen.  We'll see you tomorrow morning |
| 24 | | at 9 a.m.  Thank you. |
| 25 | | COURT BAILIFF:  All rise. |

241

1          (At 4:43 p.m., proceedings adjourned)

2

3

4

5

6              DVD 2006-26  5-02-06  4:43:35

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

```
(    STATE OF MICHIGAN   )
(          SS            )
( COUNTY OF CHARLEVOIX )
```

       I hereby certify that this transcript represents the complete, true and correct rendition of the videotape of the proceedings as recorded.

       I further state that I assume no responsibility for any events that occurred during the above proceedings or any inaudible responses by any party or parties that are not discernible on the video of the proceedings.

Dated:  October 9, 2006

_____
Charna L. Welch, CER-5973

# EXHIBIT D

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF CHARLEVOIX

KORN FAMILY LIMITED PARTNERSHIP,
GALE KORN, and SHELDON KORN,

      **Plaintiffs/Counter-Defendants,**

and, Shauna Korn and Ashley Korn,

      **Counter-Defendants,**

v.

HARBOR BUILDING COMPANY, LLC,
DISCOUNT HOMES, LLC, NORTHERN
GRADING, EXCAVATING & SEPTIC, LLC,
ABINGTON DEVELOPMENT COMPANY, INC.,
BRIDGESTONE DEVELOPMENT, LLC,
CLARITA COMMONS DEVELOPMENT, LLC,
and LAWRENCE LENCHNER,

      **Defendants/Counter-Plaintiffs.**

_____/

TRUE COPY
of a document on file
in the office of the
Charlevoix County Clerk

Hon. Richard M. Pajtas
Case No. 03-1723-19-CB

RECEIVED
JUL 2 8 2006
By_____

Allen R. Telgenhof (P43114)
Attorney for Plaintiffs and Counter-Defendants
Hayes Telgenhof Turkelson & Groat, P.C.
1404 Bridge Street
Charlevoix, Michigan 49720
(231) 547-1111

Michael I. Conlon (P43954)
Attorney for Plaintiffs and Counter-Defendants
Running, Wise & Ford, Inc.
326 East State Street, P.O. Box 686
Traverse City, Michigan 49684
(231) 946-2700

_____/

Mark J. Hilal (P57028)
Bridget Brown Powers (P46888)
Attorneys for Defendants/
Counter-Plaintiffs
618 Howard Street
Petoskey, Michigan 49770
(231) 347-8200

## JUDGMENT

POWERS & HILAL, ATTORNEYS, 618 HOWARD STREET, PETOSKEY, MICHIGAN 49770

This action having come on for trial before the court and a jury, and the issues being having been duly tried, and the jury having answered the issues as shown by the record,

IT IS THEREFORE ORDERED AND ADJUDGED that Plaintiffs take nothing, and their Complaint shall be dismissed on the merits, and that Defendants recover from Plaintiffs all taxable costs.

IT IS FURTHER ORDERED AND ADJUDGED that Defendants recover from Plaintiffs, The Korn Family Limited Partnership, and/or Sheldon Korn, and/or Gale Korn, and/or Shauna Korn, and/or Ashley Korn, the sum of $1,745,000.00, with interest thereon at the rate provided by law, from the date of the filing of the Counter-Complaint, plus all taxable costs.

IT IS FURTHER ORDERED AND ADJUDGED that Defendants recover from Plaintiffs, Sheldon Korn, and/or Gale Korn, the sum of $250,000.00, with interest thereon at the rate provided by law, from the date of the filing of the Counter-Complaint, in addition to the sum stated in the preceding paragraph of this Judgment, plus all taxable costs.

IT IS FURTHER ORDERED that this Judgment resolves the last pending claim, and closes this case.

Entered: _7-28-06_

Richard M. Pajtas
Circuit Judge

POWERS & HILAL, ATTORNEYS, 618 HOWARD STREET, PETOSKEY, MICHIGAN 49770

2

# EXHIBIT E

# STATE OF MICHIGAN

# COURT OF APPEALS

---

KORN FAMILY LIMITED PARTNERSHIP,
GALE KORN, SHELDON KORN, SHAUNA
KORN, and ASHLEY KORN,

        Plaintiffs/Counter-Defendants-
        Appellants,

v

HARBOR BUILDING COMPANY, L.L.C.,
DISCOUNT HOMES, L.L.C., NORTHERN
EXCAVATING, GRADING & SEPTIC, L.L.C.,
ABINGTON DEVELOPMENT COMPANY,
L.L.C., BRIDESTONE DEVELOPMENT
COMPANY, L.L.C., CLARITA COMMONS
DEVELOPMENT COMPANY, L.L.C., and
LAWRENCE LENCHNER,

        Defendants/Counter-Plaintiffs-
        Appellees.

UNPUBLISHED
January 29, 2008

No.  272813
Charlevoix Circuit Court
LC No.  03-172319-CB

---

Before:  Fitzgerald, P.J., and Markey and Smolenski, JJ.

PER CURIAM.

        Plaintiffs appeal by right a judgment entered after jury verdicts in defendants' favor for silent fraud in the amount of $1,070,000, for fraud and misrepresentation in the amount of $250,000, and also $250,000 as exemplary damages.  Plaintiffs also appeal the jury verdict of $250,000 against Sheldon Korn and Gale Korn for breach of fiduciary duty.[1]  We affirm.

        This litigation resulted when Lawrence Lenchner ended his business relationship with his brother-in-law Sheldon Korn.  Both Sheldon[2] and Lenchner had backgrounds in residential construction and real estate development.  They began working together in real estate

---

[1] Plaintiffs do not contest the jury's award of $175,000 for unjust enrichment.

[2] To avoid confusion individual plaintiffs are referred to by first name.

development in 1995 or 1996. According to Lenchner's theory of the case, although he and Sheldon were supposed to be partners, Sheldon never made any capital contributions or assumed any liability for any debts of the defendant business entities that Lenchner solely formed to conduct real estate development. The other plaintiffs in this litigation are Sheldon's wife, Gale, two daughters, Shauna and Ashley, and the Korn Family Limited Partnership (KFLP). The family partnership was apparently formed to evade the collection efforts of judgment creditors from an earlier unrelated lawsuit. See *Nationsbanc Mortgage Corp of Ga v Luptak*, 243 Mich App 560; 625 NW2d 385 (2001). Lenchner ended his association with the Korns on December 31, 2002.

The Korns and KFLP initiated this litigation on January 15, 2003, by filing suit against Lenchner and the real estate development companies he had formed. Plaintiffs third amended complaint alleged the following theories: (a) money owed on unpaid loans to the companies; (b) conversion; (c) statutory liability (treble damages) under MCL 600.2919a for receiving and concealing stolen or embezzled property; (d) fraudulent or innocent misrepresentation; (e) silent fraud; (f) bad faith promises; (g) breach of fiduciary duty; (h) tortious interference with business relationships; (i) unlawful discharge violating public policy, or alternatively, violating the whistle blower's protection act; (j) civil conspiracy; and (k) breach of contract. Lenchner and his companies (hereafter, defendants) in essence claimed that the Korns looted the companies for their personal benefit, alleging in a counterclaim: (a) conversion; (b) civil conspiracy to commit conversion; (c) breach of fiduciary duty; (d) civil conspiracy to commit breach of fiduciary duty; (e) fraud; (f) silent fraud; (g) innocent misrepresentation; (h) conspiracy to commit fraud, silent fraud, and innocent misrepresentation; (i) promissory estoppel; (j) unjust enrichment; and (k) constructive trust.

After a thirteen-day trial, the jury rejected all the Korns claims and rendered verdicts in favor of defendants totaling $1,745,000 against all plaintiffs jointly and severally (with verdict forms naming each plaintiff and/or the other plaintiffs), and an additional $250,000 awarded against Sheldon Korn and/or Gale Korn in the amount of $250,000 for breach of fiduciary duty. Specifically, the jury rejected Sheldon and Gale Korn's claim of being Lenchner's fifty-percent partners in the various business real estate development entities. The jury also rejected all of plaintiffs' legal theories for damages. On defendants' counterclaims, the jury found in favor of defendants, awarding damages against all plaintiffs of $175,000 for unjust enrichment, $1,070,000 for silent fraud, $250,000 for fraud & misrepresentation, and $250,000 as exemplary damages. The trial court entered judgment on July 28, 2006, against KFLP and/or each individual plaintiff for $1,745,000 and against Sheldon Korn and/or Gale Korn for an additional $250,000; each award also included interest from the date of filing the counter-complaint. The trial court subsequently denied plaintiffs' motion for judgment notwithstanding the verdict (JNOV), remittitur, or new trial. Plaintiffs appeal by right the judgment and the order denying post trial relief.

I

Plaintiffs first argue that the trial court erred by denying their motions for directed verdict and JNOV regarding defendants' claims of (A) fraud and (B) silent fraud. We disagree. We find defendants' legal theories that all plaintiffs are liable for fraud and silent fraud sound and supported by evidence, which if viewed in the light most favorable to defendants, supports the

jury verdicts. Plaintiffs' legal arguments to the contrary fail. Consequently, the trial court did not err in denying plaintiffs' motions for directed verdict and JNOV.

This Court reviews de novo a trial court's decision on both a motion for directed verdict and a motion for JNOV. *Foreman v Foreman*, 266 Mich App 132, 135; 701 NW2d 167 (2005). When reviewing the trial court's decision on a motion for a directed verdict, we must view the evidence presented up to the point of the motion and all legitimate inferences from the evidence in the light most favorable to the nonmoving party to determine whether a fact question existed. *Zantel Marketing Agency v Whitesell Corp*, 265 Mich App 559, 568; 696 NW2d 735 (2005). A directed verdict is appropriate only when no factual question exists upon which reasonable minds could differ. *Smith v Foerster-Bolser Construction, Inc*, 269 Mich App 424, 427-428; 711 NW2d 421 (2006).

Similarly, a motion for JNOV should be granted only when there was insufficient evidence presented to create an issue of fact for the jury. *Merkur Steel Supply Inc v Detroit*, 261 Mich App 116, 123; 680 NW2d 485 (2004). The trial court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party and determine whether the facts presented preclude judgment for the nonmoving party as a matter of law. *Id*. at 123-124. If the evidence is such that reasonable people could differ, the question is for the jury and JNOV is improper. *Foreman*, *supra* at 136.

A

As a general rule, actionable common-law fraud requires proof that: "(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *M & D, Inc v McConkey*, 231 Mich App 22, 27; 585 NW2d 33 (1998).

Plaintiffs correctly argue there can be no fraud without a false representation. *Id*.; *Hord v Environmental Research Inst (After Remand)*, 463 Mich 399, 404; 617 NW2d 543 (2000). Further, "an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. Future promises are contractual and do not constitute fraud." *Hi-Way Motor Co v International Harvester Co*, 398 Mich 330, 336; 247 NW2d 813 (1976). But defendants rely on a recognized exception that "an unfulfilled promise to perform in the future is actionable when there is evidence that it was made with a present undisclosed intent not to perform." *Foreman*, *supra* at 143, citing *Rutan v Straehly*, 289 Mich 341, 348-349; 286 NW 639 (1939); see, also, *Crook v Ford*, 249 Mich 500, 504-505; 229 NW 587 (1930).

Plaintiffs' main argument is that all plaintiffs may not be found liable for any fraud that Sheldon alone perpetrated. Plaintiffs assert defendants presented no evidence at trial that Gale, Shauna, or Ashley made a false statement on which Lenchner or his companies reasonably relied. This argument fails for several reasons. Defendants' theorized that all Korns and KFLP were acting in concert to loot defendant companies for personal benefit. In *Kefuss v Whitley*, 220 Mich 67; 189 NW 76 (1922), the plaintiff alleged that several people including Whitley and Davey defrauded him. The Court opined:

Where there is evidence that parties are acting in collusion, "Everything said, done, or written by any one of the parties to the combination, in furtherance of the common purpose, is deemed the act of all." *Gumberg* v *Treusch,* 103 Mich 543, 554. In my opinion, the fair inference to be drawn from the proofs is that Mr. Davey knew all about the deal with plaintiff and, having accepted the fruit of the fraud, he may not complain of a decree which so far as possible places the parties *in statu quo.* [*Kefuss*, *supra* at 88-89.]

Plaintiffs argue that defendants' concert of action theory is unavailable because defendants voluntarily dismissed separate independent claims of civil conspiracy. Although both defendants and plaintiffs dismissed their civil conspiracy claims before sending the case to the jury, this argument is unavailing. The *Kefuss* concert of action theory does not depend on proving an independent claim of civil conspiracy. It requires evidence that parties knowingly acted to further a common purpose, in this case, to siphon company assets for the Korn family's personal use and benefit. Here, there was evidence from which the jury could infer all Korns knowingly participated in a common fraudulent scheme. There was testimony from Sheldon, Gale, and Shauna from which the jury could infer that the Korn family operated as a unit in its business dealings regarding the Lenchner companies. Further, there was testimony from which the jury could infer that Sheldon, Gale and Shauna participated in the fraudulent scheme. For example, there was evidence that Sheldon wrote checks to Gale for hundreds of thousands of dollars on company accounts, that Gale deposited the funds into KFLP (comprised of all Korn family members), and from which all family members could freely draw funds.

Moreover, for the reasons discussed more fully in part IV, plaintiffs affirmatively waived any claim of error regarding a severable determination of liability as to each plaintiff. Here, because of the "and/or" verdict form that all parties agreed to submit to the jury, even if only Sheldon were liable for fraud, the verdict should be upheld.

Next, plaintiffs argue that defendants offered evidence at trial on a fraud theory that had not been alleged in their counter-complaint. Specifically, defendants offered evidence that Sheldon agreed to act like a partner but did not; this induced Lenchner to fund the companies that the Korns looted. Plaintiffs' claim of prejudice by lack of notice is without merit. The very essence of plaintiffs' claims against defendants was that Sheldon and Gale Korn were 50-50 partners with Lenchner in the various real estate development companies. Lenchner denied the Korns were partners. Defendants' pleadings stated that the Korns "engaged in a practice and course of conduct that operated as a fraud and a deceit on the Lenchner entities." Thus, defendants' theory of fraud was within the broad framework of the issues raised by both parties' pleadings, and, indeed, went to the heart of the case: was there a partnership or was a fraud perpetrated? Plaintiffs were not prejudiced by lack of notice.

Moreover, it was during the Korns' counsel's cross-examination of Lenchner that testimony was elicited that established the fraud theory that Sheldon agreed to act like a partner but did not. MCR 2.118(C)(1) provides: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they are treated as if they had been raised by the pleadings." So if the pleadings were not broad enough to include this theory of fraud, the record supports finding it was tried by implied consent of the parties. That defendants did not move to amend their counterclaim is of no moment because (1) when issues are tried by implied consent of the parties they "are treated as if they had been raised by the pleadings" and (2) an

"amendment of the pleadings to conform to the evidence . . . may be made on motion of a party at any time, even after judgment." MCR 2.118(C)(1).

Next, plaintiffs contend this theory will not support a judgment of fraud because it was a promise only actionable for breach of contract, not fraud. Plaintiffs are correct that in general, "an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. Future promises are contractual and do not constitute fraud." *Hi-Way Motor Co*, *supra* at 336. But "an unfulfilled promise to perform in the future is actionable when there is evidence that it was made with a present undisclosed intent not to perform." *Foreman*, *supra* at 143. Here, the jury could have reasonably found that Sheldon's promise to fully participate in a partnership by contributing capital and agreeing to personally be responsible for company debts, as Lenchner was, induced Lenchner to continue funding the companies from which the Korns siphoned funds for the personal benefit of all Korns. More important, the jury could reasonably have determined from the evidence that Sheldon never intended to fulfill his promise, intended Lenchner to rely and act on it, and that Lenchner and his companies reasonably relied on the false promise and were thereby defrauded.

Finally, plaintiffs argue that defendants' theory of fraud cannot sustain a judgment against all plaintiffs other than Sheldon because there was no proof of agency between Sheldon and the other plaintiffs. Further, plaintiffs argue, even if Sheldon were the agent of the other plaintiffs, there was no evidence Sheldon's actions were within the scope of the agency. But as discussed *supra*, and more fully in part III (A), defendants' theory of the case was not agency; rather, defendants posited that the Korns acted in concert to perpetrate a common fraudulent scheme. Evidence was presented at trial that supported defendants' theory of the case and on which reasonable people could disagree. Thus, the trial court properly denied plaintiffs' motions for directed verdict and JNOV with respect to defendants' counterclaim of fraud and misrepresentation. *Foreman*, *supra* at 135-136.

B

Michigan recognizes a cause of action for silent fraud. *Lumber Village, Inc v Seigler*, 135 Mich App 685, 699-670; 355 NW2d 654 (1984), citing *United States Fidelity & Guaranty Co v Black*, 412 Mich 99; 313 NW2d 77 (1981). "[T]o establish a claim of silent fraud, there must be evidence . . . [of] some sort of representation that was false." *McConkey*, *supra* at 25. But, "[a] misrepresentation need not necessarily be words alone, but can be shown where the party, if duty-bound to disclose, intentionally suppresses material facts to create a false impression to the other party." *Id*. Thus, "in order to prove a claim of silent fraud, a plaintiff must show that some type of representation that was false or misleading was made and that there was a legal or equitable duty of disclosure." *Id*. at 31, citing *Black, supra* at 125, 127. Where a duty of disclosure exists, a party's action or conduct "can be actionable as silent fraud if that action or conduct is intended to create a misimpression to the opposing party." *McConkey*, *supra* at 33. Silent fraud, like other forms of fraud, also requires a plaintiff to establish reliance on the false or misleading impression created by the non-disclosure. *Lumber Village*, *supra* at 700.

From the evidence presented at trial, the jury could have found that a fiduciary relationship existed between defendants and Sheldon and Gale Korn with respect to the operation of the defendant companies' Northern Michigan real estate business operations. Further, the jury could reasonably have concluded from the evidence that Sheldon and Gale created a false

impression that company checks written to Gale on business accounts were for reimbursement of business expenses. Likewise, the jury could well have found that the Korns created a false impression that other purchases and payments made on business accounts were for business purposes. Further, there was evidence that promises were made, especially by Sheldon, that questionable company expenditures would be documented and accounted for as business expenses. And, the jury could easily have concluded from the evidence that Gale and Sheldon Korn never intended to account for their expenditure of company money but instead intended to suppress the true nature of the expenditures. Finally, the jury could reasonably have concluded that Lenchner reasonably relied on the false impression created by the Korns, so he continued funding the companies, and as a result, sustained over a million dollars in damages.[3] Because reasonable people could disagree regarding the import of the evidence at trial, the trial court did not err in denying plaintiffs' motion for directed verdict and JNOV. *Foreman*, *supra* at 135-136.

Plaintiffs' argument that the silent fraud verdict is unsustainable against all plaintiffs fails for the same reasons as discussed in subpart A. Further, plaintiffs' argument that the Korns' expenditure of company funds could have been to reimburse business expenses, or loans, or capital draws that were merely reclassified after the fact as "theft losses" merely reinforces the conclusion that questions of fact were presented at trial for the jury to resolve. Hence, the trial court properly denied plaintiffs' motions for direct verdict and JNOV. *Id*.

## II

Next, plaintiffs argue that the verdict against Gale for breach fiduciary duty must be set aside because no evidence showed defendants relied on Gale's advice and judgment. We disagree.

The evidence at trial established that Gale Korn received numerous substantial checks written by both Sheldon and Lenchner ostensibly for business purposes on company accounts. From financial records presented at trial and the testimony of defendants' financial expert, reasonable jurors could have concluded that Gale did not properly account for the company funds entrusted to her. Indeed, the jury could have found that Gale was a key participant in a scheme to divert company funds to KFLP for the use and personal benefit of the Korn family.

Moreover, plaintiffs agreed to submit this claim and the rest of defendants' counter-claims to the jury on the basis that liability could be imposed if either Gale Korn or Sheldon Korn breached a fiduciary duty owed to defendants. As discussed in part IV, plaintiffs waived any claim of error regarding the "and/or" verdict forms all parties agreed to submit to the jury.

## III

Next, defendants argue that the trial court erred by (A) not sua sponte instructing the jury regarding the law of principal and agent, and (B) instructing the jury it could award exemplary

---

[3] Defendants' financial expert testified that company records reflected $1,418,451.49 in undocumented expenditures by the Korns.

damages because they are not permitted where economic damages are sought. Plaintiffs forfeited the first claim and waived the second; manifest injustice did not result.

This court reviews claims of instructional error de novo. *Cox v Flint Bd of Hospital Managers*, 467 Mich 1, 8; 651 NW2d 356 (2002). MCR 2.516 governs jury instruction procedure in civil cases. MCR 2.516(C) provides:

> A party may assign as error the giving of or the failure to give an instruction only if the party objects on the record before the jury retires to consider the verdict (or, in the case of instructions given after deliberations have begun, before the jury resumes deliberations), stating specifically the matter to which the party objects and the grounds for the objection. Opportunity must be given to make the objection out of the hearing of the jury.

Thus, to preserve an alleged error regarding jury instructions for appeal, a party must request the instruction before deliberations begin or must object to the instructions given within the same timeframe. *Id.*; *Leavitt v Monaco Coach Corp*, 241 Mich App 288, 300; 616 NW2d 175 (2000). "This Court will review an unpreserved issue concerning an error in jury instruction only when necessary to prevent manifest injustice. Manifest injustice results where the defect in instruction is of such magnitude as to constitute plain error, requiring a new trial, or where it pertains to a basic and controlling issue in the case." *Mina v General Star Indemnity Co,* 218 Mich App 678, 680-681; 555 NW2d 1 (1996), rev'd in part on other grounds 455 Mich 866; 568 NW2d 80 (1997) (citations omitted).

In some circumstances, a party may waive alleged instructional error. A waiver is an intentional relinquishment or abandonment of a known right. *Grant v AAA Michigan/Wisconsin, Inc (On Remand)*, 272 Mich App 142, 148; 724 NW2d 498 (2006), citing *People v Carter,* 462 Mich 206, 215; 612 NW2d 144 (2000). "'One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error.'" *Carter, supra* at 215 (citation omitted). Moreover, a party that expressly agrees with an issue in the trial court cannot then take a contrary position on appeal. *Grant, supra* at 148. In the context of a jury instruction, when a party agrees with the trial court's instructions as given, the party is not entitled to relief regarding the instruction on appeal. *Chastain v General Motors Corp (On Remand)*, 254 Mich App 576, 591; 657 NW2d 804 (2002).

A

The record discloses that plaintiffs had more than ample opportunity to request jury instructions and object to the instructions that the trial court actually read. Plaintiffs filed requests for jury instructions with the court some six months before trial. After the parties had rested their cases and the trial court decided the parties' motions before arguments, the court and counsel turned their attention to proposed jury instructions. Plaintiffs counsel indicated that "we . . . need a minute to discuss them." The essence of the colloquy between the court and counsel was that the parties' counsel needed a moment to put the final instructions in a form that could be copied to submit to the jury. The trial court then stated, "Let's take a break, and you can see what you can clean up between the two of you so that we'll spend less time in chambers. Let me know when you're ready." *Id*. The court was then in recess for over an hour, after which

plaintiffs' counsel delivered his closing argument. The trial was then adjourned to the next day with the jury to return the next morning at 9:00 A.M.

The next morning at 9:43 a.m., the trial court opened the record by assuring the jury that "we were all working diligently." The court's comment clearly suggests to seasoned trial lawyers that counsel and the court were addressing last minute concerns with jury instructions or verdict forms. Defendants' counsel then delivered his closing argument, and plaintiffs' counsel presented his rebuttal. At the close of rebuttal, and after a 14-minute recess, the trial court began reading the final jury instructions. During the course of instructing the jury, defense counsel requested and was granted a bench conference. After the court's charge was completed, the bailiff sworn, and the jury excused, the trial court asked counsel, "anything further for the record?" Counsel for both sides indicated there was nothing. This record supports defendants' contention that both parties' counsel met with the trial court in chambers and agreed on jury instructions. At a minimum, the record establishes plaintiffs' counsel had ample opportunity to object but did not. So, alleged instructional was not preserved. MCR 2.516(C).

With respect to the merits of plaintiffs' claim that the trial court should have instructed the jury regarding agency, plaintiffs mischaracterize defendants' argument. Defendants did not argue that Sheldon acted as the agent of the other Korn family members. Rather, defendants argued that the evidence supported the finding that all plaintiffs knowingly acted in concert to perpetrate a common fraudulent scheme. See *Kefuss*, *supra*. On this basis, defendants contend that all Korns are bound by Sheldon's deeds and words in carrying out the common fraudulent scheme.

Defendants' theory of the case was not the same as the issue involved in *Smith-Douglas v Walch*, 391 Mich 201; 215 NW2d 142 (1974), on which defendants rely. In that case, the question at trial was whether a buyer who bought from a retailer could be liable to the manufacturer on the basis that the retailer was acting as the manufacturer's agent. The *Smith-Douglas* Court held that agency was "the controlling legal issue supported by the testimony presented to the jury" and because no instruction was given, a new trial was required. *Id*. at 203-204. Whether the other plaintiffs authorized certain actions by Sheldon is not the same question as whether all plaintiffs, including Sheldon, were participating in a common fraudulent scheme. The distinction is perhaps subtle, but real. Compare MRE 801(d)(2)(D) & (E). While both sides dismissed independent tort claims of civil conspiracy before submitting the case to the jury, this did not lessen the principle of *Kefuss* regarding joint liability of codefendants for each others' acts (in this case co-plaintiffs) when engaged in a common fraudulent scheme. In sum, the legal rules pertaining to principal and agent were not basic and controlling in this case. Consequently, manifest injustice did not result from the failure to instruct the jury on agency principles. *Mina*, *supra* at 680-681. Plaintiffs' claims on this issue fail.

B

Plaintiffs waived any error regarding the trial court's instruction regarding exemplary damages. Plaintiffs' counsel acknowledged during post-trial motions that all parties had agreed to the verdict forms submitted to the jury. Indeed, each party submitted claims against the other for exemplary damages, and mirror verdict forms were submitted to the jury with respect to plaintiffs' claims against defendants and defendants' claims against plaintiffs. As noted, plaintiffs' counsel specifically approved the verdict forms. The trial court read its instruction

regarding exemplary damages to apply equally to the parties' claims against each other. Thus, the record indicates that plaintiffs' counsel affirmatively agreed with the trial court's instruction regarding exemplary damages. Plaintiffs have waived this alleged instructional error. *Chastain*, *supra* at 591. "A party who expressly agrees with an issue in the trial court cannot then take a contrary position on appeal." *Grant*, *supra* at 148. Even if forfeited, defendants present a persuasive argument that the claims and evidence in this case would support an award of exemplary damages. *Veselenak v Smith*, 414 Mich 567, 573-575; 327 NW 261 (1982); *McPeak v McPeak (On Remand)*, 233 Mich App 483, 490; 593 NW2d 180 (1999). Thus, manifest injustice did not result. *Mina*, *supra* at 680-681.

IV

Plaintiffs next argue that the trial court committed plain error by not instructing the jury with M Civ JI 41.01[4] and M Civ JI 41.02.[5] This error, plaintiffs argue, was compounded by the "and/or" verdict form used here and resulted in manifest injustice. We disagree and again conclude that plaintiffs have waived any error.

A waiver is an intentional relinquishment or abandonment of a known right. *Grant, supra* at 148, citing *Carter*, *supra* at 215. Here, plaintiffs' counsel included M Civ JI 41.01 and M Civ JI 41.02 in requested jury instructions submitted to the trial court well in advance of trial. So plaintiffs' counsel was clearly aware of these instructions. Also, the record clearly shows plaintiffs' counsel affirmatively agreed to use the incompatible "and/or" verdict form. Thus, the record reflects that although aware of M Civ JI 41.01 and M Civ JI 41.02, plaintiffs' counsel abandoned his request for those instructions and also affirmatively approved the "and/or" verdict format. An abandonment of a known right constitutes a waiver. *Grant, supra* at 148. "'One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error.'" *Carter*, *supra* at 215 (citation omitted). "A party who expressly agrees with an issue in the trial court cannot then take a contrary position on appeal." *Grant*, *supra* at 148. Accordingly, plaintiffs are not entitled to relief on this issue. *Chastain*, *supra* at 591.

V

Next, plaintiffs contend exemplary damages were in excess of actual damages and are not recoverable as a matter of law. Further, plaintiffs argue the "and/or" verdict form permitted the

---

[4] M Civ JI 41.01 (Two or More Defendants - Separate Consideration - Repeating Instructions) provides: "There are *[number]* defendants in this trial. Each defendant is entitled to separate consideration of [his / or / her] own defense. I shall not repeat my instructions for each defendant. Unless I tell you otherwise, all instructions apply to each defendant."

[5] M Civ JI 41.02 (Damages Where There Is No Allocation of Fault Between Defendants) provides: "If you find one of the defendants to be liable, you shall determine the amount of damages [he / or / she] caused and return a verdict in that amount. If you find more than one of the defendants to be liable, you shall return a separate verdict for the amount of damages you determine each defendant caused."

jury to award exemplary damages without finding the requisite malicious, willful, and wanton conduct. Finally, plaintiffs contend the evidence did not support awarding exemplary damages against Gale, Shauna, Ashley and KFLP. We conclude plaintiffs' arguments do not merit relief.

Exemplary damages may be awarded in intentional tort cases, including fraud, where they compensate for injured feelings even though compensation is also awarded for economic loss. "As a practical matter, the conduct we have found sufficient to justify the award of exemplary damages has occurred in the context of the intentional torts, slander, libel, deceit, seduction, and other intentional (but malicious) acts." *Veselenak*, *supra* at 575.

Plaintiffs' argument that the trial court's instruction permitted awarding exemplary damages in excess of defendants' "whole" injury fails. First, as discussed already, plaintiffs at a minimum forfeited, if they did not, in fact, waive, alleged error regarding the jury instructions. Second, jury instructions must be read as a whole and not piecemeal. *Bachman v Swan Harbour Ass'n*, 252 Mich App 400, 424; 653 NW2d 415 (2002). Here, the court instructed the jury, "You may add to the award of actual damages an amount you agree is proper as exemplary damages." Read in the context of the court's entire charge, "actual damages" patently refers to amounts the jury might have awarded as economic damages on claims of fraud, silent fraud, breach of fiduciary duty, and so forth. Although "actual damages" may now include both economic and non-economic damages, historically "actual damages" were synonymous with only economic damages. See *Veselenak*, *supra* at 573-574. Nonetheless, the court's charge read as a whole did not permit double recovery or more compensation than the injuries defendants suffered.

Finally, plaintiffs apparently concede by not arguing to the contrary that the evidence at trial supported an award of exemplary damages against Sheldon. Because plaintiffs waived any error regarding the "and/or" verdict form and a determination of each individual plaintiff's liability, plaintiffs' argument regarding exemplary damages fails.

VI

Finally, plaintiffs argue that the trial court erred in not granting their motion for remittitur or new trial because the jury verdicts were excessive with respect to Gale, Shauna, Ashley and KFLP. Again, we find plaintiffs' arguments do not merit relief.

When a jury awards damages that appear excessive because of the influence of passion or prejudice, or the jury award is clearly or grossly excessive, a court may grant a new trial. MCR 2.611(A)(1)(c)-(d). Alternatively, a trial court may offer the prevailing party an opportunity to consent to judgment in the highest amount the court finds is supported by the evidence. MCR 2.611(E)(1). This Court reviews a trial court's decision regarding a motion for remittitur or new trial for an abuse of discretion. *Grace v Grace*, 253 Mich App 357, 367; 655 NW2d 595 (2002). An abuse of discretion occurs when a court chooses an outcome that is not within the principled range of outcomes. *McManamon v Redford Twp*, 273 Mich App 131, 138; 730 NW2d 757 (2006). This Court must view the evidence in the light most favorable to the nonmoving party. *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 499; 668 NW2d 402 (2003). The trial court, having witnessed the testimony and the evidence as well as the jury's reactions, is in the best position to evaluate the credibility of the witnesses and make an informed decision. Consequently, we must accord due deference to the trial court's decision. *Phillips v Deihm*, 213 Mich App 389, 404; 541 NW2d 566 (1995). Moreover, as pertinent here, a verdict should not be

set aside merely because the method the jury used to compute damages cannot be determined. *Diamond v Witherspoon*, 265 Mich App 673, 694; 696 NW2d 770 (2005).

In this case, after ruling that defendants waived any issues regarding the "and/or" verdict forms by approving them, the trial court denied defendants' motion for JNOV, or remittitur, or new trial by reasoning as follows:

> And it was also my impression, based upon Sheldon Korn's testimony primarily, that he was emphatic that it was a family unit that operated through the family, Korn Family Trust. And I think he explained why to a certain extent and that he was avoiding a judgment creditor. But he was emphatic that he involved the whole family equally in this entire business relationship.

> And so there was some evidence at least to raise an issue. The jury has made its decision, and the Court will not set that decision aside, will not grant the motion for remittitur and will not grant the motion for a new trial.

Plaintiffs' arguments that the trial court abused its discretion lack merit. First, for the reasons already discussed, plaintiffs waived any claim of error that an assessment of liability as to each individual plaintiff was not made.

Second, for the reasons discussed in parts III (B) & V, the award of exemplary damages did not render the verdicts excessive by awarding more than defendants' economic and non-economic damages.

Third, plaintiffs' argument that the methodology of defendants' expert witness, Janice Smolinski, was suspect does not support finding the verdict excessive. Although, perhaps, defendants could have argued that Smolinski's testimony should not have been admitted under MRE 702, they did not raise such a claim in their questions presented on appeal, so it has been waived. MCR 7.212(C)(5); *Hammack v Lutheran Social Services*, 211 Mich App 1, 7; 535 NW2d 215 (1995). The only other argument that Smolinski's testimony might affect pertains to whether remittitur or new trial should have been granted. That is, the trial court in deciding the motion for remittitur or new trial should have concluded that Smolinski's testimony was not credible or not deserving of any weight. This argument is meritless because in deciding a motion for remittitur or new trial, the court must view the evidence in the light most favorable to the nonmoving party. *Wiley, supra* at 499.

Plaintiffs' remaining arguments also fails. That Ashley or Shauna, from plaintiffs' perspective of the evidence, only received limited personal financial benefits from defendant companies is immaterial to the assessment of the damages defendants sustained. The only verdict that is based on benefits plaintiffs received is that for unjust enrichment. Because plaintiffs waived an individual assessment of damages as to each plaintiff, this argument cannot be grounds for concluding the verdicts were excessive.

Plaintiffs present the same agency argument regarding KFLP that we found lacked merit in Part III (A). As discussed already, plaintiffs mischaracterize defendants' argument. Defendants did not argue that Sheldon acted as the agent for KFLP. They claimed that that the evidence supported finding that all plaintiffs knowingly acted in concert to perpetrate a common

fraudulent scheme. The evidence supports defendants' theory of the case that all Korns participated in a fraudulent scheme of siphoning assets from the defendant companies and funnel those assets through KFLP for the use and personal benefit of all Korns.

Defendants' arguments with respect to Gale fail for the same reasons discussed in part II. From the evidence presented at trial, the jury could have found that Gale was a key participant in a scheme to divert company funds to KFLP for the use and personal benefit of the Korn family. As discussed in part IV, plaintiffs waived any claim of error regarding the "and/or" verdict forms all parties agreed to submit to the jury.

Plaintiffs lament that this litigation should have been handled more amicably as a simple accounting process. Aside from there being no basis for finding that the verdicts were excessive, plaintiffs ignore the reality of this litigation. Plaintiffs initiated this litigation, and all parties chose to submit their respective claims to a jury. Plaintiffs clearly "rolled the dice" and lost. Either here or at the trial court level, they have failed to demonstrate a meritorious reason for now granting them a new trial.

According due deference to the trial court because it witnessed the testimony and was in the best position to evaluate witness credibility and thus make an informed decision whether the evidence supported the jury verdicts, *Phillips, supra* at 404, we conclude that plaintiffs have not shown that the trial court's decision denying their motion for remittitur or new trial was an abuse of discretion. *McManamon, supra* at 138; *Grace, supra* at 367.

We affirm.

/s/ E. Thomas Fitzgerald
/s/ Jane E. Markey
/s/ Michael R. Smolenski

# EXHIBIT F

# Order

July 29, 2008

136274

KORN FAMILY LIMITED PARTNERSHIP,
SHAUNA KORN and ASHLEY KORN,
        Plaintiffs-Counter-Defendants-
        Appellants,
and

GALE KORN and SHELDON KORN,
        Plaintiffs-Counter-Defendants,

v

HARBOR BUILDING COMPANY, L.L.C.,
DISCOUNT HOMES, L.L.C., NORTHERN
EXCAVATING, GRADING & SEPTIC, L.L.C.,
ABINGTON DEVELOPMENT COMPANY,
L.L.C., BRIDESTONE DEVELOPMENT
COMPANY, L.L.C., CLARITA COMMONS
DEVELOPMENT COMPANY, L.L.C., and
LAWRENCE LENCHNER,
        Defendants-Counter-Plaintiffs-
        Appellees.

Clifford W. Taylor,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman,
Justices

SC: 136274
COA: 272813
Charlevoix CC: 03-172319-CB

_____/

On order of the Court, the application for leave to appeal the January 29, 2008 judgment of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

July 29, 2008
_____

_Corbin R. Davis_
Clerk

s0721

# EXHIBIT G

STATE OF MICHIGAN

33RD JUDICIAL CIRCUIT COURT (CHARLEVOIX COUNTY)

KORN FAMILY LIMITED PARTNERSHIP,
GALE KORN, SHELDON KORN,
SHAUNA KORN and ASHLEY KORN,

        Plaintiffs,

v                              File No. 03-1723-19-CB

HARBOR BUILDING CO., LLC,
DISCOUNT HOMES, LLC, NORTHERN
GRADING, EXCAVATING & SEPTIC, LLC,
ABINGTON DEVELOPMENT CO., LLC,
CLARITA COMMONS DEVELOPMENT, LLC,
and LAWRENCE LENCHNER,

        Defendants.
_____/

VIDEO JURY TRIAL - VOLUME XIII OF XIII

BEFORE THE HONORABLE RICHARD M. PAJTAS, CIRCUIT COURT JUDGE

Charlevoix, Michigan - Friday, May 26, 2006

APPEARANCES:

For the Plaintiffs:  MR. ALLEN R. TELGENHOF  (P43114)
                    MR. MICHAEL I. CONLON  (P43954)
                    P O Box 490
                    Charlevoix, Michigan  49720
                    (231) 547-8990

For the Defendants:  MR. MARK HILAL (P57028)
                    MS. BRIDGET BROWN POWERS  (P46888)
                    618 Howard Street
                    Petoskey, Michigan  49770
                    (231) 347-8200

Transcribed by:     Theresa's Transcription Service
                    P O Box 21067
                    Lansing, MI  48909-1067
                    (517) 882-0060

# TABLE OF CONTENTS

                                                        PAGE

Closing argument by Mr. Hilal                              3

Rebuttal argument by Mr. Telgenhof                        51

Recess                                                    71

Jury instructions                                         72

Recess                                                    97

Verdict                                                   97

WITNESSES:

    None.

EXHIBITS:                                    IDENTIFIED   RECEIVED

    None.

```
 1                    Charlevoix, Michigan

 2                    Friday, May 26, 2006 - 9:42 a.m.

 3                    THE COURT:  Okay.  Are we ready for the jury?

 4                    MR. TELGENHOF:  We're ready, your Honor.

 5                    THE COURT:  Bailiff, please.

 6                    COURT BAILIFF:  All rise.

 7                    (At 9:43 a.m., jury enters courtroom)

 8                    COURT BAILIFF:  You may be seated.

 9                    THE COURT:  Good morning, ladies and gentlemen.

10         Thank you again for your patience.  I assure you we were all

11         working diligently.

12                    At this time, we are ready to consider the

13         Defendant/Counter-Plaintiff's closing statement.  Mr. Hilal.

14                    MR. HILAL:  Thank you, your Honor.

15                    Good morning, ladies and gentlemen.  I, like Mr.

16         Telgenhof, would like to thank you very much on behalf of our

17         client, Mr. Lenchner, my partner and co-counsel, Bridget

18         Brown Powers, and myself, for the attention and patience that

19         you have demonstrated throughout a very lengthy month.  The

20         disruption to your lives, we--none of us in this room take

21         lightly.  So we very much appreciate your dedication to your

22         civic duty.

23                    You have one more bigger task ahead of you than

24         listening to me, but if you would bear with me for just a few

25                    DVD 2006-39  5-26-06  9:44:42
```

3

1          THE COURT:  Let's have the jury, please.

2          (At 11:44 a.m., jury enters courtroom)

3          COURT BAILIFF:  You may be seated.

4          THE COURT:  Members of the jury, the evidence and

5     arguments in this case have been completed, and I will now

6     instruct you on the law that applies to this case.  Faithful

7     performance by you of your duties is vital to the

8     administration of justice.  The law you are to apply in this

9     case is contained in these instructions, and it is your duty

10    to follow them.  You must consider them as a whole and not

11    pick out one or some instructions and disregard others.

12    Following my instructions, you will go to the jury room and

13    deliberate and decide on your verdict.

14          It is your duty to determine the facts from the

15    evidence received in open court.  You are to apply the law to

16    the facts and in this way decide the case.  Sympathy must not

17    influence your decision nor should your decision be based or

18    influenced by prejudice regarding race, sex, religion,

19    national origin, age, handicap or any other factor irrelevant

20    to the rights of the parties.

21          The evidence you are to consider consists of

22    testimony of witnesses and exhibits offered and received.

23    The admission of evidence in court is governed by rules of

24    law.  From time to time, it has been my duty as judge to rule

25    on the admissibility of evidence, and you must not concern

1      yourselves with the reasons for these rulings, and you must

2      not consider any exhibit to which an objection was sustained

3      or any testimony or exhibit which was ordered stricken.

4              Arguments, statements, and remarks of attorneys are

5      not evidence, and you should disregard anything said by an

6      attorney which is not supported by evidence or by your own

7      general knowledge and experience.  However, an admission of a

8      fact by an attorney is binding on his or her client.

9              The defendant corporations in this case are

10     entitled to the same fair and unprejudiced treatment as an

11     individual would be under like circumstances, and it is your

12     duty to decide the case with the same impartiality you would

13     use in deciding a case between individuals.

14             I have not meant to indicate any opinion as to the

15     facts by my rulings, conduct or remarks during the trial, but

16     if you think I have, you should disregard it because you are

17     the sole judges of the facts.

18             In determining whether any fact has been proved,

19     you shall consider all of the evidence bearing on that fact,

20     without regard to which party produced the evidence.

21             It is not necessary that every fact be proven

22     directly by a witness or an exhibit.  A fact may be proven

23     indirectly by other facts or circumstances from which it

24     usually and reasonably follows according to the common

25     experience and observation of mankind.  This is called

73

1    circumstantial evidence, and you are to consider

2    circumstantial evidence along with other evidence in the

3    case.

4         You have a right to consider all of the evidence in

5    light of your own general knowledge and experience in the

6    affairs of life and to take into account whether any

7    particular evidence seems reasonable and probable.  However,

8    if you have personal knowledge of any particular fact in this

9    case, such knowledge may not be used as evidence.

10        If you decide that a witness said something earlier

11   that is not consistent with what the witness said in court,

12   you may consider the earlier statement in deciding whether to

13   believe the witness, but you may not consider it as proof of

14   the facts in this case.  However, there are exceptions, and

15   you may consider the earlier statement as proof of facts in

16   this case if:

17        A.  The statement was made by the plaintiff, the

18   defendant or an agent or employee of either party or;

19        B.  The statement was given under oath, subject to

20   the penalty of perjury at a trial, hearing or in a deposition

21   or;

22        C.  The witness testified during the trial that the

23   earlier statement was true.

24        You are the judges of the facts in this case, and

25   you must determine which witnesses to believe and what weight

74

1        should be given to their testimony.  In doing so, you may

2        consider each witness's ability and opportunity to observe,

3        his or her memory, manner while testifying, any interest,

4        bias or prejudice, and the reasonableness of the testimony

5        considered in the light of all of the evidence.

6                Although you may consider the number of witnesses

7        testifying on one side or the other when you weigh the

8        evidence to a particular fact, the number of witnesses alone

9        should not persuade you, if the testimony of the lesser

10       number of witnesses is more convincing.

11               You are instructed that an expert witness, in

12       answering a hypothetical question, assumes as true every fact

13       stated in the question.  I therefore instruct you that if you

14       find that the evidence fails to establish the truth of the

15       asserted facts in the hypothetical question, then you cannot

16       consider the answer of the expert to that hypothetical

17       question.  You must disregard that answer.

18               Certain evidence relevant to this case, namely, the

19       Defendant's computer hard drive, was not available at trial

20       because it was destroyed while in possession and control of

21       the Defendant, Lawrence Lenchner.  The rules of evidence

22       provide that you, the jury, may infer the fact that this

23       evidence is unfavorable to the Defendants and favorable to

24       the Plaintiffs.

25               I shall now explain to you the burden of proof

75

1    which the law places on the parties to establish their

2    respective claims.  When I say that a party has the burden of

3    proof, I mean the evidence must satisfy you that the

4    proposition on which that party has the burden of proof has

5    been established by evidence which outweighs the evidence

6    against it.

7         When I say that a party has the burden of proof or

8    the burden of proving a proposition by clear and convincing

9    evidence, I mean that the evidence must more than outweigh

10   the evidence against it.  It must be clear and convincing.

11   The evidence must satisfy you that the proposition has been

12   established with a high degree of probability.

13        In this case, the claim of fraud must be proven by

14   clear and convincing evidence, as I will explain in more

15   detail later in these instructions.  You must consider all

16   the evidence, regardless of which party produced it.

17        If your verdict is for one plaintiff or counter-

18   plaintiff, you shall determine its or his or her damages and

19   return a verdict in that amount.  If your verdict is for more

20   than one of the plaintiffs or counter-plaintiffs, you shall

21   determine the amount of their damages separately and return a

22   verdict in that separate amount for each plaintiff and

23   counter-plaintiff.

24        In addition to actual damages, the law permits the

25                    DVD 2006-39  5-26-06  11:53:16

76

1          jury, under certain circumstances, to award the injured party

2          exemplary damages.  If you should find, by a preponderance of

3          the evidence, that a plaintiff or counter-plaintiff is

4          entitled to a verdict of actual or compensatory damages and

5          further find that the defendants' or counter-defendants' acts

6          which caused actual damages to the plaintiff or counter-

7          plaintiff were maliciously, willfully, and wantonly done,

8          then you may add to the award of actual damages an amount you

9          agree is proper as exemplary damages.

10          An act or failure to act is maliciously done if

11

12          prompted or accompanied by ill-will, spite or grudge toward

13          the injured party.  An act or a failure to act is wantonly

14          done if done in reckless or callous disregard of or

15          indifference to the rights of one or more persons, including

16          the injured party.  An act or a failure to act is willfully

17          done if done voluntarily and intentionally and with specific

18          intent to do something the law forbids.

19          Each plaintiff and counter-plaintiff claims that a

20          defendant or counter-defendant defrauded the plaintiff or

21          counter-plaintiff.  To establish fraud, plaintiffs and

22          counter-plaintiffs have the burden of proving each of the

23          following elements by clear and convincing evidence:

24          A.  The defendant or counter-defendant made a

25          representation of a material fact.

77

1          B.   The representation was false when it was made.

2          C.   The defendant or counter-defendant knew the

3     representation was false when it was made or that it was made

4     recklessly, that is, without knowing whether it was true.

5          D.   The defendant or counter-defendant made the

6     representation with the intent that the plaintiff or counter-

7     plaintiff would rely on it.

8          E.   The plaintiff or counter-plaintiff did rely on

9     the representation, and;

10         F.   That the plaintiff or counter-plaintiff was

11    damaged as a result of its reliance.

12              Your verdict will be for a plaintiff or counter-

13    plaintiff on a claim of fraud if you decide that that

14    plaintiff or counter-plaintiff has proved each of these

15    elements by clear and convincing evidence.  Your verdict will

16    be for a defendant or counter-defendant on a claim of fraud

17    if you decide that the plaintiff or counter-plaintiff has

18    failed to prove any one of these elements by clear and

19    convincing evidence.

20              Each plaintiff and counter-plaintiff claims that a

21    defendant or counter-defendant defrauded that plaintiff or

22    counter-plaintiff by failing to disclose material facts.  To

23    establish this, each plaintiff and counter-plaintiff has the

24    burden of proving each of the following evidence (sic) by

25    clear and convincing evidence:

78

1              A.   That the defendant or counter-defendant failed

2          to disclose a material fact.

3              B.   The defendant or counter-defendant had actual

4          knowledge of the fact.

5              C.   The defendant's or counter-defendant's failure

6          to disclose the fact caused the plaintiff or counter-

7          plaintiffs to have a false impression.

8              D.   When the defendant or counter-defendant failed

9          to disclose the fact, that defendant or counter-defendant

10         knew the failure would create a false impression.

11             E.   When the defendant or counter-defendant failed

12         to disclose the fact, that defendant or counter-defendant

13         intended that the plaintiff or counter-plaintiff rely on the

14         resulting false impression.

15             F.   That the plaintiff or counter-plaintiff relied

16         on the false impression, and;

17             G.   That the plaintiff or counter-plaintiff was

18         damaged as a result of such reliance.

19             Your verdict will be for a plaintiff or counter-

20         plaintiff on a claim of fraud if you decide that the

21         plaintiff or counter-plaintiff has proved each of these

22         elements by clear and convincing evidence.  Your verdict will

23         be for a defendant or a counter-defendant on a claim of fraud

24         if you decide that the plaintiff or counter-plaintiff has

25         failed to prove any one of these elements by clear and

1        convincing evidence.

2              When I say that a plaintiff must convince you of

3        the elements of fraud by clear and convincing evidence, I

4        mean that the evidence must be clear, unequivocal, and

5        convincing.  You must not be convinced that the truth of the

6        matter is--I'm sorry.  You must be convinced that the truth

7        of the matter is highly probable as opposed to more likely

8        than not.

9              Reliance.  When I use the word relied, I mean the

10       plaintiff or counter-plaintiff would not have entered into

11       the agreement or continued the agreement if defendant or

12       counter-defendant had not made the representation or

13       promises, even if the representation or promises was not the

14       only reason for the plaintiff or counter-plaintiff's action.

15             Innocent misrepresentation.  Each plaintiff and

16       counter-plaintiff claims that a defendant or counter-

17       defendant made an innocent misrepresentation of material

18       fact.  To establish this, each plaintiff and counter-

19       plaintiff has the burden of proving by a preponderance of

20       evidence each of the following elements:

21             A.   That the defendant or counter-defendant made a

22       representation of a material fact.

23             B.   That the representation was made in connection

24       with the making of a contract between a plaintiff or counter-

25       plaintiff and a defendant or a counter-defendant.

80

1          C.   The representation was false when it was made.

2          D.   The plaintiff or counter-plaintiff would not

3     have entered into the contract if the defendant or counter-

4     defendant had not made the representation.

5          E.   The plaintiff or counter-plaintiff had a loss

6     as a result of entering into the contract, and;

7          F.   That the plaintiff or counter-plaintiff's loss

8     benefitted the defendant or counter-defendant.

9          Your verdict will be for the plaintiff or counter-

10    plaintiff on the claim of innocent misrepresentation if you

11    decide that the plaintiff or counter-plaintiff has proved

12    each of these elements.  Your verdict will be for a defendant

13    or counter-defendant on the claim of innocent

14    misrepresentation if you decide that the plaintiff or

15    counter-plaintiff has failed to prove any one of these

16    elements.

17         Promissory estoppel.  Each plaintiff and counter-

18    plaintiff claims that a defendant or a counter-defendant is

19    liable to the plaintiff or counter-plaintiff based upon--

20    based on promissory estoppel.  To establish this claim, each

21    plaintiff and counter-plaintiff has the burden of proving

22    each of the following elements:

23         A.   That the defendant or counter-defendant made a

24    promise to the plaintiff or counter-plaintiff that was clear

25    and definite.

1              B.   That the promise was made--when the promise was

2         made, the defendant or counter-defendant knew or should

3         reasonably have expected that the promise would induce the

4         plaintiff or counter-plaintiff to take or refrain from taking

5         some action.

6              C.   The plaintiff or counter-plaintiff did take or

7         refrain from taking some action in reliance on the promise.

8              D.   The plaintiff or counter-plaintiff was damaged

9         as a result of that reliance.

10             Your verdict will be for a plaintiff or counter-

11        plaintiff on a claim of promissory estoppel if you decide

12        that the plaintiff or counter-plaintiff has proved all these

13        elements.  Your verdict will be for a defendant or

14        counter-defendant on a claim of promissory estoppel if you

15        decide that the plaintiff or counter-plaintiff has not proved

16        any one of these elements.

17             A promise is words, writing or other conduct that

18        shows an intent to act or refrain from acting in a certain

19        way.  To be a promise, it must be made in such a manner that

20        a person to whom it is made is justified in believing that a

21        commitment has been made.  A statement of opinion or a

22        prediction of future events is not a promise.

23             To determine the existence and scope of a promise,

24        you may consider the words and actions of the parties to a

25        transaction as well as the nature of the relationship between

1        the parties, the custom and usage in the trade or business,

2        and any other circumstances surrounding their actions.

3               To support a promissory estoppel claim, the alleged

4        reliance on the promise must be based solely and exclusively

5        on the alleged promise.  The acts of reliance cannot be a

6        performance which is otherwise required by an existing

7        contract or by law.

8               Because the theory of promissory estoppel involves

9        the enforcement of a promise, you may also consider other

10       rules involving the enforcement of contracts.  In other

11       words, it would not be just to enforce an oral promise under

12       the theory of promissory estoppel if another rule says the

13       promise is unenforceable even if it were made.  One of these

14       other rules is what is called repudiation.  Put simply, a

15       person who promises to do something is no longer bound by his

16       or her promise if the other person says something or does

17       something which indicates that the other party is not going

18       to live up to their end of the bargain.  Unless you believe

19       that the enforcement of a defendant's promise is necessary to

20       avoid an injustice, you must find for the defendant.

21              Damages under promissory estoppel theory are

22       limited to those necessary to prevent injustice and are

23       generally limited to loss suffered in direct reliance on the

24       alleged promise.  However, damages may not be put to the

25       promisee--I'm sorry.  However, damages may not put the

1    promisee in a better position than if the promise had been
2    performed.

3          Unjust enrichment.  The counter-plaintiffs claim
4    that the counter-defendants were unjustly enriched in
5    obtaining money from the counter-plaintiffs.  To establish a
6    claim of unjust enrichment, the counter-plaintiffs must
7    prove:

8          1.  Receipt of a benefit by the counter-defendants
9    from the counter-plaintiffs, and;

10          2.  An inequity to the counter-plaintiffs resulting
11    because of the retention of the benefit by the counter-
12    defendants.

13          When unjustment--when unjust enrichment exists, the
14    law operates to imply a contract in order to prevent the
15    unjust enrichment.  However, if you find that an actual
16    express contract was entered into by the parties covering the
17    same subject matter, you may not allow the counter-plaintiffs
18    to recover under the theory of unjust enrichment.

19          Plaintiffs have the burden of proof with respect to
20    any claim of breach of contract on each of the following
21    propositions:

22          1.  The existence of a valid contract.

23          2.  The terms of the contract or at least the terms
24    violated by the defendants.

25          3.  The performance of things to be performed by

84

1        the plaintiffs, and;

2               4.  The non-performance by the defendants.

3               With respect to any claim of breach of contract,

4        your verdict will be for the plaintiffs if you find that each

5        of these elements has been proven.  If you decide in favor of

6        the plaintiffs, it will be your duty to award the plaintiffs

7        money damages, which naturally arise from the breach or those

8        that were in contemplation of the parties at the time the

9        contract was made.  Your verdict will be for the defendants

10       if you find that any of these elements have not been proven.

11              A partnership cannot be implied as a matter of law

12       from a business relation if the parties have not made or

13       intended to make a partnership contract.  An individual is

14       never to be charged as a partner unless by contract and with

15       the intent he or she has formed a relation in which the

16       elements of partnership are to be found.  That relationship,

17       at the very least, should consist of a community of interest

18       in some lawful commerce or business, for the conduct of which

19       the parties are mutual--mutually principals of and agents for

20       each other with general powers within the scope of the

21       business.  These powers, however, by agreement between the

22       parties themselves, may be restricted to the extent even of

23       making one the sole agent of the others and of the business.

24              As between the plaintiff and the defendant, the

25       question of whether there was a partnership depends on an

85

intention mutually shared to be established by facts and circumstances.  Participation in profits as between the parties does not establish a partnership, but is only some evidence of a partnership.

In this case, plaintiffs claim that defendants were doing business with plaintiffs as partners.  To establish the existence of that partnership, plaintiffs have the burden to prove:

1.  That plaintiffs received a share of the profits of the business enterprise in question, and;

2.  That plaintiffs did not receive that share of profits as payment of:

A.  A debt by installment or otherwise.

B.  Wages of an employee.

C.  Interest on a loan, though the payment varied with the profits of the business, and;

D.  Consideration of the sale of goodwill of a business or other property by installments or otherwise.

Every partner has a duty to give any other partner, on demand, a true and full account of all information relating to any matter affecting the partnership.

The rights and duties of the partners in relation to the partnership shall be determined subject to any agreement between them by the following rules:

Each partner shall be repaid his or her

86

1        contributions, whether by way of capital or advances to the

2        partnership property, and share equally in the profits and

3        surplus remaining after all liabilities, including those of

4        the partners, are satisfied.

5                Each partner shall contribute toward the losses,

6        whether capital or otherwise, sustained by the partnership

7        according to his or her share of the profits.

8                The plaintiffs and counter-plaintiffs have alleged

9        that each has breached their fiduciary relationship with the

10       other.  Plaintiffs and counter-plaintiffs have the burden to

11       prove:

12               1.  The existence of a fiduciary relationship.

13               2.  Defendant or counter-defendant's breach.

14               3.  Plaintiff or counter-plaintiffs were damaged as

15       a result of defendant or counter-defendant's breach.

16               Your verdict will be for the plaintiffs or counter-

17       plaintiffs if you find that each of these elements has been

18       proved.  If you find for the plaintiffs, you must determine

19       the amount of actual damages resulting from the defendants or

20       counter-defendants, breach of their fiduciary duties that

21       will place plaintiffs or counter-plaintiffs in the economic

22       position that they would have enjoyed but for the breach.

23       Your verdict will be for the defendants or counter-defendants

24       if you find that the plaintiffs or counter-plaintiffs have

25       failed to prove any one of these elements.

87

When I use the word fiduciary duty, I mean any of the following:

1.    Defendants and counter-defendants had an obligation or duty to act with the utmost good faith and integrity in their dealings with the plaintiffs or counter-plaintiffs in their partnership relationship.

2.    Defendants and counter-defendants had an obligation or duty to disclose all known information that is significant and material to the affairs or property of the partnership relationship, or;

3.    Defendants and counter-defendants had an obligation or duty to account to the partnership for any benefit and hold as trustee for it any profits derived by them without the consent of the plaintiffs and counter-plaintiffs or the other partners from any transaction connected with the conduct of the partnership or from any use by themselves of partnership property.

When I use the words breach, I mean any of the following:

1.    The defendants failed to fulfill their obligations or duties to act with the utmost good faith and integrity in their dealings with one another in partnership affairs.

2.    The defendants failed to fulfill their obligations or duty to disclose all known information that is

1    significant and material to the affairs or property of the

2    partnership, or;

3            3.  The defendants failed to fulfill their

4    obligation or duty to account to the partnership for any

5    benefit and hold as trustee for it any profits derived by

6    them without the consent of the plaintiffs or other partners

7    from any transaction connected with the conduct or

8    partnership--conduct of the partnership or from any use by

9    themselves of partnership property.

10           MR. HILAL:  Your Honor, may we approach on that

11   instruction?

12           THE COURT:  Wait till I finish, please.  There's a

13   couple of omissions?

14           Plaintiffs have alleged that the defendants engaged

15   in conversion of plaintiff's property.  Plaintiffs have the

16   burden to prove that:

17           1.  The plaintiffs had an ownership interest in the

18   property, had title to the property or had a right to

19   immediate possession of the property, and;

20           2.  Defendants committed a distinct act or dominion

21   wrongfully exerted over plaintiff's property.

22           Your verdict will be for the plaintiffs if you find

23   that each of these elements have been proved.  Your verdict

24   is for the plaintiffs--I'm sorry.  If your verdict is for the

25   plaintiffs, you must determine the amount of actual damages

89

resulting from the conversion.  Your verdict will be for the defendants if you find that the plaintiffs have failed to prove any one of these elements.

Plaintiffs have alleged that the defendants engaged in a statutory conversion of plaintiff's property. Plaintiffs have the burden to prove that:

1.  The defendant's actions established either the buying, receiving or aiding in the concealment of converted property, and;

2.  The defendant had actual knowledge of the fact that he is buying, receiving or aiding in the concealment of any stolen, embezzled or converted property.

Your verdict will be for the plaintiffs if you find that each of these elements have been proved.  Your verdict-- if your verdict is for the plaintiffs, you must determine the amount of actual damages resulting from the conversion.  If your verdict is for the plaintiffs, you may award the plaintiffs three times the amount of actual damages sustained, plus costs and reasonable attorney fees, pursuant to statute.  Your verdict will be for the defendants if you find that the plaintiffs have failed to establish--or failed to prove any one of these elements.

Plaintiffs have alleged that they are owed money for advances made to the defendants.  Plaintiffs have the burden to prove that:

90

1            1.  Plaintiffs loaned or otherwise advanced monies

2       to the defendants.

3            2.  Plaintiffs failed to pay back--defendants

4       failed to pay back plaintiffs for the monies that plaintiffs

5       loaned or otherwise advanced to the defendants, and;

6            3.  Plaintiffs were damaged as a result of the

7       defendant's failure to pay back the monies to the plaintiffs.

8            Your verdict will be for the plaintiffs if you find

9       that each of these elements have been proved.  If your

10      verdict is for the plaintiffs, you must determine the amount

11      of monies that plaintiffs failed to pay--that the defendants

12      failed to pay back to the plaintiffs and award those monies

13      to the plaintiffs.  Your verdict will be for the defendants

14      if you find that the plaintiffs have failed to prove any one

15      of these elements.

16           All right, now, counsel, approach, please.

17           (At 12:17 p.m., bench conference)

18           (At 12:21 p.m., bench conference concluded)

19           THE COURT:  When you go to the jury room, ladies

20      and gentlemen, your deliberations should be conducted in a

21      businesslike manner, and you should first select a

22      foreperson.  She or he should see to it that your discussion

23      goes forward in an orderly fashion and that each juror has an

24      opportunity to discuss the issues.  When at least five of you

25      agree upon a verdict, it will be received as your verdict.

1          In your deliberations, you should weigh the

2     evidence with an open mind and consideration for each other's

3     opinions.  If differences of opinion arise, you should

4     discuss them in a spirit of fairness and frankness.  You

5     should express not only your opinion, but also the facts and

6     reasons upon which you base it.

7          In the course of your deliberations, do not

8     hesitate to reexamine your own views and change your opinion

9     if you are convinced that it is wrong.  However, none of you

10     should surrender your honest conviction as to the weight and

11     effect of the evidence or lack of evidence solely because of

12     the opinion of your fellow jurors or for the mere purpose of

13     returning a verdict.

14          If you wish to communicate with me or examine the

15     exhibits while you are deliberating, please have your

16     foreperson write a note and give it to the bailiff.

17          During your deliberations and before you reach a

18     verdict, you must not disclose anything about your

19     discussions to others outside the jury room, not even how

20     your voting stands.  Therefore, until you reach a verdict, do

21     not disclose that information, even in the courtroom.

22          During your deliberations, you may not communicate

23     with persons outside the jury room, other than the judge, or

24     seek information by any means, including cellular telephones

25     or other electronic devices.  If you discover a juror has

1    violated my instructions, you should report it to me.

2         There is an exception, though.  Is your daughter

3    here?

4         UNIDENTIFIED JUROR:  Not yet.

5         THE COURT:  All right.

6         UNIDENTIFIED JUROR:  I left the number here, and I

7    told her to call my cell, which I have in there on silence.

8         THE COURT:  When she gets here, we'll just stop

9    deliberations so that you can do what you need to do and

10   then, when you come back, the bailiff will tell you to resume

11   your deliberations.

12        UNIDENTIFIED JUROR:  Thank you.

13        THE COURT:  And I guess maybe I should clarify that

14   for the record.  Your daughter's leaving for a track meet,

15   and you want to give her a hug goodbye, right?

16        UNIDENTIFIED JUROR:  She's made sixth in our

17   district in the hurdles.

18        THE COURT:  Yeah, I'm so sorry.

19        UNIDENTIFIED JUROR:  Pretty good.

20        THE COURT:  All right, thank you.

21        One of the things the lawyers didn't talk about,

22   and so I need to talk about at least a little bit, is the

23   jury verdict forms.  And I'm going to give you two files; one

24   the defendant's written on it and one plaintiff's.

25        And keep in mind, whenever I use defendants or

93

1      plaintiffs, we're usually talking about counter-defendants

2      and counter-plaintiffs.  I think we've been over that enough.

3           There are two sets of jury verdict forms for each--

4      for the defendants and two sets for the plaintiffs, and I've

5      written defendants on their two sets.  One is for your--

6      whatever you want to do with it, and the other one is for the

7      foreperson to bring out and read to us when you've reached a

8      verdict.

9           And these verdict forms cover the different

10     theories or claims of the respective parties.  For example,

11     the first page on the defendant's verdict form is breach of

12     fiduciary duty.  The second one is fraud or

13     misrepresentation, so on and so forth.  And, for example,

14     they tell you what to do:  We, the jury, make the following

15     answers to the questions submitted by the Court:

16          Question No. 1:  Did the plaintiff/counter-

17     defendant, Sheldon Korn and/or Gale Korn, owe a fiduciary

18     duty to the defendant/counter-plaintiffs?

19          Answer:  Yes or no, and you mark the appropriate

20     box.

21          If your answer is no, do not proceed to the next

22     question on this page.  And if it is yes, you go to the next

23     question, and so on and so forth.

24          And then there's another file marked plaintiffs

25     that have the same forms, only on their jury verdict forms,

1          they--they followed a similar format.  The first page doesn't

2          have a name on it, but it does ask:  Were plaintiffs, Gale

3          and Sheldon Korn, either together or any one of them

4          individually, 50 percent partners in the defendant's

5          businesses with the defendant Larry Lenchner?

6                    Answer:  Yes or no.

7                    If your answer is no, do not answer the next

8          question.  Proceed to Question 3.

9                    Well, actually, there's no Question 3, but you go

10         to Page 2, and it's entitled "Breach of Fiduciary Duty."

11         Page 3 is common law conversion, so on and so forth, so it

12         covers each one of their claims.

13                   So you need to go through each page to address each

14         of their claims and give us your verdict on each of their

15         individual claims.  And there's instructions that tell you

16         exactly what to do.  And, again, when you've reached your

17         verdict and the foreperson--I will ask the foreperson to read

18         these forms.  It's going to take a little while to read them

19         all, but I will ask you to read these forms so that we can

20         know what your verdict is as to both sides' various claims.

21                   I've also made a copy of the exhibit list that I've

22         kept, and I've tried to name each exhibit, to give it a title

23         as best I could from the evidence, to kind of describe what

24         it is so that, if you want to look at any one or all of 200,

25         approximately, exhibits--more than that--all you need to do

1         is ask for any one of them or all of them.  And that exhibit

2         list is going to be a part of a file entitled "Instructions

3         and Exhibit List."  And I've made another copy of the written

4         instructions that I have just given to you, so that, if you

5         want, you can refer to any of these instructions to review

6         them during your deliberations.

7                 I think I've covered everything, except for

8         swearing in the bailiff.

9                 Jerry, do you solemnly swear or affirm that you

10        will keep the persons sworn as jurors in this trial from

11        separating from each other; that you will not allow any

12        communication to be made to them, orally or otherwise; that

13        you will not communicate with them, orally or otherwise,

14        except upon the order of this Court, or ask them if they have

15        agreed upon a verdict until they shall be discharged; and

16        that you will not, before they render their verdict,

17        communicate to any person the state of their deliberations or

18        the verdict they have agreed upon, so help you God?

19                 COURT BAILIFF:  I will.

20                 THE COURT:  Thank you.  Okay, thank you very much,

21        ladies and gentlemen.  When you--

22                 COURT BAILIFF:  All rise.

23                 THE COURT:  When you reach the jury room, you may

24        begin your deliberations.

25                 (At 12:29 p.m., jury leaves courtroom)

```
 1                    THE COURT:  It's 12:30.  Raise your hand if there
 2          is anyone who is ready to start a long holiday weekend.  All
 3          right, anything further for the record?
 4                    MR. TELGENHOF:  Nothing.
 5                    MR. HILAL:  No, your Honor.
 6                    THE COURT:  Okay.
 7                    (At 12:30 p.m., court recessed)
 8                    (At 4:15 p.m., court reconvened)
 9                    COURT BAILIFF:  They'll be right here.  The parties
10          went to the restroom.
11                    THE COURT:  Okay.
12                    COURT BAILIFF:  You may be seated for a moment.
13                    THE COURT:  Okay.
14                    COURT BAILIFF:  All rise.
15                    (At 4:16 p.m., jury enters courtroom)
16                    COURT BAILIFF:  You may be seated.
17                    THE COURT:  Who will speak for the jury?
18                    JURY FOREPERSON:  I will.
19                    THE COURT:  Mr. Ekstrom, I think the best way to do
20          it would be to read from starting with the plaintiff's jury
21          verdict form.  Would you read it for us, please, and just
22          follow all the way through?
23                    JURY FOREPERSON:  Jury verdict form.  Question No.
24          1:  Were plaintiffs, Gale and Sheldon Korn, either together
25          or any one of them individually, 50 percent partners in the
```

97

defendant business with the defendant Larry Lenchner?

Answer:  No.

Breach of fiduciary duty.  Question No. 1:  Did defendant Larry Lenchner owe a fiduciary duty to plaintiffs Gale and Sheldon Korn, either together or to any one of them individually?

Answer:  No.

Common law conversion.  Question No. 1:  Did defendant Larry Lenchner convert plaintiffs Gale and Sheldon Korn's interest in the defendant businesses?

Answer:  No.

Statutory conversion.  Question No. 1:  Did defendant Larry Lenchner commit statutory conversion of plaintiffs Gale and Sheldon Korn's interest in the defendant's business?

Answer:  No.

Question No. 3:  Are plaintiffs Gale and Sheldon Korn entitled to recover three times the amount of actual damages arising out of defendant Larry Lenchner's statutory conversion?

Answer:  No.

Breach of contract.  Question No. 1:  Was there a contract or agreement, whether express or implied, between plaintiffs Gale and/or Sheldon Korn, either together or any one of them individually, and defendant Larry Lenchner to

98

1   participate in the ownership of the defendant businesses?

2           Answer:  No.

3           Fraud and misrepresentation.  Question No. 1:  Did

4   defendant Larry Lenchner commit fraud and misrepresentation

5   regarding plaintiffs Gale and/or Sheldon Korn's business

6   relationship and expectancy with the defendant's companies?

7           Answer:  No.

8           Silent fraud.  Question No. 1:  Did defendant Larry

9   Lenchner commit silent fraud regarding plaintiffs Gale and/or

10  Sheldon Korn's business relationship and expectancy with the

11  defendant companies?

12          Answer:  No.

13          Promissory estoppel.  Question No. 1:  Did

14  defendant Larry Lenchner make promises to plaintiffs Gale and

15  Sheldon Korn, either together or any one of them

16  individually, to induce plaintiffs to continue participating

17  in the defendant's businesses?

18          Answer:  No.

19          Monies loaned.  Question No. 1:  Are plaintiffs

20  Gale and/or Sheldon Korn and/or the Korn Family Limited

21  Partnership entitled to damages in the amount of monies

22  loaned to defendant businesses that remain unpaid?

23          Answer:  No.

24          Exemplary damages.  Question No. 1:  Are plaintiffs

25  Gale and Sheldon Korn, either together or any one of them

```
1          individually, entitled to exemplary damages?

2                    Answer:  No.

3                    THE COURT:  Thank you.  The defendant's jury

4      verdict form?

5                    JURY FOREPERSON:  Form of verdict, breach of

6      fiduciary duty.  We, the jury, make the following answers to

7      the questions submitted by the Court.

8                    Question No. 1:  Did plaintiffs/counter-defendants

9      Sheldon Korn and/or Gale Korn owe a fiduciary duty to the

10     defendants/counter-plaintiffs?

11                   Answer:  Yes.

12                   Question No. 2:  Did plaintiffs/counter-defendants

13     Sheldon Korn and/or Gale Korn breach his/her/their fiduciary

14     duty to defendants/counter-plaintiffs?

15                   Answer:  Yes.

16                   Question 3:  What is the defendants/counter-

17     plaintiffs' total damages?

18                   Answer:  Two hundred and fifty thousand dollars.

19                   Form of verdict, fraud and misrepresentation.  We,

20     the jury, make the following answers to the questions

21     submitted by the Court:

22                   Question No. 1:  Did plaintiffs/counter-defendants,

23     the Korn Family Limited Partnership, and/or Sheldon Korn,

24     and/or Gale Korn, and/or Shauna Korn, and/or Ashley Korn

25     commit an act or acts of fraud and misrepresentation against
```

1      defendants/counter-plaintiffs?

2          Answer:  Yes.

3          Question No. 2:  What is defendants/counter-

4      plaintiff's total amount of damages arising out of

5      plaintiff's fraud and misrepresentation?

6          Answer:  Two hundred and fifty thousand dollars.

7          Form of verdict, innocent misrepresentation.  We,

8      the jury, make the following answers to the questions

9      submitted by the Court:

10          Question No. 1:  Did plaintiffs/counter-defendants,

11      the Korn Family Limited Partnership, and/or Sheldon Korn,

12      and/or Gale Korn, and/or Shauna Korn, and/or Ashley Korn

13      commit innocent misrepresentation against defendants/counter-

14      plaintiffs?

15          Answer:  No.

16          Question 2:  What is defendants/counter-plaintiffs'

17      total amount of damages arising out of plaintiff's

18      misrepresentation?

19          Answer:  Zero.

20          Form of verdict, silent fraud.  We, the jury, make

21      the following answers to the questions submitted by the

22      Court:

23          Question No. 1:  Did plaintiffs/counter-defendants,

24      the Korn Family Limited Partnership, and/or Sheldon Korn,

25      and/or Gale Korn, and/or Shauna Korn, and/or Ashley Korn

1    commit silent fraud against defendants/counter-plaintiffs?

2    Answer:  Yes.

3    Question No. 2:  What is defendants/counter-

4    plaintiff's total amount of damages arising out of

5    plaintiff's silent fraud?

6    One million seventy thousand dollars.

7    Form of verdict, promissory estoppel.  We, the

8    jury, make the following answers to the questions submitted

9    by the Court:

10   Question No. 1:  Did plaintiffs/counter-defendants,

11   the Korn Family Limited Partnership, and/or Sheldon Korn,

12   and/or Gale Korn, and/or Shauna Korn, and/or Ashley Korn,

13   either together or any one of them individually, make

14   promises to defendant/counter-plaintiff Lawrence C. Lenchner

15   to induce defendant/counter-plaintiff Lawrence C. Lenchner to

16   continue

17

18   the business relationship?

19   Answer:  Yes.

20   Question No. 2:  What is defendant/counter-

21   plaintiff Lawrence C. Lenchner's total amount of damages

22   arising out of plaintiff's promises?

23   Answer:  Zero.

24   Form of verdict, unjust enrichment.  We, the jury,

25   DVD 2006-39  5-26-06  4:25:34

1    make the following answers to the questions submitted by the

2    Court.

3        Question No. 1:  Were plaintiffs/counter-

4    defendants, the Korn Family Limited Partnership, and/or

5    Sheldon Korn, and/or Gale Korn, and/or Shauna Korn, and/or

6    Ashley Korn, either together or any one of them individually,

7    unjustly enriched in obtaining money from the

8    defendants/counter-plaintiffs?

9        Answer:  Yes.

10        Question No. 2:  What is the defendants/counter-

11    plaintiffs' total amount of damages arising out of

12    plaintiff's unjust enrichment?

13        Answer:  A hundred and seventy-five thousand

14    dollars.

15        Form of verdict, exemplary damages.  We, the jury,

16    make the following answers to the questions submitted by the

17    Court:

18        Question No. 1:  Are defendants/counter-plaintiffs,

19    either together or individually, entitled to exemplary

20    damages?

21        Answer:  Yes.

22        Questions No. 2:  What is defendants/counter-

23    plaintiffs' total amount of exemplary damages?

24        Answer:  Two hundred and fifty-thousand dollars.

25        THE COURT:  Thank you.  Bailiff, would you get the

1                jury verdict forms for me, please?

2                        Mr. Foreman, did the jury intend to accumulate all

3          of these figures into a lump sum?

4                        JURY FOREPERSON:  We did not figure that, your

5          Honor.

6                        THE COURT:  Did you--was that the intent?

7                        JURY FOREPERSON:  Yes.

8                        THE COURT:  To add all of these separate figures up

9          for a total verdict?

10                       JURY FOREPERSON:  Yes.

11                       THE COURT:  Okay.  Thank you, sir.

12                       Does counsel wish to have the jury polled?

13                       MR. TELGENHOF:  No, thank you, your Honor.

14                       THE COURT:  Pardon?

15                       MR. TELGENHOF:  No, thank you.

16                       THE COURT:  All right, the Court will enter a

17         judgment based on the jury's verdict.  Counsel for the

18         defendant/counter-plaintiff will prepare that proposed

19         judgment and the statutory costs and so forth.

20                       MR. HILAL:  Thank you, your Honor.

21                       THE COURT:  And submit it under the court rules.

22                       Ladies and gentlemen of the jury, I want to thank

23         you very much for your dedicated service for this very

24         lengthy trial.  You were incredibly attentive throughout this

25         trial on these very long days, and we appreciate your

1    service.  I know it's late, and I know you're tired and ready

2    to go home, but if you'll return to the jury room for just a

3    few moments, I'll be in to talk to you briefly.

4               Once again, thank you very much.  We are recessed.

5               COURT BAILIFF:  All rise.

6               (At 4:29 p.m., jury leaves courtroom)

7               THE COURT:  You can be seated.  I'm just going to

8    total this.

9               Anybody total it?

10              MR. HILAL:  Two million five thousand dollars,

11   your Honor, is what I got.

12              MR. TELGENHOF:  I came up just under two.

13              THE COURT:  I got one million, nine nine five.

14              MR. HILAL:  I'm sorry, your Honor?

15              MR. TELGENHOF:  Yes.

16              THE COURT:  One million, nine hundred and ninety-

17   five thousand.

18              MR. TELGENHOF:  That's what I got.

19              THE COURT:  Is that what you got?

20              MR. TELGENHOF:  Just in my head, your Honor.

21              THE COURT:  Okay.

22              MR. HILAL:  I'll do it again.

23              THE COURT:  All right.  Thank you very much, ladies

24   and gentlemen.  We are recessed.

25              (At 4:31 p.m., proceedings concluded)

<u>CERTIFICATE OF REPORTER</u>

```
(   STATE OF MICHIGAN  )
(        SS           )
( COUNTY OF CHARLEVOIX )
```

       I hereby certify that this transcript represents the complete, true and correct rendition of the videotape of the proceedings as recorded.

       I further state that I assume no responsibility for any events that occurred during the above proceedings or any inaudible responses by any party or parties that are not discernible on the video of the proceedings.

Dated:   December 7, 2006

_____
Charna L. Welch, CER-5973

# EXHIBIT H

T/5

## JURY VERDICT FORM

**QUESTION NO. 1:**

Were Plaintiffs Gale and Sheldon Korn (either together or any one of them individually) 50% partners in the Defendant businesses with Defendant Larry Lenchner?

**ANSWER:**

Yes _____          No ___X___

If your answer is "no", do not answer the next question, proceed to Question No. 3.

**QUESTION NO. 2:**

What is the total amount of Plaintiffs Gale and/or Sheldon Korn's damages for their 50% interest in the businesses against the Defendants?

**ANSWER:** $ _____

# BREACH OF FIDUCIARY DUTY

**QUESTION NO. 1:**

Did Defendant Larry Lenchner owe a fiduciary duty to Plaintiffs Gale and Sheldon Korn (either together or to any one of them individually)?

ANSWER:

Yes _____     No ___X___

If your answer is "no", do not answer the next question.

**QUESTION NO. 2:**

Did Defendant Larry Lenchner breach his fiduciary duty to Plaintiffs Gale and/or Sheldon Korn?

ANSWER:

Yes _____     No _____

If your answer is "no", do not answer the next question.

**QUESTION NO. 3:**

What is Plaintiffs Gale and/or Sheldon Korn's total damages arising out of Defendant Larry Lenchner's breach of fiduciary duty?

ANSWER: $ _____

2

## COMMON LAW CONVERSION

QUESTION NO. 1:

Did Defendant Larry Lenchner convert Plaintiffs Gale and Sheldon Korn's interest in the Defendant businesses?

ANSWER:

Yes _____    No \_\_\_X\_\_\_\_

If your answer is "no", do not answer the next question.

QUESTION NO. 2:

What is the total amount of Plaintiffs Gale and/or Sheldon Korn's damages arising out of Defendant Larry Lenchner's conversion?

ANSWER: $ _____

## STATUTORY CONVERSION

**QUESTION NO. 1:**

Did Defendant Larry Lenchner commit statutory conversion of Plaintiffs Gale and Sheldon Korn's interest in the Defendant businesses?

**ANSWER:**

Yes _____    No ___X___

If your answer is "no", do not answer the next question.

**QUESTION NO. 2:**

What is the total amount of Plaintiffs Gale and Sheldon Korn's damages arising out of Defendant Larry Lenchner's statutory conversion?

ANSWER: $ _____

**QUESTION NO. 3:**

Are Plaintiffs Gale and Sheldon Korn entitled to recover 3 times the amount of actual damages arising out of Defendant Larry Lenchner's statutory conversion?

**ANSWER:**

Yes _____    No ___X___

If your answer is "no", do not answer the next question.

**QUESTION NO. 4:**

What is the total amount of 3 times the amount of actual damages that Plaintiffs Gale and/or Sheldon Korn's have sustained as a result of Defendant Larry Lenchner's statutory conversion?

ANSWER: $ _____

## BREACH OF CONTRACT

**QUESTION NO. 1:**

Was there a contract or agreement, whether express or implied, between Plaintiffs Gale and/or Sheldon Korn (either together or any one of them individually) and Defendant Larry Lenchner to participate in the ownership of the Defendant businesses?

**ANSWER:**

Yes _____     No ___X___

If your answer is "no", do not answer the next question. If your answer is "yes", make the following determination.

**QUESTION NO. 2:**

Did the Defendant Larry Lenchner breach the contract or the agreement?

**ANSWER:**

Yes _____     No _____

If your answer is "no", do not answer the next question. If your answer is "yes", answer the following question.

**QUESTION NO. 3:**

What is Plaintiffs Gale and/or Sheldon Korn's total damages arising out of Defendant Larry Lenchner's breach of the contract or the agreement?

ANSWER: $ _____

## FRAUD AND MISREPRESENTATION

**QUESTION NO. 1:**

Did Defendant Larry Lenchner commit fraud and misrepresentation regarding Plaintiffs Gale and/or Sheldon Korn's business relationship and expectancy with the Defendant companies?

**ANSWER:**

Yes _____     No __X____

If your answer is "no", do not answer the next question.

**QUESTION NO. 26:**

What is the total amount of Plaintiffs Gale and/or Sheldon Korn's damages arising out of Defendant Larry Lenchner's fraud and misrepresentation?

**ANSWER:** $ _____

## SILENT FRAUD

**QUESTION NO. 1:**

Did Defendant Larry Lenchner commit silent fraud regarding Plaintiffs Gale and/or Sheldon Korn's business relationship and expectancy with the Defendant companies?

**ANSWER:**

Yes _____        No ___X___

If your answer is "no", do not answer the next question.

**QUESTION NO. 2:**

What is the total amount of Plaintiffs Gale and/or Sheldon Korn's damages arising out of Defendant Larry Lenchner's silent fraud?

**ANSWER:** $ _____

# PROMISSORY ESTOPPEL

**QUESTION NO. 1:**

Did Defendant Larry Lenchner make promises to Plaintiffs Gale and Sheldon Korn (either together or any one of them individually) to induce Plaintiffs to continue participating in the Defendant businesses?

**ANSWER:**

Yes _____     No ___X___

If your answer is "no", do not answer the next question.

**QUESTION NO. 2:**

What is the total amount of Plaintiffs Gale and/or Sheldon Korn's damages arising out of Defendant Larry Lenchner's promises which induced Plaintiffs to continue participating in the Defendant businesses?

ANSWER: $ _____

# MONIES LOANED

QUESTION NO. 1:

Are Plaintiffs Gale and/or Sheldon Korn and/or the Korn Family Limited Partnership entitled to damages in the amount of the monies loaned to Defendant Businesses that remain unpaid?

ANSWER:

Yes _____     No __X__

If your answer is "no", do not answer the next question.

QUESTION NO. 2:

What is the total amount of the monies loaned by Plaintiffs Gale and Sheldon Korn to Defendant Businesses that remain unpaid?

ANSWER: $ _____

## EXEMPLARY DAMAGES

QUESTION NO. 1:

Are Plaintiffs Gale and Sheldon Korn (either together or any one of them individually) entitled to exemplary damages?

If your answer is "no", do not answer the next question.

ANSWER:

Yes _____     No ___X___

QUESTION NO. 2:

What is the total amount of Plaintiffs Gale and/or Sheldon Korn's exemplary damages?

ANSWER: $ _____

Δ's

# FORM OF VERDICT
## BREACH OF FIDUCIARY DUTY

We, the jury, make the following answers to the questions submitted by the Court:

**QUESTION NO. 1:** Did Plaintiffs/Counter-Defendants Sheldon Korn and/or Gale Korn owe a fiduciary duty to Defendants/Counter-Plaintiffs?

ANSWER:

YES ____X____          NO_____

If your answer is "no," do not proceed to the next question on this page.

**QUESTION NO. 2:** Did Plaintiffs/Counter Defendants Sheldon Korn and/or Gale Korn breach his/her/their fiduciary duty to Defendants/Counter-Plaintiffs?

ANSWER:

YES ____X____          NO_____

If your answer is "no," do not proceed to the next question on this page.

**QUESTION NO. 3:** What is Defendants/Counter-Plaintiffs' total damages ?

ANSWER:

AMOUNT    $ __250,000__

# FORM OF VERDICT
## FRAUD AND MISREPRESENTATION

We, the jury, make the following answers to the questions submitted by the Court:

**QUESTION NO. 1:** Did Plaintiffs/Counter-Defendants, The Korn Family Limited Partnership and/or Sheldon Korn and/or Gale Korn and/or Shauna Korn and/or Ashley Korn, commit an act or acts of fraud and misrepresentation against Defendants/Counter-Plaintiffs?

ANSWER:

YES___ X ___          NO_____

If your answer is "no," do not proceed to the next question on this page.

**QUESTION NO. 2:** What is Defendants/Counter-Plaintiffs' total amount of damages arising out of Plaintiffs' fraud and misrepresentation?

ANSWER:

AMOUNT  $ _250,000_

# FORM OF VERDICT
## INNOCENT MISREPRESENTATION

We, the jury, make the following answers to the questions submitted by the Court:

**QUESTION NO. 1:** Did Plaintiffs/Counter-Defendants, The Korn Family Limited Partnership and/or Sheldon Korn and/or Gale Korn and/or Shauna Korn and/or Ashley Korn, commit innocent misrepresentation against Defendants/Counter-Plaintiffs?

ANSWER:

YES_____          NO_____X_____

If your answer is "no," do not proceed to the next question on this page.


**QUESTION NO. 2:** What is Defendants/Counter-Plaintiffs' total amount of damages arising out of Plaintiffs' misrepresentation?

ANSWER:

AMOUNT    $_____

# FORM OF VERDICT
## SILENT FRAUD

We, the jury, make the following answers to the questions submitted by the Court:

**QUESTION NO. 1:** Did Plaintiffs/Counter-Defendants, The Korn Family Limited Partnership and/or Sheldon Korn and/or Gale Korn and/or Shauna Korn and/or Ashley Korn, commit silent fraud against Defendants/Counter-Plaintiffs?

ANSWER:

YES____ X _____          NO_____

If your answer is "no," do not proceed to the next question on this page.

**QUESTION NO. 2:** What is Defendants/Counter-Plaintiffs' total amount of damages arising out of Plaintiffs' silent fraud?

ANSWER:

AMOUNT    $ 1, 0 7 0, 0 0 0 ____

# FORM OF VERDICT
## PROMISSORY ESTOPPEL

We, the jury, make the following answers to the questions submitted by the Court:

**QUESTION NO. 1:**  Did Plaintiffs/Counter-Defendants, The Korn Family Limited Partnership and/or Sheldon Korn and/or Gale Korn and/or Shauna Korn and/or Ashley Korn, either together or any one of them individually, make promises to Defendant/Counter-Plaintiff, Lawrence C. Lenchner to induce Defendant/Counter-Plaintiff Lawrence C. Lenchner to continue the business relationship?

**ANSWER:**

> YES_____ X _____          NO_____

If your answer is "no," do not proceed to the next question on this page.


**QUESTION NO. 2:**  What is Defendant/Counter-Plaintiff Lawrence C. Lenchner's total amount of damages arising out of Plaintiffs' promises?

**ANSWER:**

> AMOUNT     $_____ 0 _____

# FORM OF VERDICT
## UNJUST ENRICHMENT

We, the jury, make the following answers to the questions submitted by the Court:

**QUESTION NO. 1:** Were Plaintiffs/Counter-Defendants, The Korn Family Limited Partnership and/or Sheldon Korn and/or Gale Korn and/or Shauna Korn and/or Ashley Korn, either together or any one of them individually, unjustly enriched in obtaining money from Defendants/Counter-Plaintiffs?

**ANSWER:**

YES ___ X ___              NO _____

If your answer is "no," do not proceed to the next question on this page.

**QUESTION NO. 2:** What is Defendants/Counter-Plaintiffs' total amount of damages arising out of Plaintiffs' unjust enrichment?

**ANSWER:**

AMOUNT $ 175,000

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION - DETROIT**

**IN THE MATTER OF:**

Sheldon M. Korn,

                    Debtor.

Bankruptcy Case No. 14-41173
Chapter 7
Hon. Thomas J. Tucker

Adversary Proceeding No. 14-04408
Hon. Thomas J. Tucker

Lawrence Lenchner; Harbor Building
Company, LLC; Northern Grading, Excavating
& Septic, LLC; Abington Development, Inc.;
Bridgestone Development, LLC; and Clarita
Commons Development, LLC

                    Plaintiffs,

v.

Sheldon M. Korn

                    Defendant.

---

## CERTIFICATE OF SERVICE

Elliot G. Crowder certifies that on October 1, 2014 copies of the <u>Motion for Partial Summary Judgment</u>, <u>proposed Order</u>, <u>Notice</u>, <u>Brief in Support</u>, <u>Exhibits</u>, and this <u>Certificate of Service</u> were served upon the following parties via the Court's CM/ECF (PACER) system, and/or by United States Postal Service First Class Mail.

| Debra Beth Pevos<br>debra@jacobweingarten.com | |
|---|---|

Respectfully submitted,
**STEVENSON & BULLOCK, P.L.C.**

By: /s/ Elliot G. Crowder
Elliot G. Crowder (P76137)
Counsel for Plaintiffs
26100 American Drive, Suite 500
Southfield, MI 48034
Phone: (248) 354-7906
Facsimile: (248) 354-7907
Email: ecrowder@sbplclaw.com

Dated: October 1, 2014